# EXHIBIT 3

**PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD**

|  |  |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and <br> NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION:BERGEN COUNTY <br> Docket No. BER-C-000117-26 <br><br> Civil Action |

**BRIEF ON BEHALF OF PLAINTIFF CAPRICOR THERAPEUTICS IN SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION**

Andrew Muscato (NJ Bar ID 18661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
(A Delaware Limited Liability Partnership)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Quyen L. Ta*
Emily Haffner*
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

William K. Wray Jr.*
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
500 Boylston Ave.
Boston, MA 02116
Telephone: (617) 573-4889
Facsimile: (650) 470-4570
*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

*Pro hac vice motion to be submitted

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND AND STATEMENT OF FACTS ............................................................ 4

    I.    BACKGROUND ......................................................................................................... 4

    II.    STATEMENT OF FACTS ........................................................................................ 5

        A. The Parties ........................................................................................................ 5

        B. Duchenne Muscular Dystrophy and the Deramiocel treatment. ...................... 6

        C. The FDA Approval Process. ............................................................................. 8

        D. The Distribution Agreement is a fatally flawed contract that requires Capricor and the Distributor to sell Deramiocel at a loss. ............................................................ 9

        E. Nippon Shinyaku, the Distributor, has breached and repudiated the Distribution Agreement. ..................................................................................................... 12

        F. After securing the exclusive right to distribute Deramiocel, the Distributor failed to prepare to do so. ................................................................................................ 13

        G. The Distributor repudiated the Distribution Agreement when it stated—then confirmed in writing—that a new Agreement was the only path forward. .................................. 16

        H. The Distributor stands to frustrate Capricor's efforts to establish other distribution networks by claiming exclusive distribution rights. ...................................... 17

ARGUMENT ...................................................................................................................... 19

THE COURT SHOULD GRANT THE REQUESTED PRELIMINARY INJUNCTIVE RELIEF. ............................................................................................................... 19

        A. Capricor—and, more importantly, Duchenne patients—will suffer irreparable harm absent injunctive relief. .............................................................................. 20

        B. Capricor is reasonably likely to succeed on the merits. ................................ 29

        C. The balance of hardships favors Capricor .................................................... 34

        D. The public interest favors injunctive relief. .................................................. 34

CONCLUSION ................................................................................................................... 37

## TABLE OF AUTHORITIES

Beachcomber Coins, Inc. v. Boskett,
166 N.J. Super. 442 (App. Div. 1979) ................................................................30

Brown v. City of Paterson,
424 N.J. Super. 176 (App. Div. 2012)      39

Christiansen v. Local 680 of Milk Drivers & Dairy Employees of New Jersey,
127 N.J. Eq. 215 (N.J. 1940)...............................................................................28

City of Orange Township Board of Education v. City of Orange Township,
451 N.J. Super. 310 (Ch. Div. 2017) ...................................................................28

Crowe v. De Gioia,
90 N.J. 126 (1982) ......................................................................................... passim

Da Silva v. Musso,
53 N.Y.2d 543, 428 N.E.2d 382, 444 N.Y.S.2d 50 (1981) .................................30

DiFolco v. MSNBC Cable L.L.C.,
622 F.3d 104 (2d Cir. 2010) ................................................................................34

Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,
111 F.3d 284 (2d Cir. 1997) ..........................................................................35, 36

Gould v. Board of Education,
81 N.Y.2d 446, 616 N.E.2d 142, 599 N.Y.S.2d 787 (1993) ........................31, 32

Hadden v. Consolidated Edison Co. of New York, Inc.,
34 N.Y.2d 88, 312 N.E.2d 445, 356 N.Y.S.2d 249 (1974) ..........................35, 36

Horizon Health Center v. Felicissimo,
263 N.J. Super. 200 (App. Div. 1993),
aff'd as modified, 135 N.J. 126 (1994)................................................................26

J.I. Kislak, Inc., v. Artof,
13 N.J. Misc. 129 (Ch. 1934).............................................................................27

Lakshmi Grocery & Gas, Inc. v. GRJH, Inc.,
138 A.D.3d 1290, 30 N.Y.S.2d 743 (3d Dep't 2016).........................................32

McKenzie v. Corzine,
396 N.J. Super. 405 (App. Div. 2007)...............................................21, 22, 24

McNeil v. Legislative Apportionment Commission,
176 N.J. 484 (2003) ............................................................................................20

Monmouth County Correctional Institution Inmates v. Lanzaro,
    643 F. Supp. 1217 (D.N.J. 1986),
    aff'd in part, modified in part on other grounds,
    834 F.2d 326 (3d Cir. 1987)......................................................................26, 39

Morris County Transfer Station, Inc. v. Frank's Sanitation Service, Inc.,
    260 N.J. Super. 570 (App. Div. 1992).........................................................38

Naylor v. Harkins,
    11 N.J. 435 (1953)......................................................................................28

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp L.P.
    92 N.Y.2d 458, 705 N.E.2d 656, 682 N.Y.S.2d 664 (1998) .......................33, 34

Russell v. Russell,
    127 N.J. Eq. 555 (Ch. 1940) ......................................................................27

Somerset Air Service, Inc. v. Township of Bedminster,
    No. SOM-L-419-06, 2006 WL 861498
    (N.J. Super. Ct. Law Div. Apr. 4, 2006),
    aff'd per curiam, No. A-5311-05T2, 2007 WL 1774058
    (N.J. Super. Ct. App. Div. June 21, 2007) .................................26, 27, 38

Suenram v. Society of Valley Hospital,
    155 N.J. Super. 593 (Law. Div. 1977).........................................................25, 27

Tenavision, Inc. v. Neuman,
    45 N.Y.2d 145, 379 N.E.2d 1166, 408 N.Y.S.2d 36 (1978) .............................33

Waste Management of New Jersey, Inc. v.
    Morris County Municipal Utilities Authority,
    433 N.J. Super. 445 (App. Div. 2013).........................................................37

Waste Management of New Jersey, Inc. v. Union County Utilities Authority,
    399 N.J. Super. 508 (App. Div. 2008).........................................................29, 37

**Statutes**

42 U.S.C. § 426(b) ..............................................................................................10, 12

42 U.S.C. § 1395w-3a(b)(1)(B) ...........................................................................11

42 U.S.C. § 1395w-3a(c)(1)..................................................................................11, 31

42 U.S.C. § 1395w-3a(c)(4)(A)(ii)(I) ..................................................................12

**Regulations**

42 C.F.R. § 414.904(a)(2)..................................................................................11

42 C.F.R. §§ 447.500-447.522...........................................................................10

**Other Authorities**

Restatement (Second) of Contracts § 152 (A.L.I. 1981) .................................................29

Restatement (Second) of Contracts § 250 cmt. b (A.L.I. 1981) ....................................32

Restatement (Second) of Contracts § 256 (A.L.I. 1981) .............................................33

Plaintiff Capricor Therapeutics, Inc. ("Capricor") respectfully submits this brief in support of its application for an Order to Show Cause that seeks the entry of a Preliminary Injunction.

## PRELIMINARY STATEMENT

This case concerns a potentially life-extending medicine for boys and young men dying from Duchenne muscular dystrophy ("Duchenne" or "DMD"), a flawed contract whose pricing structure makes distribution of that medicine economically impossible, and a distributor that has repudiated the contract and stands to obstruct alternative distribution. Given what is at stake, Capricor respectfully requests that the Court enter a preliminary injunction that recognizes the likelihood that the contract is subject to rescission, preserves the status quo, and permits Capricor to distribute Deramiocel on its own with partners other than Defendants Nippon Shinyaku Co. Ltd. and NS Pharma, Inc. (collectively, the "Distributor"). The injunction would also restrain the Distributor from interfering with Capricor's distribution activities.

- **The potentially life-extending medicine is Deramiocel.** Deramiocel is a first-in-class cell therapy for Duchenne muscular dystrophy—a progressive, irreversible, and invariably fatal genetic disorder that affects approximately 15,000 boys and young men in the United States. Most Duchenne patients lose mobility as young children, with most dying in their 20s or early 30s. In a recent Phase 3 trial, Deramiocel slowed patients' skeletal muscle deterioration by 54% and cardiac decline by 91%, both with statistical significance. The U.S. Food and Drug Administration ("FDA") has set a target action date of August 22, 2026. Approval may come sooner.

- **The flawed contract is the Distribution Agreement (the "Agreement").** Its ███████████████████████████████████████ ████████████████████████████. In other words, the contract that sets forth the

1

exclusive means of distributing Deramiocel provides that doing so will be unprofitable for both parties.

- **The Distributor is Defendant Nippon Shinyaku and its wholly owned U.S. subsidiary, NS Pharma, Inc**. The Distributor has failed to prepare to distribute Deramiocel. It then repudiated the Distribution Agreement and attempted to bully Capricor into an arrangement that would benefit only the Distributor. An injunction is necessary to prevent the Distributor from obstructing Capricor's alternative distribution efforts.

The four elements necessary to issue a preliminary injunction set forth in <u>Crowe v. De Gioia</u>, 90 N.J. 126, 132-34 (1982), are satisfied here.

*First*, if the Court does not grant injunctive relief, Capricor and Duchenne patients will suffer irreparable harm. Deramiocel is an innovative medicine of great economic value that Capricor has spent decades and hundreds of millions of dollars to develop. Unless the roadblocks to its distribution are removed, Capricor will suffer harm that cannot be adequately remedied by money damages. Moreover, the Duchenne patients who are the prospective users of the medicine are suffering muscular and other physical degradation on a daily basis. No other therapy can slow down the progressive deterioration Duchenne patients experience as effectively as Deramiocel can. Any delayed or reduced access to Deramiocel will cause irreparable loss in their muscle mass, cardiac function, and remaining mobility. For many patients, lack of access to Deramiocel may lead to a much earlier death.

*Second*, Capricor is likely to succeed on the merits.

- The Distribution Agreement is subject to rescission based on, among other grounds, a mutual mistake: the parties mistakenly agreed to a pricing formula that does not work for either party and that leads to economic loss for both.

- The Distributor repudiated the Distribution Agreement and thus cannot rely on its protections.

- Furthermore, the Distributor has materially breached its obligations under the Distribution Agreement by failing to undertake commercially reasonable efforts to prepare for the launch and distribution of Deramiocel.

*Third*, the balance of hardships favors Capricor. On Capricor's side: Capricor has devoted years of its corporate existence and hundreds of millions of dollars to the development of Deramiocel and the rigors of obtaining FDA approval and is now on the eve of potentially recouping its investment. Moreover, thousands of Duchenne patients face the prospect of losing irreplaceable muscle and cardiac function each day distribution of Deramiocel is delayed. On Defendants' side, they stand to lose only the speculative profits of an Agreement they now acknowledge is unprofitable and unworkable. Indeed, that is why Nippon Shinyaku repudiated the Distribution Agreement. The Distributor cannot credibly claim hardship under an Agreement that is not economically viable and that it has repudiated.

*Fourth*, the public interest favors the injunctive relief sought. Access to Deramiocel implicates serious public health concerns. Again, the Distributor repudiated the Distribution Agreement on March 27, 2026 and confirmed the repudiation in writing five days later. Thus, the status quo, given the repudiation, is that the Distributor is not acting as the exclusive distributor. Injunctive relief will preserve the status quo by permitting Capricor to arrange alternative distribution of Deramiocel without Defendants' interference. An injunction will ensure that the

3

therapy can reach thousands of Duchenne patients who need it as soon as possible after approval while the parties resolve any issues relating to unwinding the Distribution Agreement.

Capricor respectfully requests that the Court enter the Order to Show Cause and on its return date, grant the requested Preliminary Injunction.

## BACKGROUND AND STATEMENT OF FACTS

### I.    BACKGROUND

Capricor commenced this action on May 7, 2026 by filing its Verified Complaint for Equitable Relief by way of an Order to Show Cause seeking a Preliminary Injunction.

This Court has jurisdiction over this matter because Defendant NS Pharma, Inc. maintains its principal place of business in the Borough of Paramus, Bergen County, New Jersey, and conducts continuous and systematic business activities within New Jersey, including acting as a subdistributor for Deramiocel. Defendant Nippon Shinyaku is a Japanese corporation that has purposefully availed itself of the privilege of conducting business in New Jersey by, among other things, entering into the Distribution Agreement and establishing and maintaining a wholly owned U.S. subsidiary, NS Pharma, Inc., through which it directs its corporate activities concerning Deramiocel. Further, Nippon Shinyaku agreed in the Distribution Agreement that it could be sued through NS Pharma, Inc. Agreement § 4.2.

The Verified Complaint asserts eight claims:

- Count One: Rescission based on mutual mistake;

- Count Two: Rescission based on unilateral mistake (in the alternative);

- Count Three: Rescission based on frustration of purpose;

- Count Four: Declaratory judgment establishing Capricor's right to distribute Deramiocel outside the Distributor's exclusivity;

- Count Five: Breach of contract for failure to perform;

4

- Count Six: Breach of contract for anticipatory repudiation;

- Count Seven: Breach of the implied covenant of good faith and fair dealing; and

- Count Eight: Unjust enrichment.

The present application for a Preliminary Injunction is further supported by

1) the Certification of Dr. Linda Marbán, Chief Executive Officer of Capricor ("Marbán Cert.");

2) the expert Certification of Richard Rieger of Berkeley Research Group, LLC ("Rieger Cert."), who provides opinions on the Distributor's commercial launch readiness and the Medicare Part B reimbursement framework as applied to the Agreement's pricing;

3) the Certification of Aravindhan Veerapandiyan, M.D. ("Veerapandiyan Cert."), a treating Duchenne clinician;

4) the Certification of Jonathan Soslow, M.D. ("Soslow Cert."), a treating Duchenne clinician; and

5) Certifications from three individuals whose lives have been deeply affected by Duchenne: Aidan Leffler ("Leffler Cert."), Elijah Stacy ("Stacy Cert."), and Heather Hay ("Hay Cert.").

## II.   STATEMENT OF FACTS

### A.   The Parties

Capricor is a Delaware biotechnology company based in San Diego, California. (Verified Compl. ¶¶ 23; Marbán Cert. ¶ 5.) Capricor is publicly traded on Nasdaq Global Select Market. It is the developer and manufacturer of Deramiocel, an allogeneic cell therapy for the treatment of Duchenne muscular dystrophy. (Verified Compl. ¶¶ 23, 32-33.) Capricor manufactures Deramiocel at facilities at Cedars-Sinai Medical Center in Los Angeles and in San Diego, where

5

it has invested approximately $30 million for expanded manufacturing capacity in anticipation of commercial launch. (Verified Compl. ¶ 32.)

Nippon Shinyaku is a Japanese pharmaceutical corporation headquartered in Kyoto, Japan. (Verified Compl. ¶ 25.) NS Pharma, a Delaware corporation with its principal place of business in Paramus, New Jersey, is its wholly-owned U.S. subsidiary. (Verified Compl. ¶ 24.) Nippon Shinyaku is a direct party to the Distribution Agreement and has agreed that it "at all times [is] fully liable for the acts or omissions of [NS Pharma] as if such act or omission was undertaken directly by" Nippon Shinyaku, and that "any action or claim by Capricor in respect of any breach, act, error or omission" by Nippon Shinyaku "may be brought against" NS Pharma. (Agreement § 4.2.) NS Pharma markets Viltepso, an exon-skipping therapy for a genetically defined subset of Duchenne patients. Upon information and belief, Viltepso is the only product NS Pharma currently distributes in the United States. (Marbán Cert. ¶ 6.)

**B. Duchenne Muscular Dystrophy and the Deramiocel treatment.**

Duchenne is a progressive, irreversible, and invariably fatal genetic disorder that attacks every muscle in the body—including the heart. (Verified Compl. ¶ 2; Veerapandiyan Cert. ¶¶ 4-9; Soslow Cert. ¶¶ 4-6.) It is caused by the absence of dystrophin, a protein that stabilizes muscle cell membranes. (Verified Compl. ¶ 48.) Without dystrophin, muscle fibers are damaged with every use and progressively replaced by scar tissue and fat. The destruction is irreversible. Approximately 15,000 individuals in the United States are living with Duchenne, overwhelmingly boys and young men. (Verified Compl. ¶ 2; Veerapandiyan Cert. ¶ 5.)

Boys with Duchenne develop normally for their first few years, then begin to lose ground— first affecting the ability to run, then to climb stairs, then to walk. (Verified Compl. ¶ 2.) Aidan Leffler, for example, was diagnosed with Duchenne at age three; as a young child, he did not jump or run as fast as other kids, and by age twelve, after breaking his leg, he could no longer run and

6

struggled to participate in other physical activities. (Leffler Cert. ¶¶ 2-3.) Most of the boys are wheelchair-dependent by early adolescence. (Verified Compl. ¶ 2.) Elijah Stacy, now twenty-four, lost the ability to walk at age eleven and has been completely dependent on a power-wheelchair ever since. (Stacy Cert. ¶¶ 1, 3.)

As the teenage years progress, those with Duchenne lose the use of their arms and hands. Basic comforts that people take for granted every day, like sleeping comfortably, tend to become incredibly difficult, and only get harder with time. (See Stacy Cert. ¶ 3.) Their hearts progressively scar and weaken. Most die of heart failure or respiratory collapse in their twenties or early thirties. (Verified Compl. ¶ 2.) Elijah's heart health is now in decline; his left ventricular ejection fraction has dropped, and he understands that once it further drops, the effects of Duchenne tend to worsen fast. (Stacy Cert. ¶¶ 3, 8.) There is no cure to Duchenne. (Verified Compl. ¶ 2.) At present, no approved therapy addresses both the skeletal and cardiac dimensions of the disease. (Verified Compl. ¶ 49; Veerapandiyan Cert. ¶¶ 10, 21; Soslow Cert. ¶¶ 9-10.) Aidan has spent years of his life away from school and family participating in clinical trials, desperately searching for something which could arrest his inevitable decline, including one trial that turned out to be a placebo and two others that were unable to effectively slow his decline. (Leffler Cert. ¶¶ 4-5.) Elijah, too, has been a part of other clinical trials that were not successful. (Stacy Cert. ¶ 5.)

Deramiocel is composed of cardiosphere-derived cells isolated from donated human heart tissue. (Verified Compl. ¶ 49.) It works by shifting the immune response in affected muscle from one promoting inflammation and scarring to one promoting preservation. It is administered intravenously every three months and does not require genetic matching—it is an off-the-shelf therapy that can be given to any eligible patient. (Verified Compl. ¶ 49.) Deramiocel has received Orphan Drug, Regenerative Medicine Advanced Therapy, and Rare Pediatric Disease designations

from the FDA. (Verified Compl. ¶ 49.) These designations reflect that Deramiocel addresses a serious, life-threatening condition with significant unmet medical need. (Veerapandiyan Cert. ¶ 12; Soslow Cert. ¶¶ 11-12.)

### C. The FDA Approval Process.

In November 2017, the FDA cleared Capricor's Investigational New Drug application for Deramiocel (a/k/a, CAP-1002) on its initial submission, authorizing the randomized, double-blind, placebo-controlled HOPE-2 Phase 2 trial in Duchenne patients. (Marbán Cert. ¶ 22.) HOPE-2 met its primary efficacy endpoint, demonstrating a statistically significant benefit on the Performance of the Upper Limb (PUL 2.0) scale, and the trial results were published in The Lancet.[1] (Verified Compl. ¶ 77; Marbán Cert. ¶ 22.) Data from the HOPE-2 trial reported in June 2022 and extended through four years of follow-up, reinforced those findings and demonstrated preservation of both skeletal-muscle and cardiac function over time. (Marbán Cert. ¶¶ 24-25.) On the strength of the HOPE-2 record, and with the designations referenced above in hand, Capricor initiated the pivotal Phase 3 HOPE-3 Trial — a randomized, double-blind, placebo-controlled study of 106 Duchenne patients. (Marbán Cert. ¶ 25.)

In December 2025, Capricor announced the results of the HOPE-3 trial—a randomized, double-blind, placebo-controlled study of 106 Duchenne patients. (Verified Compl. ¶¶ 77-78.) The data showed that Deramiocel slowed skeletal muscle deterioration by approximately 54% and slowed cardiac decline by approximately 91%, both with statistical significance. (Verified Compl. ¶¶ 5, 77; Veerapandiyan Cert. ¶¶ 14-15; Soslow Cert. ¶ 14.) After reviewing these results, on March 10, 2026, the FDA set a target action "PDUFA" date of August 22, 2026 for Capricor's application for full approval for Deramiocel. (Marbán Cert. ¶ 72.)

---

[1] The Lancet is one of the world's most prestigious general medical journals focused on groundbreaking clinical research.

### D. The Distribution Agreement is a fatally flawed contract that requires Capricor and the Distributor to sell Deramiocel at a loss.

The most consequential feature of the Distribution Agreement is that its pricing structure renders distribution of Deramiocel economically irrational for both parties—and for the healthcare providers who would administer the therapy. (Verified Compl. ¶¶ 9, 51, 56-58.) The broader background and terms of the Distribution Agreement are described below. (See infra §§ II.B.5-II.B.6.)

In summary, and as more fully described below, the Distribution Agreement's pricing mechanics guarantee that, shortly after launch, Medicare would only reimburse Deramiocel at approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, not at the commercially determined market price. That is so because under the Distribution Agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and because Medicare's Average Sales Price ("ASP") benchmark would be calculated from the manufacturer's own reported sales. As written, the Distributor's downstream price to providers is not captured in the ASP calculation. Medicaid and commercial payors, which benchmark to Medicare, follow that same trajectory. The pricing structure, in the words of Capricor's expert, "produces an economically unworkable result" that "is not consistent with the economic requirements of a provider-administered product reimbursed under Medicare Part B." Rieger Cert. § V.B. The mechanics that produce that result are set forth below.

That outcome is not what the parties intended, nor what they understood. At the time of contracting, both parties believed the Distribution Agreement's pricing terms would permit Capricor, the Distributor, and healthcare providers to distribute Deramiocel without economic loss. (Verified Compl. ¶¶ 9, 36, 62.) That was a fundamental assumption of the bargain. (Verified

9

Compl. ¶¶ 9, 61-62.) The Distributor's projections are consistent only with a pricing model that permits each participant in the distribution chain to earn a return.

The Distribution Agreement, however, does not permit the parties to economically make or distribute Deramiocel. The parties were fundamentally mistaken about how the contract would interact with the reimbursement mechanics of Medicare Part B. Medicare is the federal health-insurance program that covers Americans age 65 and older and persons under 65 with qualifying disabilities. Because Duchenne causes progressive and total disability, the overwhelming majority of Duchenne patients who live twenty years or more qualify for Medicare through the Social Security Disability Insurance entitlement after the 24-month waiting period. (Verified Compl. ¶ 58.) See 42 U.S.C. § 426(b); Rieger Cert. § II.

Medicare Part B reimburses physician-administered drugs—including cell therapies like Deramiocel, once approved—at 106% of the **manufacturer's** ASP. 42 U.S.C. § 1395w-3a(b)(1)(B); 42 C.F.R. § 414.904(a)(2); Rieger Cert. § III.B. The ASP is calculated from a drug manufacturer's own sales data, which it reports quarterly to CMS. 42 U.S.C. § 1395w-3a(c)(1); 42 C.F.R. §§ 447.500-447.522; Rieger Cert. § III.B.

How this plays out with the Distribution Agreement is as follows:

1. ███████████████████████████████████████████
(See Agreement at Exhibit A.)

2. ███████████████████████████████████████████
███████████████████████████████████████████
████████████

3. Articles 6.3 and 6.4 of the Distribution Agreement designate Capricor as the manufacturer, labeler, and NDC owner.[2] (Agreement §§ 6.3, 6.4.)

---

[2] An NDC is a National Drug Code—the FDA-assigned identifier that designates the manufacturer for regulatory and reimbursement purposes.

10

4. Because the contract purports to make the Distributor the exclusive US distributor for Deramiocel, the Distributor is Capricor's sole U.S. purchaser.

5. Accordingly, ███████████████████████████████████████ ███████████████████████████████████ (Rieger Cert. § V.B)

6. Because the Distributor is not the manufacturer, any sales the Distributor would make to a hospital, health care provider, or other buyer do not count for ASP calculations. (Rieger Cert. § V.B.)

The arithmetic that follows is straightforward and devastating. For the first two quarters of distribution, there is no ASP because there have been no reportable sales to CMS. Reimbursement during this brief interlude is calculated based on the Distributor's sales price from wholesale acquisition cost rather than ASP. See 42 U.S.C. § 1395w-3a(c)(4)(A)(ii)(I). But after CMS starts to calculate ASP, ███████████████████████████████████████ ███████████████████████████████ Rieger Cert. § V.B. At that point, ███████████ ███████████████████████████, ensuring a net loss after overhead and research and development. The Distributor would also lose money on distribution expenses (personnel, ultra-cold-chain logistics, specialty-pharmacy coordination, site-of-care infusion support, and state-level distribution licensing). No rational distributor will distribute Deramiocel on these terms. No rational manufacturer would make it.

The spiral propagates beyond Medicare patients. The majority of state Medicaid programs benchmark reimbursement for physician-administered drugs to Medicare's ASP-based formula, typically at an ASP plus a specified percentage. (Rieger Cert. § V.C. (describing how private insurers that reference Medicare pricing follow the same path.)) Within a short period after launch, every major payor class in the United States would effectively refuse to cover Deramiocel at a price above a fraction ███████████████████████████████. For a rare pediatric disease in which the vast majority of adult patients are Medicare beneficiaries due to Social Security

11

Disability Insurance entitlement after the 24-month waiting period, see 42 U.S.C. § 426(b), the effect is a comprehensive foreclosure: no rational provider will administer Deramiocel to the patients who need it. (Rieger Cert. §§ V.C-V.D.)

Neither party understood this dynamic at the time of contracting. (Marbán Cert. ¶ 34.) The Distributor's subsequent repudiation of the Distribution Agreement and demand for a revised ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ agreement, described below, confirms that they have since come to understand the flaw—and understand that the Distribution Agreement is not a viable path forward for anyone. (Marbán Cert. ¶ 34.)

### E. Nippon Shinyaku, the Distributor, has breached and repudiated the Distribution Agreement.

By 2021, Capricor had been developing Deramiocel for well over a decade. (Marbán Cert. ¶ 28.) It had advanced the therapy through multiple clinical trials and had secured Orphan Drug, Regenerative Medicine Advanced Therapy, and Rare Pediatric Disease designations from the FDA. Marbán Cert. ¶ 21. Capricor sought a U.S. distribution partner with the infrastructure, personnel, and expertise to bring Deramiocel to market upon FDA approval. (Marbán Cert. ¶ 21, 28.)

In December 2021, Nippon Shinyaku delivered to Capricor a detailed capability presentation titled "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (the "Capability Presentation"). (Verified Compl. ¶ 35; Marbán Cert. ¶ 29.) In the Capability Presentation, the Distributor represented that it had the commercial infrastructure, personnel, and expertise necessary to distribute a complex therapy like Deramiocel in the United States. (Verified Compl. ¶ 35.) The Distributor touted "u▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and highlighted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). The Distributor asserted that it had

specialty-distribution capabilities (without noting that, upon information and belief, its products did not require the ultra-cold-chain logistics, site-of-care coordination, or infusion infrastructure that a cell therapy like Deramiocel requires).  The Distributor represented that it had the capability to "███████████████████," "██████████████" in required states, and manage third-party logistics providers, specialty pharmacies, and specialty distribution partners pre- and post-launch. (Marbán Cert. ¶ 29.)

The Capability Presentation also included the Distributor's financial projections for Deramiocel. Those projections reflected what Capricor and the Distributor both understood in 2022: that Deramiocel could be priced and sold at levels generating commercially viable margins for manufacture, distribution, and administration.

In January 2022, Capricor and Nippon Shinyaku executed the Distribution Agreement, granting Nippon Shinyaku the exclusive right to "promote, market, sell and distribute" Deramiocel in the United States, including Puerto Rico, through ████████████. (Agreement §§ 2.1, 15.1.) The Agreement is governed by New York law. (Id. § 18.4.) Because Nippon Shinyaku has utilized NS Pharma as its agent and sub-distributor, Nippon Shinyaku is "at all times [] fully liable for the acts or omissions of [NS Pharma] as if such act or omission was undertaken directly by" Nippon Shinyaku, and NS Pharma may be sued in Nippon Shinyaku's stead. (Id. § 4.2.)

**F.  After securing the exclusive right to distribute Deramiocel, the Distributor failed to prepare to do so.**

In exchange for the exclusive right to distribute Deramiocel, the Distributor assumed extensive obligations to prepare for and execute a successful commercial launch. (Verified Compl. ¶ 39.) The Distributor must use "Commercially Reasonable Efforts" to promote, market, sell, and distribute Deramiocel, and must "vigorously promote the sale" of Deramiocel. (Agreement § 5.4.) The Distributor's specific obligations include developing and maintaining a commercial team with

sufficient experience and resources (id. § 5.5.5); establishing distribution infrastructure, including warehousing and logistics (id. § 5.5.6); and ensuring compliance with all applicable laws, including state distribution licensing (id. § 5.18). The Agreement requires the Distributor to obtain Capricor's prior written consent before appointing any subdistributors, except its own wholly-owned subsidiary. (Id. § 4.2.) It requires the parties' Joint Steering Committee to establish Minimum Sales Requirements within ninety days before anticipated BLA approval. (Id. § 5.2.1.)

The Agreement also contemplates the situation where the Distributor has shown it is unable or unwilling to perform. Article 4.1.2 provides that Capricor may distribute Deramiocel

> through or with others . . . if and to the extent Distributor is unable to so distribute the Products due to (a) regulatory requirements; (b) Distributor's failure to meet its Minimum Sales Requirements . . . ; or (c) Distributor being otherwise prohibited or prevented from selling and/or distributing the Products or refusing or being unable to sell and/or distribute the Products to any Customer or class of Customers other than by Customer decision.

(Id. § 4.1.2.)

The Agreement provides for tiered dispute resolution: escalation to senior executives, followed by ICC arbitration with three arbitrators in New York or Los Angeles. (Agreement §§ 18.1-18.3.) Article 18.3.3 expressly preserves each party's right to seek injunctive relief in court: "Nothing contained in this Article 18 shall prevent either Party from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent serious and irreparable injury to one Party or to others." (Id. § 18.3.3.)

Preparing for distribution of a medicine like Deramiocel requires extensive and continuous work. The Distributor has not done that work. Initially, the FDA set a PDUFA date for Deramiocel of August 31, 2025. (Verified Compl. ¶ 65.)  Then, in July 2025, the FDA issued a Complete Response Letter ("CRL") identifying further steps Capricor needed to take to secure final approval. (Verified Compl. ¶ 66.) The Distributor treated the CRL as a license to disengage. (Verified

14

Compl. ¶ 67.) On July 15, 2025, an employee of the Distributor told Capricor's Director of Commercial that "  '" on Deramiocel. (Verified Compl. ¶ 68; Marbán Cert. ¶¶ 55-58.) The

" were being ." (Id. ¶¶ 68, 71.)

Capricor objected and repeatedly sought assurances of performance and updates on the Distributor's preparations for distribution. On November 6, 2025, NS Pharma's General Counsel, , doubled down in writing. He asserted that

. (Verified Compl. ¶ 73; Marban Cert. ¶ 61.)

As noted above, in December 2025, Capricor announced the results of the HOPE-3 trial—a randomized, double-blind, placebo-controlled study of 106 Duchenne patients. Deramiocel slowed skeletal muscle deterioration by approximately 54% and slowed cardiac decline by approximately 91%, both with statistical significance. (Veerapandiyan Cert. ¶¶ 14-15; Soslow Cert. ¶ 14.)[3]

The FDA reacted positively to the HOPE-3 results. On March 10, 2026, the FDA indicated that it was resuming review of Capricor's application for full approval, and set a new PDUFA target action date of August 22, 2026. (Marbán Cert. ¶ 72.) FDA approval —which for most of 2025 had been a contingent future event that the Distributor treated as an excuse to stand down—is now a possibility. (Rieger Cert. § II.)

---

[3] On March 12, 2026, Capricor announced further positive results from the HOPE-3 trial. MRI scans showed Deramiocel significantly slowed heart muscle scarring—and for patients with existing heart damage, it reversed the expected decline in heart function. Functionally, it slowed the loss of basic abilities like feeding oneself by roughly 83%.

15

**G. The Distributor repudiated the Distribution Agreement when it stated—then confirmed in writing—that a new Agreement was the only path forward.**

On March 27, 2026—seventeen days after the FDA lifted the CRL—Nippon Shinyaku's Chief Executive Officer, Toru Nakai, traveled from Japan to meet in person with Capricor's Chief Executive Officer. (Verified Compl. ¶¶ 84.) At that meeting, the Distributor told Capricor that a "███████████████████████████" ("PLD") was "the only path forward" for the Distributor's distribution of Deramiocel in the United States. (Marbán Cert. ¶ 77.) Under that arrangement, ███ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████. (Verified Compl. ¶¶ 16, 87.)

On April 1, 2026, Dr. Marbán wrote to the Distributor to confirm her understanding of that position in writing: "███████████████████████████ ███████████████████████████████████████████ ███████████████████████████." ███████████, VP of Business Development at NS Pharma responded the same day: "███████████████████████████ ███████████████████████████████████████████ ███████████" (Id. ¶¶ 78-79.)

On April 10, 2026, the Distributor sent a formal draft amendment—the "Proposed Amendment"—to Capricor. (Verified Compl. ¶ 87; Marbán Cert. ¶ 81.) The Proposed Amendment confirmed in writing what the Distributor had communicated verbally. Under its terms, ███ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

16

█████████████████████████████████████████████████████████████████████████

█████████████████████████████" for purposes of federal reimbursement calculations. (Verified Compl. ¶ 88.) And Capricor would ████████████████████. This was not the Distribution Agreement the parties had bargained for—it represented a total revision of the Distribution Agreement's material terms. (Verified Compl. ¶ 87.)

Capricor, which now had confirmation that its distributor could not and would not properly distribute Deramiocel, invested substantial additional financial and personnel resources to prepare for the launch of Deramiocel upon FDA approval. Its efforts included initiating over ████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████, and pressing other projects forward to prepare for distribution. (Marbán Cert. ¶ 80.)

### H. The Distributor stands to frustrate Capricor's efforts to establish other distribution networks by claiming exclusive distribution rights.

Capricor rejected the Proposed Amendment in writing on May 6, 2026, informing Defendants that the proposal was unacceptable and that Capricor accepted Defendants' repudiation of the Distribution Agreement. (Verified Compl. ¶¶ 88-89; Marbán Cert. ¶ 84.) Based on the Distributor's conduct and communications, Capricor expects that the Distributor will interfere with Capricor's attempts to establish alternative distribution channels.

Further, the Distributor is in no position to perform. More than four years after the Distribution Agreement was signed, and with potential FDA approval just a few months away, NS Pharma's own Head of Commercial confirmed at the ████████████████████████ ████████ that core launch-readiness tools remain unbuilt: ████████████████████

17



. (Verified Compl. ¶¶ 12, 63, 80(A); Marbán Cert. ¶ 75; Rieger Cert. § VI.B.)

. (Marbán Cert. ¶ 76.)

The Distributor's distribution infrastructure is likewise deficient. Defendants assert that

—without obtaining Capricor's prior written consent. To the extent those arrangement constitute subdistributor relationships, the Distributor was obligated to seek Capricor's written consent under Article 4.2. (Verified Compl. ¶¶ 42, 80(C); Marbán Cert. ¶ 75; Agreement § 4.2.) The Distributor has given Capricor inconsistent representations about state-level distribution licensing: at times representing that                                    and at other times—including most recently—acknowledging that they will                          that Defendants never sought Capricor's consent to and have refused to document despite repeated requests. (Verified Complaint ¶ 81(C).)                          . (Verified Compl. ¶ 80(C)) And no Minimum Sales Requirements were established 90 days before the original PDUFA target date of August 31, 2025, despite the Distribution Agreement's requirement that they be set within ninety days of anticipated BLA approval. (Verified Compl. ¶ 46; Agreement § 5.2.1.)

18

These ██████████████████—unauthorized under Article 4.2 and made before the Distributor's March 2026 repudiation—do not negate the repudiation. Rather, they constitute further breaches: the Distributor unilaterally ████████████████████ Capricor never approved, while simultaneously failing to build the integrated launch apparatus the Distribution Agreement required. That the Distributor went partway down a distribution path before abandoning the Agreement, in an attempt to thrust a Private Label Distribution structure upon Capricor, confirms the Distributor has no intent to perform the bargain as written.

Although the Distributor is not prepared to perform, Capricor expects that the Distributor is prepared to obstruct Capricor's distribution of Deramiocel. Absent an injunction, the Distributor will impair Capricor's right to establish alternative distribution channels. The Distributor's position is heavy-handed and straightforward: agree to the Proposed Amendment, or no distribution will occur.

## ARGUMENT

**THE COURT SHOULD GRANT THE REQUESTED PRELIMINARY INJUNCTIVE RELIEF.**

A party seeking a preliminary injunction must demonstrate: (1) a reasonable probability of success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships favors the moving party; and (4) the injunction will not harm the public interest. Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982); McNeil v. Legis. Apportionment Comm'n, 176 N.J. 484, 484, (2003) ("[T]he standards informing the grant of a stay when an issue of significant public importance is raised must include not only the traditional factors applicable to disputes between private parties but also, and most paramount, considerations of the public interest . . . ."). Capricor satisfies each Crowe factor.

19

"[A] court may take a less rigid view in its consideration of these factors when the interlocutory injunction sought is designed to merely preserve the status quo." McKenzie v. Corzine, 396 N.J. Super. 405, 414 (App. Div. 2007).

Here, Capricor's requested relief preserves the status quo: the Distributor has repudiated the Distribution Agreement, and the parties also entered into the Agreement based on a mutual mistaken understanding of how pricing would work. Both support termination or rescission of the Distribution Agreement. Under the present circumstances, Capricor is or should be free to distribute Deramiocel on its own or establish alternative distribution channels and the parties should be free to resolve how the Distribution Agreement should be unwound. Any other view would give effect to an agreement both parties have concluded is unworkable. Moreover, no product is in the distribution channel today—Deramiocel has not yet received FDA approval, and no doses have reached any patient through any channel other than through participation in Capricor's clinical trials. The requested injunction disturbs no ongoing commercial relationship: no customer of the Distributor loses anything, no provider must change acquisition practices, and no reimbursement framework must be rebuilt. The injunction simply permits Capricor to proceed with alternative distribution avenues so that, if and when FDA approval issues, a viable path to patients is in place.

### A. Capricor—and, more importantly, Duchenne patients—will suffer irreparable harm absent injunctive relief.

Irreparable harm exists where the injury cannot be adequately compensated by monetary damages. Crowe, 90 N.J. at 132-33. The harm here is not merely financial. It is physical, progressive, and irreversible for the thousands of Duchenne patients who stand to potentially benefit from Deramiocel.

20

The harm is ripe and requires action now, not after FDA approval. A rare-disease therapy's commercial viability is determined in the weeks and months surrounding launch, and launch preparation begins well in advance of the PDUFA action date. (Rieger Cert. § III.C.) Commercial readiness of the type Deramiocel requires—cold-chain logistics, site-of-care coordination, specialty-pharmacy relationships, payor engagement, hub services, and state-level distribution licensing—"requires extended lead times to address manufacturing, site-of-care, and market access readiness prior to the anticipated approval date." (Id.) The first several months following launch establish "prescribing patterns, provider confidence, and payor positioning, with effects that can persist over the product's lifecycle." (Id.) With a PDUFA action date of August 22, 2026, the commercial partnerships Capricor must assemble should be established as soon as possible. Judicial relief entered after FDA approval—and after the Distributor has communicated to payors and providers under a pricing structure that cannot sustain the distribution chain—would arrive too late. The harm the injunction would prevent is accruing now.

The causal chain between the injunction Capricor seeks and the harm it prevents is direct. The Distributor has informed Capricor in writing that it will not distribute Deramiocel under the existing Agreement; at the same time, the Distributor is poised to obstruct Capricor's alternative distribution efforts by asserting its claimed exclusivity. (See supra § II.B.8.) Without this Court's intervention, Deramiocel will not reach Aidan Leffler, Elijah Stacy, Heather Hay's sons, or the approximately 15,000 Duchenne patients in the United States who might benefit from it—because the only party with putative contractual rights to distribute refuses to do so, and the manufacturer with the product, the capacity, and the clinical data is blocked by the Distributor's own abandoned contract. (Rieger Cert. § II.)

21

If the Court does not grant the injunction sought, then it is likely that Deramiocel will not reach Duchenne patients in the first instance:

- The Distributor is both unprepared and unwilling to distribute Deramiocel. The Agreement providing for its distribution is fundamentally flawed in a manner that discourages both parties from investing in Deramiocel's distribution. The Distributor itself agrees, which is why it repudiated it in favor of a different "path." (See supra § II.B.7; infra § III.A.2.b.) Thus, Capricor is neither required to, nor inclined to, distribute Deramiocel through or with the Distributor.

- But distribution through means other than the Distributor is also impracticable without an injunction. Capricor expects the Distributor to conclude that it still has contractual exclusivity over U.S. distribution of Deramiocel; and the Distributor is poised to interfere with Capricor's attempts to establish the commercial partnerships needed to distribute Deramiocel. Although the Distribution Agreement is no longer binding, the Distributor may use the Distribution Agreement—which on its face provides the Distributor with the exclusive right to distribute Deramiocel—to interfere with Capricor's relations with third parties.

Capricor and Duchenne patients will be irreparably harmed even if it were possible to distribute Deramiocel to some patients for some amount of time. The Agreement's pricing structure guarantees that even if product were somehow to be sold under the Distribution Agreement, clinical administration would cease within quarters. Once the ASP is established, after two quarters of sales, Medicare reimbursement drops to 106% of ███████ ███████ ███████████ (Rieger Cert. § V.B; supra § II.B.4.) At that reimbursement level, both Capricor and the Distributor lose money from selling Deramiocel. This concrete projection about

22

the future discourages investments that must be made *today*. If Capricor cannot establish alternative means of distribution now, there will be no adequate and substantial system for making, distributing, and administering Deramiocel, resulting in fewer doses to fewer patients.

Duchenne is a disease of irreversible destruction. Deramiocel does not cure it and does not necessarily reverse existing damage. Rather, it preserves function that, once lost, is lost forever. (Veerapandiyan Cert. ¶¶ 18-19; Soslow Cert. ¶¶ 18-19.)

Aidan Leffler's experience illustrates the benefits of treatment: when he began treatment, he was still capable of getting out of bed, getting dressed, taking a shower, and could live mostly independently, but his family "did not expect any of this to last." (Leffler Cert. ¶ 6.) Four years after his treatment with Deramiocel, Aidan had not lost arm function, his ejection fraction was completely stable, and he was able to live almost completely independently. (Id. ¶ 7.) Deramiocel did not reverse Aidan's condition, but it prevented a likely decline in his health.

On the other hand, every month of delay in making Deramiocel available is a month of permanent harm to patients who would otherwise benefit. For Heather Hay, the mother of two boys with Duchenne (eight and eleven years old), "with each passing day, my sons lose muscle function that they will never recover." (Hay Cert. ¶ 2.) For Elijah, who is 24 years old and whose heart is beginning to fail, the need is immediate and concrete; his left ventricular ejection fraction is dropping to a level where Deramiocel may not be able to fully stabilize him (only slow his decline). For him, "those months [of delay] are not abstract—they are cardiac cells dying and eligibility slipping away." (Stacy Cert. ¶¶ 1, 8.)

In the HOPE-3 trial, untreated patients experienced measurable declines in both upper-limb and cardiac function over twelve months. Treated patients experienced significantly less decline— but neither group gained function. (Veerapandiyan Cert. ¶ 19; Soslow Cert. ¶ 21.) Muscle tissue

23

destroyed during a period of delay will never regenerate. Cardiac scar tissue formed during untreated progression will remain for the remainder of the patient's life.

In concrete terms, a fifteen-year-old boy who can currently lift a cup to his mouth may, in months without treatment, lose the ability to do so. That ability will not come back. A seventeen-year-old whose cardiac ejection fraction is at 40% may, without treatment, decline past the threshold at which heart failure symptoms manifest, with cardiac tissue permanently scarred. For non-ambulatory teenagers whose upper limbs are their last remaining tool for eating, communication, and any degree of independence, every percentage point of preserved function is the difference between self-sufficiency and total dependence. (Veerapandiyan Cert. ¶¶ 7, 20; Leffler Cert. ¶ 7; Hay Cert. ¶¶ 2, 4.)

There is no substitute for Deramiocel. No currently-approved therapy addresses both the skeletal and cardiac manifestations of Duchenne. (Veerapandiyan Cert. ¶ 21; Soslow Cert. ¶ 22.) If, following FDA approval, Deramiocel is not distributed to patients in a timely manner following FDA approval, Duchenne patients will have nowhere else to turn.

New Jersey courts have repeatedly recognized that threats to medical care and public health constitute irreparable harm warranting injunctive relief. See, e.g., Somerset Air Serv., Inc. v. Township of Bedminster, No. SOM-L-419-06, 2006 WL 861498, at *4 (N.J. Super. Ct. Law Div. Apr. 4, 2006), (finding irreparable harm based on termination of emergency medical transportation services for potential users), aff'd per curiam, No. A-5311-05T2, 2007 WL 1774058 (N.J. Super. Ct. App. Div. June 21, 2007); Horizon Health Ctr. v. Felicissimo, 263 N.J. Super. 200, 219 (App. Div. 1993) (affirming injunction to enjoin demonstrators in front of an abortion clinic because these demonstrations interfered with plaintiff's clients' rightful access to health care and abortion services), aff'd as modified, 135 N.J. 126 (1994); Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro,

24

643 F. Supp. 1217, 1227-28 (D.N.J. 1986) (finding irreparable harm where substantial delays to abortion services may cause substantial injury to plaintiffs and that "[m]oney damages are obviously not an adequate remedy in such situations"), aff'd in part, modified in part on other grounds, 834 F.2d 326 (3d Cir. 1987); Suenram v. Soc'y of Valley Hosp., 155 N.J. Super. 593, 597 (Law. Div. 1977) (finding irreparable harm to temporarily enjoin defendant hospital from interfering with medical treatment of a terminally ill plaintiff where plaintiff "is in danger of suffering irreparable injury if relief is postponed for the shortest period of time or denied").

In Somerset Air Service, the plaintiff was an airport operator for emergency medical service helicopters and sought injunctive relief to enjoin the township from interfering with its medical service operations at the airport pending final resolution. 2006 WL 861498, at *7. The court found that the "abrupt termination" of this emergency medical service helicopter unit constituted irreparable harm because the public health and safety would suffer through "the danger of increased mortality to potential users of the service" who needed to be transported for medical emergencies. Id. at *4.

In Suenram, the plaintiff was a terminally ill woman whose prognosis showed that she would not survive another month based on the current medical treatment, and requested taking an unproven drug treatment whose use was not sanctioned by defendant hospital. Suenram, 155 N.J. Super. at 597. As plaintiff requested a temporary restraining order to allow for treatment, the court found plaintiff would suffer irreparable injury with even the shortest of delays in receiving this alternative treatment, and relief would "likely be of only academic value if secured at sometime in the future." Id.; see also id. ("For the terminally ill, the phrase 'justice delayed is justice denied' is especially significant." (citation omitted)). The same logic applies here: the patients at issue are

children with a fatal disease, and the harm is concrete and imminent. (See Veerapandiyan Cert. ¶¶ 17, 20, 23.)

Capricor, too, will suffer irreparable harm. It has invested nearly two decades and hundreds of millions of dollars bringing Deramiocel to market. It has built manufacturing capacity, hired personnel, and is preparing for commercial launch. (Marbán Cert. ¶ 27.) Specifically, Capricor's San Diego manufacturing facility is currently producing commercial-grade doses of Deramiocel and has capacity to supply an estimated 250 to 500 patients per year, with six new cleanrooms targeted for early 2027 that would scale capacity to 2,500 to 4,000 patients per year, and further expansion underway to support up to 10,000 patients per year by 2030. (Marbán Cert. ¶¶ 85-86.) Commercial-supply manufacturing has begun, and Capricor's patient-support call center is expected to be operational approximately one month before the PDUFA date. (Marbán Cert. ¶¶ 87-88.) The harm to Capricor's relationships with the clinical and patient communities, and to the credibility on which its ability to develop future therapies depends, cannot be reduced to money damages. See Russell v. Russell, 127 N.J. Eq. 555, 560, (Chan. 1940) (noting that the "difficulty of satisfactorily estimating damages to business is frequently recognized" and supportive of injunctive relief (citation omitted)); City of Orange Twp. Bd. of Educ. v. City of Orange Twp., 451 N.J. Super. 310, 320 (Ch. Div. 2017) ("Harm may be considered irreparable if it cannot be remedied by monetary damages."); J.I. Kislak, Inc., v. Artof, 13 N.J. Misc. 129, 132 (Chan. 1934) (holding there was irreparable harm where impairment of business and diversion of clients was "not calculable or readily ascertainable"). Moreover, the market launch of a rare-disease therapy is a one-time event. The commercial trajectory of Deramiocel will be largely determined by the success of its initial six to twelve

26

months on the market. (Rieger Cert. § III.C.) A disrupted or failed launch—caused by a distributor that cannot distribute—cannot be re-created later. The harm is permanent.

The company-level harm compounds the patient-level harm and cannot be disentangled from it. Capricor is a publicly traded, single-product company at the moment of its commercial launch. A rare-disease therapy has one opportunity to establish physician adoption, payor coverage postures, patient-advocacy relationships, and investor confidence. Once physicians form an impression that the therapy is unavailable or uneconomic, and once payors build coverage frameworks around a Distributor-led structure that cannot hold, those impressions and frameworks persist across product lifetimes. (Rieger Cert. § III.C.) The damage is not the loss of quarterly sales, which can, in principle, be quantified, but the loss of the conditions under which any future sales of Deramiocel or of Capricor's pipeline of cardiosphere-derived therapies are possible.  See Waste Mgmt. of N.J., Inc. v. Union Cnty. Utilities Auth., 399 N.J. Super. 508, 534 (App. Div. 2008) ("A court may issue an interlocutory injunction on a less than exacting showing if necessary to prevent the subject matter of the litigation from being 'destroyed or substantially impaired.'" (citation omitted)); see also Christiansen v. Loc. 680 of Milk Drivers & Dairy Emps. of N. J., 127 N.J. Eq. 215, 220 (N.J. 1940) (holding an injunction to enjoin contractual enforcement was warranted if the "defendant Local is permitted to enforce its contract with the employer, to the extent of terminating the services of the individual complainants, the status will have been substantially impaired, if not destroyed"); Naylor v. Harkins, 11 N.J. 435, 446-47 (1953) (affirming an injunction to restrain defendants from "taking affirmative action which might destroy plaintiffs' status [quo] [as members of a union chapter] and the subject of the litigation").  That loss is not reducible to money.

27

The harm is further compounded by the distortion the Distributor is positioned to inflict on the reimbursement landscape itself. Payors form their initial coverage and reimbursement assumptions for a new therapy in the weeks surrounding launch, based on communications from the product's distributor, and once those assumptions are embedded in coverage policies and internal reimbursement models, they are extraordinarily difficult to revise. (Rieger Cert. § III.C.) If the Distributor communicates with payors as the purported exclusive U.S. distributor on the basis of a pricing structure that cannot generate viable margins, those early assumptions will calcify around that structure—and because Medicare's ASP sets the reimbursement ceiling for Medicaid and the commercial payors that benchmark to Medicare, a low initial ASP remains the ceiling indefinitely. Even if Capricor at a later time obtains relief to distribute through alternative channels, it would face a market in which payors have already formed relationships, expectations, and coverage frameworks around the Distributor that Capricor cannot replicate or unwind. A reimbursement framework corrupted at launch cannot be rebuilt by any later award of damages.

The harm is also actively inflicted, not merely passively permitted. Capricor expects that the Distributor will obstruct Capricor's efforts to distribute on its own or establish alternative distribution channels by asserting the disclaimed exclusivity rights against third-party logistics providers, specialty pharmacies, and specialty distributors that Capricor would otherwise engage. (see supra § II.B.8.) Those threats, which are based on an exclusivity clause Defendants have themselves abjured, deter the very counterparties Capricor needs to mitigate patient harm. If the Distributor interferes with Capricor's efforts, fewer commercial partners will be willing to transact with Capricor at all—and that erosion, once set, cannot be reconstituted by any later damages award.

28

**B. Capricor is reasonably likely to succeed on the merits.[4]**

Capricor has a reasonable probability of success on multiple, independently sufficient grounds. Courts routinely find that "mere doubt as to the validity of the claim" is not an adequate basis for denial of a preliminary injunction. Crowe, 90 N.J. at 133.

*1. Capricor is likely to succeed on its claim for rescission due to mutual mistake.*

Under both New Jersey and New York law, rescission is available where both parties labored under a mutual mistake of fact going to a basic assumption on which the contract was made, and the mistake has a material effect on the agreed exchange of performances. See Restatement (Second) of Contracts § 152 (A.L.I. 1981); Gould v. Board of Educ., 81 N.Y.2d 446, 453, 616 N.E.2d 142, 145-46, 599 N.Y.S.2d 787, 790-91 (1993); Da Silva v. Musso, 53 N.Y.2d 543, 550-52, 428 N.E.2d 382, 386-87, 444 N.Y.S.2d 50, 54-55 (1981); Beachcomber Coins, Inc. v. Boskett, 166 N.J. Super. 442, 445-46 (App. Div. 1979).

The New York Court of Appeals' decision in Gould v. Board of Education, 81 N.Y.2d 446, 616 N.E.2d 142, 599 N.Y.S.2d 787 (1993), illustrates the doctrine. Susan Gould, an elementary school teacher, acquired tenured status without her knowledge or that of the school board. When the school board later moved to deny tenure, Gould resigned in exchange for a clean personnel file, all parties believing she was relinquishing only a probationary position. After her resignation was accepted, her counsel discovered she had in fact been tenured. See id. at 449-50, 616 N.E.2d at 143-44, 599 N.Y.S.2d at 788-89. The Court of Appeals held the resignation a nullity and ordered her reinstated, reasoning that "a contract entered into under a mutual mistake of fact is voidable and subject to rescission" where the mistake existed at the time of contracting, is substantial, and

---

[4] New York law governs the Agreement's substantive terms. (Agreement Art. 18.4.) Because the Agreement has been repudiated and is voidable, Capricor also asserts that New Jersey law supports the requested outcome.

prevents a true "meeting of the minds." Id. at 453, 616 N.E.2d at 145-46, 599 N.Y.S.2d at 790-91. The Board's good-faith ignorance of its own employee's status did not save the transaction, because "a misconception concerning a critical aspect of [the contracting party's] employment pervade[d] the entire transaction." Id. at 453, 616 N.E.2d at 146, 599 N.Y.S.2d at 791.

The New York Appellate Division has applied Gould to commercial contracts on facts more analogous to those before this Court. In Lakshmi Grocery & Gas, Inc. v. GRJH, Inc., 138 A.D.3d 1290, 30 N.Y.S.3d 743 (3d Dep't 2016), the prospective lessee of a gas station and convenience store repeatedly asked the lessor for the store's "inside sales" figures—a critical metric for the store's profitability. The lessor's president provided figures purporting to represent August 2010 sales, but those figures actually represented August 2009 sales—an error she later admitted at trial. The actual August 2010 figures were roughly thirty percent lower and "too low to permit successful operation of the store." Id. at 1291-92, 30 N.Y.S.3d at 745. The court affirmed the rescission of the lease and the dismissal of the lessor's breach-of-contract counterclaim, id. at 1291-93, 30 N.Y.S.3d at 744-46, holding that the parties' shared misapprehension as to "the basis for the store's profitability" constituted mutual mistake warranting rescission. Id. at 1292, 30 N.Y.S.3d at 745-46 (citing Gould, 81 N.Y.2d at 453, 616 N.E.2d at 145-46, 599 N.Y.S.2d at 790-91).

Here, both parties entered the Distribution Agreement on the shared assumption that its pricing formula would yield commercially viable margins for every participant in the distribution chain. The Distributor's own Capability Presentation confirmed the assumption. (Marbán Cert. ¶ 29.)

That fundamental assumption was wrong. Under the interaction between Articles 6.3 and 6.4 of the Distribution Agreement (locking Capricor, the manufacturer, as the labeler and NDC

30

owner), the ████████████████ (Capricor's only reportable sale), and 42 U.S.C. § 1395w-3a(c)(1) (anchoring ASP to the manufacturer's own sales), ████████████████

████████████████████. Rieger Cert. § V.B. To the contrary, distribution of Deramiocel will be uneconomical. As in Lakshmi, the parties' shared misapprehension goes to "the basis for [the venture's] profitability," 138 A.D.3d at 1292, 30 N.Y.S.3d at 745-46; and as in Gould, the misconception "pervade[s] the entire transaction." 81 N.Y.2d at 453, 616 N.E.2d at 146, 599 N.Y.S.2d at 791. The mistake is mutual, it goes to a basic assumption on which the parties contracted, and it materially defeats the agreed exchange. Capricor is therefore reasonably likely to prevail on its claim that the Distribution Agreement should be rescinded due to mutual mistake.

### 2. *The Distributor repudiated the Distribution Agreement.*

Under New York law, anticipatory repudiation occurs when a party communicates an "unequivocal" manifestation of intent not to perform its contractual obligations. Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 150, 379 N.E.2d 1166, 1168, 408 N.Y.S.2d 36, 38 (1978); Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463, 705 N.E.2d 656, 659, 682 N.Y.S.2d 664, 667 (1998). The party's words or conduct must be "sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." Restatement (Second) of Contracts § 250 cmt. B  (A.L.I. 1981).

The Distributor's actions effected an anticipatory repudiation. On March 27, 2026, the Distributor told Capricor that a ████████████████████" was "the only path forward" for the Distributor's continued distribution of Deramiocel. (Marbán Cert. ¶ 77.) On April 1, 2026, ████████ of NS Pharma confirmed that position in writing. (Id. ¶ 78.) The Distributor's April 10 Proposed Amendment was consistent with its repudiation. The Proposed Amendment ████████████████████████████████

████████████████████████████████████████████████

████████. The Distributor unmistakably asserted that the only path forward was one to which the parties had never agreed. Its words and actions constitute repudiation as a matter of law. Cf. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir. 2010) ("[W]here the repudiation is in writing, . . .the court may resolve the issue of repudiation 'as a matter of law.'" (citation omitted)).

Capricor materially changed its position in reliance on the repudiation. It has committed financial and personnel resources to building alternative distribution, including initiating over ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████,

and pressing other projects forward to prepare for distribution. (Marbán Cert. ¶ 80.) Capricor then accepted the repudiation by rejecting the Proposed Amendment in writing. (Marbán Cert. ¶ 82.) Once accepted, a repudiation cannot be retracted. Restatement (Second) of Contracts § 256.

Once a repudiation has been accepted and relied upon by the non-repudiating party, it cannot be withdrawn. See Restatement (Second) of Contracts § 256 (A.L.I. 1981). Capricor accepted the repudiation in writing, and changed position in reliance on it by committing substantial financial and personnel resources to alternative distribution. (See supra § II.B.8.) A party that has repudiated and had its repudiation accepted cannot re-enter the contract it walked away from by changing its mind after the fact. Defendants have no exclusivity rights left to assert.

Capricor is reasonably likely to prevail on its repudiation claim.

### 3. Defendants have materially breached the Distribution Agreement.

A material breach by one party excuses further performance by the other. Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) (applying New York law). A breach is material when it "go[es] to the root" of the agreement and "defeats the object of the parties in making the contract." Id.; see also Hadden v. Consol. Edison Co. of N.Y., Inc., 34 N.Y.2d 88, 96, 312 N.E.2d 445, 449, 356 N.Y.S.2d 249, 254-55 (1974).

The Agreement's principal object was the successful commercialization of Deramiocel. (Agreement § 5.4.) The Distributor has failed in the obligations that give effect to that object. It has failed to perform the obligations it assumed under the Distribution Agreement that are necessary to ensure a successful launch once FDA approval is received.  Among other things, ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████.  It has ██████████████████ without obtaining Capricor's prior written consent under Article 4.2 ████████████████ ████████████████████████████ that Capricor never agreed to.  It r████████████ ████████████████████████ after the July 2025 CRL was received and did not adequately reprovision. And in writing, Defendants' General Counsel disclaimed Defendants' obligations, asserting that Defendants are ████████████████████████████████ ██████████████████████████████████. (Marbán Cert. ¶ 61.) When asked about its commercial readiness, ████████████████████████████████████, told Capricor's CEO that it was ████████████████ (Id. ¶ 70.)

These failures are not technical. They describe a distributor that has comprehensively abandoned the preparations that were its consideration for exclusivity, at the very moment when

33

those preparations were most needed. (Rieger Cert. § VI.B.) Defendants' own admissions at the

███████████████████ that core launch-readiness tools remain unfinished establish the

breach. A breach this comprehensive is material as a matter of law. See Frank Felix Assocs., 111

F.3d at 289; Hadden, 34 N.Y.2d at 96, 312 N.E.2d 445, 449, 356 N.Y.S.2d 249, 254-55. Capricor

is reasonably likely to prevail on its breach claim.

### C. The balance of hardships favors Capricor

The balance of hardships decisively favors Capricor. On Capricor's side: a potentially life-extending therapy, the result of nearly two decades of research, is locked behind an exclusive distributor that has told Capricor in writing that it demands a fundamentally restructured arrangement that Capricor has repeatedly rejected. Patients with a fatal disease are suffering irreversible harm with every day of delay. (Veerapandiyan Cert. ¶¶ 18-22; Soslow Cert. ¶¶ 19-22; Stacy Cert. ¶¶ 8-9; Hay Cert. ¶¶ 2-5.)

On Defendants' side: the injunction Capricor seeks would suspend the Distribution Agreement's exclusivity provisions pending final judgment. Defendants would lose no right they have told Capricor they are prepared to exercise; Defendants have said the opposite, in writing, through their General Counsel, their CEO, and their April 10 draft amendment. (Marbán Cert. ¶ 81.)

Enforcing exclusivity under these circumstances would reward Defendants' non-performance, perpetuate harm to Duchenne patients, and prevent Capricor from distributing a therapy it has spent decades developing. The equities favor Capricor.

### D. The public interest favors injunctive relief.

The public interest overwhelmingly supports the limited equitable relief Capricor seeks.

Where, as here, public-interest considerations predominate, courts "may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they

are accustomed to go when only private interests are involved." Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth., 433 N.J. Super. 445, 454 (App. Div. 2013) (citation omitted). In such cases, a court may grant an injunction based on a full and fair weighing of the Crowe factors, including "the impact the injunction would have on the public interest," even where a plaintiff has not fully demonstrated reasonable probability of success. Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 521 (App. Div. 2008).

*First,* the public interest supports securing treatment for Duchenne patients. Approximately 15,000 individuals are living with Duchenne in the United States. (Veerapandiyan Cert. ¶ 5.) Their families have waited decades for a therapy that can meaningfully change the trajectory of this disease. (Veerapandiyan Cert. ¶¶ 22-23; Soslow Cert. ¶¶ 22-23; Stacy Cert. ¶¶ 5, 10; Hay Cert. ¶¶ 3, 5.) Deramiocel is that therapy.

The FDA's Priority Review, Orphan Drug, Regenerative Medicine Advanced Therapy, and Rare Pediatric Disease designations reflect formal agency judgments that Deramiocel addresses a serious, life-threatening condition affecting a small population with significant unmet medical need. (Rieger Cert. at § II.) The public interest in ensuring timely access to a potentially life-saving therapy for children with a fatal disease is as powerful as any interest this Court could weigh.

New Jersey courts have repeatedly granted injunctive relief where public health and medical access are at stake. See, e.g., Somerset Air Serv., 2006 WL 861498, at *1 (emergency medical helicopter service); Morris Cnty. Transfer Station, Inc. v. Frank's Sanitation Serv., Inc., 260 N.J. Super. 570, 576, 578 (App. Div. 1992) (granting an injunction to enjoin defendant from diverting solid waste from plaintiff's transfer stations: "the interest of the general public and the protection of the environment is under constant threat so long as defendants operate their garage as an illegal transfer station and continue to divert waste from lawfully designated facilities");

35

Monmouth Cnty. Corr. Inst. Inmates, 643 F. Supp. at 1228 (noting that issuance of an injunction against defendant's policies and practices on abortions was in the public interest, addressing a denial of "financial and moral assistance to those in need of essential medical services"). This case presents a more direct public-health interest: the availability of what could potentially be the only approved therapy that addresses both dimensions of a fatal childhood disease.

Defendants cannot credibly claim a competing public interest. Capricor expects Defendants not to ask this Court to permit them to distribute Deramiocel; to ask this Court to prevent Capricor from distributing Deramiocel while Defendants themselves decline to do so. There is no public interest in preventing a therapy from reaching children with a fatal disease.

**Second**, the public interest supports preserving the status quo. Brown v. City of Paterson, 424 N.J. Super. 176, 188 (App. Div. 2012) (" [T]he public interest strongly favors preserving the status quo . . . pending resolution of the litigation."). Here, the status quo is that the parties are not bound by the repudiated Agreement, Capricor is entitled to distribute through alternative means, and the parties to the contract may unwind the Distribution Agreement with or without the assistance of arbitration.

Independent of the doctrines of mutual mistake, repudiation, and breach, the Distribution Agreement itself contemplates the relief Capricor seeks. Article 4.1.2 provides that Capricor may distribute Deramiocel "through or with others . . . if and to the extent Distributor is unable to so distribute the Products due to (a) regulatory requirements; . . . or (c) Distributor being otherwise prohibited or prevented from selling and/or distributing the Products or refusing or being unable to sell and/or distribute the Products to any Customer or class of Customers other than by Customer decision." (Agreement § 4.1.2.)

36

Both conditions are satisfied. Defendants are unable to distribute Deramiocel: they lack the launch infrastructure, the pricing, the demand forecast, and the state-level regulatory authorization. (Rieger Cert. § VI.B; Marbán Cert. ¶ 75.) And the Distribution Agreement's pricing structure, as applied to the Medicare reimbursement framework, ensures that Defendants are "unable to sell and/or distribute" Deramiocel to Medicare beneficiaries, Medicaid recipients, and private-insurer patients whose payors benchmark to Medicare—categories that encompass the overwhelming majority of the Duchenne patient population. (Rieger Cert. §§ III.B, V.C-V.D.) Article 4.1.2, by its own terms, authorizes alternative distribution under present circumstances.

## CONCLUSION

For the foregoing reasons, Plaintiff Capricor Therapeutics, Inc. respectfully requests that this Court enter a preliminary injunction directing that:

(a) Defendants NS Pharma, Inc. and Nippon Shinyaku Co., Ltd., and their agents, are preliminarily enjoined from holding themselves out as the exclusive distributor of Deramiocel in the United States and from taking any action to interfere with Capricor's efforts to commercialize and distribute Deramiocel, either directly or through a third party, pending the final judgment in this action; and

(b) Capricor Therapeutics, Inc. is authorized to distribute Deramiocel on its own or through alternative distribution channels pending final judgment in this action.

37

Respectfully submitted,

**SKADDEN, ARPS, SLATE,
MEAGHER  &FLOM LLP**

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

Dated:  May 7, 2026

By:  */s/ Andrew Muscato*
Andrew Muscato

Quyen L. Ta*
Emily Haffner*
**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

William K. Wray Jr.*
**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**
500 Boylston Ave.
Boston, MA 02116
Telephone: (617) 573-4889
Facsimile: (650) 470-4570

*Attorneys for Plaintiff Capricor
Therapeutics, Inc.*

*Pro hac vice motion to be submitted

38

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION, BERGEN COUNTY**

Docket No. BER-C-000117-26

---

**CAPRICOR THERAPEUTICS, INC.,**

*Plaintiff,*

v.

**NIPPON SHINYAKU CO., LTD. and NS PHARMA, INC.,**

*Defendants.*

---

**CERTIFICATION OF RICHARD RIEGER**

**MAY 7, 2026**

I.    EXECUTIVE SUMMARY ...................................................................................................1

      A.    Qualifications ...........................................................................................................1

      B.    Assignment and Summary of Opinions ...................................................................2

II.   OVERVIEW OF THE PRODUCT AT ISSUE AND FDA APPROVAL PROCESS...................4

III.  COMMERCIALIZATION PROCESS FOR BIOPHARMACEUTICAL PRODUCTS IN THE
      UNITED STATES..............................................................................................................5

      A.    Key Product Launch and Commercialization Elements...........................................5

      B.    Pricing and Reimbursement Framework for Provider-Administered Products .......7

      C.    Importance of Successful Rare Disease Product Launches ...................................10

IV.   CAPRICOR AND NS PHARMA AND THEIR COMMERCIALIZATION AND DISTRIBUTION
      AGREEMENT ................................................................................................................12

      A.    Parties ....................................................................................................................12

      B.    Commercialization and Distribution Agreement...................................................13

            1.    Capricor's Responsibilities Under the Agreement......................................14

            2.    NS Pharma's Responsibilities Under the Agreement..................................15

V.    PRICING STRUCTURE AND ITS IMPACT ON COMMERCIAL VIABILTY ...................16

      A.    The Pricing Structure Set Forth in Exhibit A ......................................................16

      B.    Impact of the Pricing Structure on Medicare Reimbursement and Commercial Viability ...............17

      C.    Impact of the Pricing Structure on Medicaid Reimbursement and Commercial Viability ...............19

      D.    Impact of the Pricing Structure on Commercial Payor Reimbursement and Commercial Viability 20

VI.   ASSESSMENT OF NS PHARMA'S COMMERCIAL READINESS .................................22

      A.    Key Activities Included in Rare Disease Commercial Readiness ........................22

      B.    Observations Regarding NS Pharma's Commercialization Readiness .................27

VII.  CONCLUSION...............................................................................................................32

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[   ]]

## I.   EXECUTIVE SUMMARY

1. Richard Rieger certifies as follows:

2. I, Richard Rieger, Managing Director of Berkeley Research Group, LLC ("BRG"), 70 West Madison Street, Chicago, IL 60602, hereby submit my opinions in the above-captioned matter.

3. I understand that the above-captioned matter was brought by Capricor Therapeutics, Inc. ("Capricor") against Nippon Shinyaku Co., Ltd. and its United States ("U.S.") subsidiary, NS Pharma, Inc. (collectively, "NS Pharma"), and concerns a dispute arising under a Commercialization and Distribution Agreement ("Agreement") between the parties. I further understand that the dispute relates to, among other things, the economic structure of the Agreement, including the pricing provisions set forth in Exhibit A, and NS Pharma's preparedness to fulfill its commercialization and distribution responsibilities for Deramiocel in the U.S. I describe these issues in detail below.

4. The opinions in this certification are my own and are based upon my education, professional experience, the references cited in this certification, and examination of the documents and other information provided to me by counsel for Capricor for this matter. The specific materials that I have relied upon to form my opinions are cited in this certification and are listed in **Attachment 1**. My opinions are subject to change should I receive additional documents and/or information, and I reserve the right to supplement and/or amend this certification should additional information become available to me.

5. In preparing this certification, I have been assisted by staff at BRG, working under my supervision and control. BRG bills for professional services rendered based on actual hours incurred at contractually agreed-upon rates per hour. My billing rate is $1,300 per hour. BRG's compensation in this matter is not dependent on, or in any way contingent upon, my findings or opinions or the outcome of this matter.

### A. Qualifications

6. I have more than thirty years of experience as a senior operating executive and advisor to pharmaceutical, biotechnology, and medical device companies, private equity and credit investors, their portfolio companies, and law firms and their clients. My work spans corporate strategy, research and development, strategic alliances and mergers and acquisitions, commercialization, manufacturing,

supply chain, and operations. Over the course of my career, I have evaluated more than one thousand biopharmaceutical and medical device products and technologies at the preclinical, clinical development, and marketed stages, and I have executed global strategic alliance and merger and acquisition transactions and led commercialization initiatives in numerous countries.

7. Before joining BRG, I held senior operating and advisory roles in life sciences, including Managing Director, Life Sciences at Alvarez & Marsal; Managing Director, Life Sciences at Huron Life Sciences (acquired by Oliver Wyman); Vice President of Business Development at Horizon Therapeutics (acquired by Amgen); General Manager and Head of Global Pharmaceuticals at Baxter Healthcare Corporation; Principal, Life Sciences at L.E.K. Consulting; and Director of Business Development and International Marketing at Abbott Laboratories (now AbbVie). In these roles I led, structured, or advised on the licensing, acquisition, launch and/or commercialization of numerous specialty biopharmaceutical and rare disease products, including Tepezza®, Krystexxa®, Synagis®, Humira®, Lupron®, Flomax®, Mobic®, Micardis®, Firdapse®, Ilumya®, Odomzo®, and the emtricitabine compound that later became part of Gilead Sciences' human immunodeficiency virus combination products.

8. My specialty biopharmaceutical, orphan drug, and rare disease commercialization experience includes work involving cell and gene therapy, precision medicine, and companion diagnostics. I served on the Board of the National Marrow Donor Program as a Cell Therapy Leader from 2013 through 2020, and I currently serve, since 2014, on the Scientific Advisory Board of Gateway for Cancer Research.

9. I hold a Master of Business Administration in Finance and General Management from the University of Chicago Booth School of Business and a Bachelor of Science in Electrical Engineering from the University of Notre Dame. My professional Curriculum Vitae is provided in **Attachment 2**.

10. My testimony within the last four years is listed in **Attachment 3**.

## B. Assignment and Summary of Opinions

11. I have been retained by Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Capricor, to provide expert opinions regarding (i) the structural economic issues created by the pricing terms in the Commercialization and Distribution Agreement between Capricor and NS Pharma, and (ii) NS Pharma's readiness for the launch and commercialization of the novel cell therapy product, Deramiocel, for the treatment of a rare disease. Capricor and NS Pharma entered into the Agreement

on January 24, 2022, pursuant to which NS Pharma became the exclusive U.S. distributor of Deramiocel with a term running through ██████████. The Agreement is described in more detail in Section IV.B. below. This certification is submitted in support of Capricor's motion for a preliminary injunction. The matter is at an early stage, and discovery has not yet commenced. Accordingly, the opinions expressed herein are based on the materials currently available to me. If I were asked to prepare a full expert report at a later stage in this dispute, I would expect to consider additional materials and potentially conduct further analysis.

12. Based on my experience as a commercial executive and adviser in the biopharmaceutical industry, and the materials that I have considered in this matter, I have been asked to provide my opinion as to:

   a. Whether the Deramiocel pricing structure as currently contemplated under the Agreement yields adequate economic value for the biopharmaceutical value chain participants to make Deramiocel commercially viable; and

   b. Whether, based on the materials available, NS Pharma is at the stage of commercial readiness that I would expect for a successful launch and commercialization of Deramiocel after the current Prescription Drug User Fee Act ("PDUFA") target action date.

13. My opinions are presented in greater detail throughout this certification. In summary, it is my opinion that:

   a. Under the Agreement, the Deramiocel pricing structure would not generate adequate economics for biopharmaceutical value chain participants to enable a product launch and sustained product adoption; and

   b. NS Pharma does not appear ready to support a successful Deramiocel launch and commercialization after the current PDUFA target action date, as key areas of commercial readiness have either not been addressed or have not been adequately developed to biopharmaceutical industry standards.

## II.   OVERVIEW OF THE PRODUCT AT ISSUE AND FDA APPROVAL PROCESS

14. The product at issue, Deramiocel, is a first-in-class allogeneic cardiosphere-derived cell therapy being developed for the treatment of Duchenne muscular dystrophy ("DMD"). DMD is a rare, progressive, and ultimately fatal neuromuscular disorder characterized by degeneration of skeletal and cardiac muscle. It is estimated that there are about 15,000 people living with DMD today in the U.S.[1] Deramiocel is designed as a repeat-dosing therapy administered by infusion in a clinical setting and has demonstrated clinical benefits across both skeletal muscle function and cardiac function in clinical studies. Approximately 24% of that target DMD population is covered by Medicare Part B; approximately 11% is covered by Medicaid; and approximately 57% is covered by commercial health plans, including private/individual insurance and commercial/employer insurance.[2]

15. Capricor is the developer, manufacturer, and regulatory sponsor of Deramiocel, and is the holder of the Biologics License Application ("BLA") for the product. As the marketing authorization holder, Capricor is responsible for regulatory interactions with the U.S. Food and Drug Administration ("FDA"), including submission and maintenance of the BLA and supporting clinical and manufacturing data.[3]

16. In December 2024, Capricor filed a BLA for Deramiocel, and the FDA assigned an initial PDUFA target action date of August 31, 2025.[4] In July 2025, the FDA issued a Complete Response Letter

---

[1] *About Duchenne,* Parent Project Muscular Dystrophy, *available at* https://www.parentprojectmd.org/about-duchenne/ (last accessed Apr. 24, 2026).

[2] *Fifteen Year Registry Report,* Parent Project Muscular Dystrophy (2023), *available at* https://www.parentprojectmd.org/wp-content/uploads/2023/08/PPMD_15-Year-Registry-Report_2023.pdf at p. 29. Note that 3% of patients report coverage through military/military dependent insurance and 2% report no insurance coverage.

[3] *See* 21 C.F.R. § 601.2(a).

[4] *Capricor Formally Submits BLA for Deramiocel in Duchenne Muscular Dystrophy Cardiomyopathy,* NeurologyLive (Jan. 2, 2025), *available at* https://www.neurologylive.com/view/capricor-completes-bla-submission-deramiocel-dmd-cardiomyopathy; *Capricor Therapeutics Provides Regulatory Update on Deramiocel BLA for Duchenne Muscular Dystrophy,* Capricor Therapeutics (June 24, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/318/capricor-therapeutics-provides-regulatory-update-on.

("CRL") declining to approve the BLA in its then-current form.[5] In December 2025, after Capricor reported positive Phase 3 HOPE-3 results, the FDA lifted the CRL and reopened the BLA for review.[6]

17. The FDA has accepted Capricor's resubmitted BLA for Deramiocel as a Class 2 resubmission under the PDUFA. The agency has established a PDUFA target action date of August 22, 2026, by which it is expected to complete its review and issue a decision regarding marketing approval.[7] Deramiocel has received Orphan Drug Designation and has been granted Regenerative Medicine Advanced Therapy designation and Rare Pediatric Disease Designation from the FDA.[8] Deramiocel is under FDA priority review.[9]

18. As of the date of this certification, Deramiocel has not yet received FDA approval and therefore cannot be commercially marketed in the U.S. However, the acceptance of the BLA resubmission and the assignment of a PDUFA target action date indicate that the product is in the final stage of the regulatory review process.[10] In my experience, this period is typically a critical pre-launch phase during which commercialization activities must be completed in preparation for potential approval and launch.

## III. COMMERCIALIZATION PROCESS FOR BIOPHARMACEUTICAL PRODUCTS IN THE UNITED STATES

### A. Key Product Launch and Commercialization Elements

---

[5] *Capricor Therapeutics Provides Regulatory Update on Deramiocel BLA for Duchenne Muscular Dystrophy,* Capricor Therapeutics (July 11, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/319/capricor-therapeutics-provides-regulatory-update-on; *See Complete Response Letter: BLA 125842/0,* FDA (July 9, 2025), *available at* https://download.open.fda.gov/crl/CRL_BLA125842_20250709.pdf.

[6] *Capricor's DMD Cardiomyopathy Cell Therapy Deramiocel Back Under Review by FDA,* NeurologyLive (Mar. 10, 2026), *available at* https://www.neurologylive.com/view/capricor-dmd-cardiomyopathy-cell-therapy-deramiocel-back-under-review-fda; *See Capricor Therapeutics Announces Positive Topline Results from Pivotal Phase 3 HOPE-3 Study of Deramiocel in Duchenne Muscular Dystrophy,* Capricor Therapeutics (Dec. 3, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/331/capricor-therapeutics-announces-positive-topline-results.

[7] *Capricor Therapeutics Announces Establishment of New PDUFA Date for Deramiocel BLA,* Capricor Therapeutics (Mar. 10, 2026), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/338/capricor-therapeutics-announces-establishment-of-new-pdufa.

[8] *Capricor Therapeutics Announces Establishment of New PDUFA Date for Deramiocel BLA,* Capricor Therapeutics (Mar. 10, 2026), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/338/capricor-therapeutics-announces-establishment-of-new-pdufa.

[9] *FDA grants priority review to deramiocel for DMD heart disease,* Muscular Dystrophy News (Mar. 6, 2025), *available at* https://musculardystrophynews.com/news/fda-priority-review-granted-deramiocel-dmd-heart-disease/

[10] *See Understanding the FDA Approval Process,* Pharmacy Times (Mar. 20, 2025), *available at* https://www.pharmacytimes.com/view/understanding-the-fda-approval-process-and-pdufa-dates, ("Overall, the PDUFA date serves as the anticipated FDA approval date, if approved."); *See e.g., Community Bulletin: BLA Accepted for Filing With Priority Review,* Sarepta Therapeutics (Nov. 28, 2022), *available at* https://www.sarepta.com/community-bulletin-bla-accepted-filing-priority-review, ("If a BLA application is accepted for filing, this means that the FDA has determined the application is sufficiently complete and the agency can move forward with a substantive review.").

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*

19. The commercialization of a biopharmaceutical product in the U.S. involves a multi-functional and highly coordinated process.[11] At a high level, this process is organized across key functional areas, including, but not limited to, sales, marketing, including pricing, market access, and reimbursement, medical affairs, manufacturing, distribution, patient advocacy, and patient support services. Key elements within these functional areas include, but are not limited to, the development of: i) a field-based salesforce and promotional messaging based on the expected product label;[12] ii) a team of Medical Science Liaisons ("MSLs") who provide scientific education;[13] iii) other go-to-market programs, including patient identification, customer market mapping, payor segmentation, and demand forecasting;[14] iv) relationships with prescribers and other stakeholders responsible for decisions about whether and how the product will be prescribed and used;[15] v) net revenue forecasts based on unit sales, pricing, market access, and reimbursement;[16] vi) infrastructure for supply chain and product distribution of a physician administered product;[17] vii) access and reimbursement support services;[18] and viii) processes for complying with any post-approval actions required by FDA.[19]

20. Each of these elements must be developed in parallel and incorporated into a comprehensive launch and commercialization plan. The effectiveness of a product launch and commercialization depends not only on the quality of each individual component, but also how these components function together in an integrated manner.

---

[11] *See The Drug Development Process,* FDA, *available at* https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process (last updated Jan. 1, 2018); *Understanding Pharmaceutical Commercialization: Stages of Launching to Market*, Medical Packaging, *available at* https://medpak.com/pharmaceutical-commercialization/ (last accessed Apr. 24, 2026).

[12] Matikainen, M., et al., (2015). *Determinants of New Product Launch Success in the Pharmaceutical Industry,* Journal of Pharmaceutical Innovation, 10: 175-189; *See also Labeling and Promotion Guidances,* FDA, *available at* https://www.fda.gov/vaccines-blood-biologics/general-biologics-guidances/labeling-and-promotion-guidances (last updated Dec. 10, 2025).

[13] *The Role of Medical Affairs from Research & Design to Commercialization*, Accreditation Council for Medical Affairs (Oct. 8, 2018), *available at* https://medicalaffairsspecialist.org/blog/the-role-of-medical-affairs-from-research-design-to-commercialization.

[14] *See* Matikainen et al., (2015). *Determinants of New Product Launch Success in the Pharmaceutical Industry,* Journal of Pharmaceutical Innovation, 10: 175-189.

[15] *HCP and KOL Mapping: A Comprehensive Guide for Pharma Teams (U.S.),* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/hcp-kol-mapping-comprehensive-guide-pharma-teams (last updated Jan. 11, 2026).

[16] *Pharma Commercial Operations: Bringing Products to Market,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharma-commercial-operations (last accessed Apr. 24, 2026).

[17] *Pharma Supply Chain: A Competitive Guide,* PharmaSource, *available at* https://pharmasource.global/content/guides/category-guide/pharma-supply-chain-a-comprehensive-guide-to-the-pharmaceutical-supply-chain/ (last accessed Apr. 24, 2026).

[18] *Patient Support Programs: A Guide for Pharma Leaders,* Zelthy, *available at* https://www.zelthy.com/blog/what-are-patient-support-programs-a-complete-guide (last updated Mar. 31, 2026).

[19] *Effective Strategies for Post-approval Lifecycle Management and Local Pharmacovigilance,* IQVIA (June 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/effective_strategies_for_post-approval_lcm.pdf; *See also Postmarketing Requirements and Commitments: Introduction,* FDA, *available at* https://www.fda.gov/drugs/guidance-compliance-regulatory-information/postmarketing-requirements-and-commitments-introduction (last updated Aug. 9, 2024).

## B. Pricing and Reimbursement Framework for Provider-Administered Products

21. Pricing and reimbursement are foundational components of the product launch and commercialization process described above, particularly for products administered by healthcare providers in clinical settings. In these settings, products are typically reimbursed under the medical benefit (i.e., Medicare Part B) rather than the pharmacy benefit (i.e., Medicare Part D), and provider economics plays a key role in determining access and utilization. As a result, manufacturer pricing decisions must be closely aligned with reimbursement methodologies and access strategies across government and commercial payors. In addition, manufacturers should consider evolving federal policy frameworks, including the Inflation Reduction Act ("IRA") and proposals such as the Most Favored Nation Model ("MFN"), which introduce new constraints on pricing flexibility and increase the importance of aligning early pricing decision with long-term reimbursement and access considerations. [20]

22. Manufacturers, defined as the NDC (National Drug Code)-holders, establish the price for biopharmaceutical products, commonly referred to as the Wholesale Acquisition Cost ("WAC"). [21] It is commonly known as a product's list price. [22] However, for provider-administered products, reimbursement is more directly tied to the product's Average Sales Price ("ASP"), which reflects actual transaction prices net of adjustments, including discounts, rebates, and chargebacks in the value chain. [23]

23. For provider-administered products, manufacturers are required to submit ASP to Centers for Medicare & Medicaid Services ("CMS") within 30 days after the close of the previous quarter. [24] These reported ASPs form the basis for reimbursement payment amounts in a subsequent quarter, resulting

---

[20] *See An Evaluation Framework for the Inflation Reduction Act's Medicare Prescription Drug-Related Provisions,* Office of the Assistant Secretary for Planning & Evaluation (ASPE), *available at* https://aspe.hhs.gov/sites/default/files/documents/73ab6a4ac654312dab18b69969106c60/aspe-ira-evaluation-framework-report.pdf; and *International Reference Pricing for Prescription Drugs*, Brookings Inst. (July 9, 2025), *available at* https://www.brookings.edu/articles/international-reference-pricing-for-prescription-drugs/. The IRA, signed into law in 2022, included several provisions expected to decrease prescription drug access. Included in the IRA is the Medicare Drug Price Negotiation Program, which empowers the federal government to negotiate prices for certain high-cost drugs without generic or biosimilar competition. MFN drug pricing is a policy that aims to lower U.S. prescription drug prices by requiring manufacturers to charge Medicare or other public programs a price equal to or lower than the second-lowest manufacturer-reported net price in other developed nations.

[21] 42 U.S. Code § 1395w-3a.

[22] *From ASP to WAC: 8 key drug pricing terms life science companies should know,* Milliman (Mar. 5, 2026), *available at* https://www.milliman.com/en/insight/asp-wac-8-key-drug-pricing-terms-life-science.

[23] 42 C.F.R. § 414.904(c) ("The average sales price is the volume-weighted average of the manufacturers' average sales prices for all National Drug Codes assigned to the drug or biological product.").

[24] *Average Sales Price (ASP) Quarterly Publication Process, Frequently Asked Questions,* CMS (March 9, 2026), *available at* https://www.cms.gov/files/document/frequently-asked-questions-faqs-asp-data-collection.pdf, p. 4.

in an effective two-quarter lag between the underlying sales activity and its impact on reimbursement rates.[25] ASP thus serves as a key benchmark for provider reimbursement over time.

24. Reimbursement methodologies vary by payor: Medicare Part B relies on an ASP-based formula, while Medicaid programs and commercial payors often use ASP as a reference point but apply their own methodologies, adjustments, and contractual terms.[26] As a result, manufacturer contracting and discounting practices that affect ASP can have broad company and provider impacts across multiple payor channels. These dynamics may be further influenced by the IRA, if applicable, which would link certain future reimbursement levels to negotiated prices and inflation-based rebates, thereby increasing the significance of early pricing and contracting decisions that shape ASP.

25. Under Medicare Part B, provider-administered products are typically reimbursed based on ASP plus a percentage add-on (historically ASP + 6%, subject to sequestration adjustments that reduce the effective add-on).[27,28] For instance, providers can purchase products in advance, typically at prices based on WAC less negotiated discounts, maintain inventory, administer them to patients, and then seek reimbursement after administration. Because reimbursement is tied to ASP plus a fixed percentage, providers rely on the relationship between their acquisition cost and ASP to acknowledge the storage and handling of these products, and to generate a margin for services rendered.[29] The IRA may alter these dynamics over time by introducing negotiated pricing for certain high-expenditure products, which could reduce ASP and compress provider margins.[30]

26. Importantly, ASP represents a volume-weighted average of manufacturer sales net of discounts, rebates, chargebacks, and other adjustments, and is intended by CMS to approximate providers'

---

[25] *Average Sales Price (ASP) Quarterly Publication Process, Frequently Asked Questions,* CMS (March 9, 2026), *available at* https://www.cms.gov/files/document/frequently-asked-questions-faqs-asp-data-collection.pdf, p. 4.

[26] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf; *From ASP to WAC: 8 key drug pricing terms life science companies should know*, Milliman (Mar. 5, 2026), *available at* https://www.milliman.com/en/insight/asp-wac-8-key-drug-pricing-terms-life-science

[27] *Medicare Part B Average Drug Sales Price,* CMS, *available at* https://www.cms.gov/medicare/payment/fee-for-service-providers/part-b-drugs/average-drug-sales-price (last accessed May 5, 2026).

[28] A sequestration adjustment under Medicare Part B is a mandatory federal budget cut that reduces what Medicare pays providers for services; *See* Weidner et al., (2021). *Observations Regarding the Average Sales Price Reimbursement Methodology.* Evidence-Based Oncology, 27(4), *available at* https://www.ajmc.com/view/observations-regarding-the-average-sales-price-reimbursement-methodology.

[29] *Commercial Spillover Impact of Part B Negotiations on Physicians,* Avalere Health (Sept. 16, 2024), *available at* https://advisory.avalerehealth.com/insights/commercial-spillover-impact-of-part-b-negotiations-on-physicians.

[30] *Commercial Spillover Impact of Part B Negotiations on Physicians,* Avalere Health (Sept. 16, 2024), *available at* https://advisory.avalerehealth.com/insights/commercial-spillover-impact-of-part-b-negotiations-on-physicians.

acquisition costs.[31] Because ASP incorporates transactions at varying price levels, including discounted sales to certain purchasers, it does not correspond to any single buyer's purchase price. In practice, some providers are able to purchase products at prices below ASP, while others purchase at prices at or above ASP.[32] As a result, ASP may be slightly lower than the effective acquisition cost for a meaningful portion of providers, while still approximating the market-wide average acquisition cost.

27. This model exposes providers to financial risk related to biopharmaceutical product acquisition costs, reimbursement levels, and payment timing, creating potential cash flow pressures. As a result, providers are highly sensitive to the spread between acquisition cost and reimbursement.

28. Medicaid reimbursement for provider-administered products varies by state but is often benchmarked, directly or indirectly, to Medicare Part B reimbursement methodologies, including ASP-based rates.[33] In practice, many states establish payment levels for provider-administered products by reference to the Medicare ASP framework, either through ASP-based formulas or by using Medicare payment limits as a baseline for their fee schedules, with state-specific adjustments.[34] Separately, under the Medicaid Drug Rebate Program, manufacturers are required to report Average Manufacturer Price ("AMP") and best price, which are used to calculate mandatory rebate obligations.[35] These rebates include a base rebate, generally calculated as a percentage of AMP or the difference between AMP and best price, and, where applicable, an additional inflation-based component.[36]

---

[31] 42 C.F.R. § 414.804(a)(1)-(3); *See also Part B Drugs and Biologicals,* CMS, *available at* https://www.cms.gov/cms-guide-medical-technology-companies-and-other-interested-parties/payment/part-b-drugs (last accessed Apr. 24, 2026).

[32] *See Medicate Part B drug and oncology payment policy issues,* MedPac (June 2016), *available at* https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-5-medicare-part-b-drug-and-oncology-payment-policy-issues-june-2016-report-.pdf at 124-125.

[33] *State Prescription Drug Resources,* Medicaid.gov, *available at* https://www.medicaid.gov/medicaid/prescription-drugs/state-prescription-drug-resources (last accessed Apr. 24, 2026); *Medicaid Covered Outpatient Prescription Drug Reimbursement Information by State,* Medicaid.gov (Dec. 2025), *available at* https://www.medicaid.gov/medicaid/prescription-drugs/downloads/medicaid-prescription-reimbursement.pdf.

[34] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf at 10-11.

[35] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf.

[36] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf.

29. Commercial payors similarly benchmark reimbursement to Medicare Part B, using ASP as a reference point while applying negotiated adjustments that vary by contract, site of care, and provider type.[37] Although commercial payors are not bound by CMS reimbursement rules, Medicare's ASP-based framework serves as a foundational benchmark in the market.[38] Reimbursement can be structured as a percentage above ASP, although alternative payment arrangements may also be used. As a result, early pricing decisions and the evolution of ASP can have a direct and lasting impact on market access and provider reimbursement across the commercial payor landscape.

30. Taken together, these dynamics make pricing and reimbursement ongoing strategic components of commercialization rather than a one-time launch decision. Pricing must balance consideration of biopharmaceutical value chain participant economics, including the effects of discounting and contracting practices on ASP and, in turn, reimbursement across payor segments. In addition, pricing activities must proactively account for policy-driven risks, including IRA-related price negotiations and inflation, as well as the potential for MFN international reference pricing frameworks, both of which can materially affect long-term pricing flexibility, market access, and revenue realization.

## C. Importance of Successful Rare Disease Product Launches

31. The importance of effective execution across these commercialization elements, including pricing, reimbursement, and market access, is further amplified in the context of rare disease therapies, where small patient populations, high treatment costs, and heightened payor scrutiny, as evidenced by restrictive coverage criteria, rigorous evidentiary standards extending beyond regulatory approval, and active budget impact management, make access and reimbursement critical determinants of launch success.[39] A well-planned product launch is a key driver of both near-term performance and long-term commercial success. In industry practice, launch effectiveness is evaluated through several related metrics, including the rate of product adoption among prescribing physicians, the level and consistency

---

[37] *Medicare Part B Reimbursement of Prescription Drugs,* ASPE Issue Brief (June 2014), *available at* https://aspe.hhs.gov/sites/default/files/private/pdf/106966/ib_mprpd.pdf at 3; *See Commercial reimbursement benchmarking*, Milliman (Nov. 20, 2023), *available at* https://www.milliman.com/en/insight/commercial-reimbursement-benchmarking-payment-rates-medicare-fee-for-service.

[38] *Medicare Part B Reimbursement of Prescription Drugs,* ASPE Issue Brief (June 2014), *available at* https://aspe.hhs.gov/sites/default/files/private/pdf/106966/ib_mprpd.pdf at 3.

[39] *From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf *Rising to the Challenge: Launch Success Factors for an Intensifying Landscape, With a Spotlight on Rare Disease,* ClearView Healthcare Partners (Sept. 2025), *available at* https://clearviewhcp.com/wp-content/uploads/2025/09/LC-Launch-Excellence-White-Paper.pdf; *See also* Chaudhary, A., Kumar, V., (2025). *Rare diseases: a comprehensive literature review and future directions.* Journal of Rare Diseases, 4(33), *available at* https://link.springer.com/article/10.1007/s44162-025-00099-6.

of utilization, patient adherence, a manufacturer's realized net price,[40] and how these factors translate into sustained revenue. When these elements are aligned and executed effectively, a product can achieve rapid adoption, establish a strong position in its therapeutic category, and maintain momentum over time. By contrast, gaps in launch planning, whether in pricing, market access, reimbursement, distribution, or stakeholder engagement, among others, can disrupt these dynamics and limit a product's commercial potential.

32. These consequences are more pronounced in rare disease therapies. Because the patient population is small, each patient represents a meaningful share of the total market. Early performance cannot be offset over time through volume growth as it might be in larger therapeutic categories. A strong launch allows for efficient identification and treatment of a large portion of eligible patients. A poorly executed launch can result in missed or delayed treatment opportunities that are not recoverable, both clinically and commercially.

33. The early launch period is therefore especially important. Problems with access and reimbursement, including pricing-related constraints and uncertainty regarding coverage, can create immediate barriers to adoption and patient treatment. Operational challenges such as delays in distribution, commercial and government payor participation, reimbursement constraints, or lack of provider readiness, among other factors, can also limit adoption. Based on my industry experience, payor coverage frameworks and reimbursement assumptions established during a product's launch phase can enable success, severely harm it, or may be difficult to modify in the future. Therefore, a product without a viable pricing structure in the market may face lasting barriers to adoption that limit its long-term commercial viability. These barriers may shape provider prescribing behavior and patient confidence in ways that affect adoption trajectories even after the underlying issues are resolved.[41] In rare disease settings, where the treating community is small and closely connected, information about early experiences spreads quickly, especially in an era of social media,  and further amplifies the impact of initial launch execution.[42]

---

[40] The net realized price is the actual amount a manufacturer receives per unit of a drug after all discounts, rebates, and other adjustments are applied.

[41] *Unlocking Pharma Launch Excellence: Key Drivers of Product Success,* Indegene, *available at* https://www.indegene.com/what-we-think/reports/achieving-product-launch-success-in-the-biopharma-industry (last accessed Apr. 24, 2026); *From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf.

[42] *See From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf.

34. From a patient perspective, the stakes are significant. For rare diseases, patients and their families are often highly engaged and may have few or no alternative treatment options.[43] In many cases the diseases are progressive, so delays in treatment can lead to more severe health issues and even death.[44] Timely and reliable access backed by adequate reimbursement support is therefore a critical part of care, not simply a matter of convenience.

35. From a commercial perspective, each patient also carries greater importance. Rare disease therapies are typically associated with higher per-patient costs, reflecting both development complexity and the limited size of the population.[45] As a result, the successful identification and treatment of each patient is central to overall performance. The loss or delay of even a small number of patients can have a material impact on revenue and long-term market position.

36. Taken together, these factors show that in rare disease markets, product launch and commercial execution must be both comprehensive and precise. A well-executed launch can support rapid product adoption and sustainable commercial success.[46] A poorly executed launch can lead to results that are difficult to correct, and, in some cases, irreversible.

## IV. CAPRICOR AND NS PHARMA AND THEIR COMMERCIALIZATION AND DISTRIBUTION AGREEMENT

### A. Parties

37. Plaintiff Capricor is a biotechnology company that developed Deramiocel, a novel allogenic cell therapy for the treatment of DMD.[47] Under the Agreement, Capricor is responsible for the development and manufacturing of the product.[48]

38. Defendant NS Pharma is the U.S. affiliate responsible for Deramiocel commercialization under the Agreement. It is my understanding that NS Pharma has been designated by Nippon Shinyaku as a

---

[43] *See* Chaudhary, A., Kumar, V., (2025). *Rare diseases: a comprehensive literature review and future directions.* Journal of Rare Diseases, 4(33), *available at* https://link.springer.com/article/10.1007/s44162-025-00099-6.

[44] *The Unique Clinical and Economic Challenges of Rare Disease Diagnosis,* Rare Disease Company Coalition (Jan. 11, 2022), *available at* https://www.rarecoalition.com/2022/01/11/unique-clinical-and-economic-challenges-of-rare-disease/.

[45] *Orphan Drug Development – What are the Real Costs?,* Health Advances (Apr. 10, 2019), *available at* https://healthadvances.com/insights/blog/orphan-drug-development-what-are-the-real-costs.

[46] Matikainen, M., et al., (2015). *Determinants of New Product Launch Success in the Pharmaceutical Industry,* Journal of Pharmaceutical Innovation, 10: 175-189; *The Role of Medical Affairs from Research & Design to Commercialization*, Accreditation Council for Medical Affairs (Oct. 8, 2018), *available at* https://medicalaffairsspecialist.org/blog/the-role-of-medical-affairs-from-research-design-to-commercialization.

[47] *About Us,* Capricor Therapeutics, *available at* https://www.capricor.com/about (last accessed Apr. 24, 2026).

[48] Commercialization and Distribution Agreement (Jan. 24, 2022) ("Agreement") § 2.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[  ]]                                                                                          Page 12

subdistributor under the Agreement and is the exclusive distributor for Deramiocel in the U.S. under the Agreement.[49]

39. Defendant Nippon Shinyaku is the parent company of NS Pharma and a party to the Agreement. Under the terms of the Agreement, Nippon Shinyaku is responsible for the performance of NS Pharma's obligations and is fully liable for NS Pharma's acts and omissions in connection with commercialization of the product.[50]

## B. Commercialization and Distribution Agreement

40. The Agreement between Capricor and NS Pharma establishes a division of responsibilities under which Capricor retains control over the development, manufacturing, and regulatory approval of Deramiocel, while NS Pharma assumes responsibility for its commercialization and distribution in the U.S. The Agreement is structured as an exclusive distribution arrangement, pursuant to which NS Pharma purchases finished product from Capricor and resells it to healthcare providers. The economic terms of the Agreement, including the pricing structure set forth in Exhibit A to the Agreement, are intended to govern the allocation of revenue between the parties and to support the commercial launch and ongoing distribution of Deramiocel following regulatory approval.

41. Pursuant to the Agreement, both Capricor and NS Pharma share responsibility for key strategic and operational decisions through a Joint Steering Committee ("JSC").[51] The JSC is a jointly constituted governance body comprised of an equal number of representatives from each Party, with each Party responsible for appointing and maintaining its representatives.[52] The JSC meets on a regular basis and serves as the primary forum for coordination, oversight, and joint decision-making with respect to matters such as clinical development progress, forecasting, pricing, and Minimum Sales Requirements, as well as the resolution of certain disputes.[53] In addition to the JSC, both Capricor and NS Pharma have responsibility for their respective operational functions, as described in more detail below.

---

[49] Agreement § 4.
[50] Agreement §§ 4.2, 11.
[51] Agreement § 2.6.
[52] Agreement § 2.6.1.
[53] Agreement § 2.6.2-3.

### 1. Capricor's Responsibilities Under the Agreement

42. Under the Agreement, Capricor is responsible for the development, manufacturing, and regulatory stewardship of Deramiocel.[54] These responsibilities reflect Capricor's role as the product's sponsor, manufacturer, and holder of the BLA, and they encompass the activities necessary to bring the product to the point of regulatory approval and maintain that approval over time.

43. Capricor's development responsibilities include the design and execution of clinical trials, analysis of clinical data, and generation of evidence necessary to support regulatory submissions.[55] Capricor conducted the clinical development program for Deramiocel, including Phase 2 and Phase 3 studies,[56] and is responsible for ongoing data generation, including long-term follow-up and any post-marketing commitments required by the FDA.[57]

44. Capricor is also responsible for manufacturing Deramiocel.[58] This includes production of the product, quality control and quality assurance, maintenance of manufacturing facilities, and compliance with applicable current Good Manufacturing Practice ("cGMP") requirements.[59] Capricor must ensure that the product is manufactured consistently, meets all regulatory specifications, and is available in sufficient quantities to support demand.[60]

45. In addition, Capricor retains primary responsibility for regulatory affairs. This includes preparation, submission, and maintenance of the BLA, management of interactions with the FDA, and compliance with all regulatory requirements applicable to a licensed biological product. Capricor is responsible for product labeling, pharmacovigilance, and ongoing reporting obligations, as well as for securing and maintaining any necessary approvals for the product's commercialization in the U.S.[61]

---

[54] Agreement § 2.

[55] Agreement § 2.1-4.

[56] *See Capricor Therapeutics Announces Positive 4-Year Data from HOPE-2 Open-Label Extension Study of Deramiocel in Duchenne Muscular Dystrophy*, Capricor Therapeutics (June 20, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/317/capricor-therapeutics-announces-positive-4-year-data-from; and *Capricor Therapeutics Announces Positive Topline Results from Pivotal Phase 3 HOPE-3 Study of Deramiocel in Duchenne Muscular Dystrophy,* Capricor Therapeutics (Dec. 3, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/331/capricor-therapeutics-announces-positive-topline-results.

[57] Agreement § 2.5.

[58] Agreement § 2.4.

[59] *See Current Good Manufacturing Practice (CGMP) Regulations,* FDA, *available at* https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations (last updated Nov. 25, 2025); *The Pharmaceutical Manufacturing Process – Steps, Tools, and Considerations,* ThomasNet, *available at* https://www.thomasnet.com/articles/chemicals/the-pharmaceutical-manufacturing-process-steps-tools-and-considerations/ (last accessed Apr. 24, 2026).

[60] *Current Good Manufacturing Practice (CGMP) Regulations,* FDA, *available at* https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations (last updated Nov. 25, 2025).

[61] Agreement § 2.1-5.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[    ]]                                                                                     Page 14

46. Capricor also maintains ownership of the product and its associated intellectual property, including trade names and trademarks.[62] As the marketing authorization holder, Capricor is responsible for the safety, quality, and regulatory compliance of Deramiocel, even where certain commercialization functions are delegated to its distribution partner.[63]

### 2.   NS Pharma's Responsibilities Under the Agreement

47. Under the Agreement, NS Pharma is responsible for the commercialization and distribution of Deramiocel in the U.S.[64] These responsibilities encompass the activities necessary to prepare the market for launch and to ensure that the product is available to biopharmaceutical value chain participants, including, patients and providers, following FDA approval.

48. More specifically, based on the Agreement and what is considered commercially reasonable in the industry, NS Pharma's responsibilities include:

    a. Developing and maintaining relationships with healthcare providers and treatment centers.[65] In my experience, this would include identifying and preparing sites of care capable of administering Deramiocel, supporting provider training and education, and ensuring that providers have the operational and reimbursement support necessary to administer the therapy.

    b. Establishing and managing the distribution and logistics infrastructure required to deliver Deramiocel to treatment sites.[66] This typically includes contracting with third-party logistics providers, specialty distributors, and specialty pharmacies, as appropriate, obtaining necessary state distribution licenses, and ensuring that product handling, storage, and transportation meet applicable requirements, including those specific to cell therapies like Deramiocel.

    c. Patient support services.[67] For a product like Deramiocel, it often includes implementation of patient Hub services to assist with benefits verification, prior authorization, procedural

---

[62] Agreement § 13.1.

[63] *See Current Good Manufacturing Practice (CGMP) Regulations,* FDA, *available at* https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations (last updated Nov. 25, 2025); and *Drug Shortages,* FDA, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/drug-shortages (last updated Dec. 23, 2025).

[64] Agreement §§ 4-5.

[65] Agreement §§ 1.7, 5.3, and 5.5.3.

[66] Agreement §§ 5.5.6, and 5.11.

[67] Agreement § 5.4.

scheduling, and coordination of care, patient support services, as well as financial support programs. These services are intended to facilitate patient access to therapy and to reduce administrative barriers that may be associated with access to treatment.

d.  Commercialization readiness, more broadly, in advance of launch.[68] This often includes completion of key pre-launch activities such as development of a gross-to-net pricing model, real-world evidence generation, preparation of pre- and post-approval payor engagement materials, establishment of distribution pathways, healthcare provider reimbursement support services and tools, deployment of field teams, and end-to-end testing and execution of commercial launch readiness, among others. These activities must be completed in a coordinated manner so that all elements of the commercialization process are operational at the time of product approval.

49. Taken together, NS Pharma is responsible for the commercial planning and execution of Deramiocel in the U.S., including the processes by which the product is marketed, promoted and sold, scientifically supported, distributed, delivered to patients, and reimbursed, among others. The success of the product's launch and ongoing utilization depends on NS Pharma's ability to effectively perform these functions in coordination with Capricor's development, manufacturing, and regulatory activities.

## V.  PRICING STRUCTURE AND ITS IMPACT ON COMMERCIAL VIABILTY

### A. The Pricing Structure Set Forth in Exhibit A

50. The pricing structure governing the commercialization of Deramiocel is set forth in Exhibit A to the Agreement.[69] At a high level, Exhibit A establishes a two-part economic arrangement consisting of ███

███████████████████████████████████████████████
███████████████████████████████████████████

51. Under this structure, ████████████████████████████
██████████████████████[71]████████████████████████

---

[68] Agreement §§ 5.1, 5.4, and 5.5.
[69] Agreement at 43.
[70] Agreement at 43.

████████████████████████████████████████████
████████████████████████████████████████████



████████ . It is my understanding that ████████████████████

████████ .

52. NS Pharma, in turn, sells Deramiocel to healthcare providers at a downstream price ████████

████ . These providers administer the therapy and seek reimbursement from third-party payors, including Medicare, Medicaid, and commercial payors.

53. Exhibit A further provides that ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ [72]

54. In economic terms, the arrangement reflects a buy-and-resell distribution model in which ████

████████████████████████████████████

████████████████████████████████████

████████████████████████ . Providers, in turn, depend on reimbursement from payors to cover the cost of the product and its administration, as well as providing any potential profitability.

## B. Impact of the Pricing Structure on Medicare Reimbursement and Commercial Viability

55. In my opinion, the pricing structure set forth in Exhibit A is not commercially viable when applied to a provider-administered product reimbursed under the Medicare Part B framework. This conclusion is driven by the interaction between the Agreement's cost-based Transfer Price and the statutory methodology used to determine reimbursement.

56. Under federal law, Medicare Part B reimburses provider-administered products, including cell therapies, at 106 percent of the manufacturer's ASP.[73] As described above, manufacturers establish the WAC as a list price, while ASP is calculated based on the manufacturer's reported sales net of

---

[72] Agreement at 43.
[73] 42 U.S.C. § 1395w-3a(b)(1)(B); 42 C.F.R. § 414.904(a)(2).

discounts, rebates, chargebacks, and other adjustments.[74] Because ███████████

███████████████████████████████████, described in ¶ 51, *supra*, and NS Pharma

is a distributor rather than a statutory manufacturer, <u>only Capricor's sales to NS Pharma are included</u>

<u>in the ASP calculation</u>.

57. This  framework  effectively ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████.

58. Under a standard industry framework, ASP reflects a range of transactions across the market and

supports a spread between the manufacturer's production cost and the price paid by providers, which

in turn supports manufacturer and distributor margins, as well as provider reimbursement and potential

profitability.[76] Under the Agreement, however, ████████████████████████

████████████████████████████████████,[77] ████████

██████████████████████. There is an alternative interpretation of Exhibit A under which ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████.

59. In summary, the pricing structure set forth in Exhibit A, when applied within the Medicare Part B

reimbursement framework, produces an economically unworkable result. By ████████████████

██████████████████████████████████████████████████████

---

[74] *From ASP to WAC: 8 key drug pricing terms life science companies should know*, Milliman (Mar. 5, 2026), *available at* https://www.milliman.com/en/insight/asp-wac-8-key-drug-pricing-terms-life-science; *Part B Drugs and Biologicals*, CMS, *available at* https://www.cms.gov/cms-guide-medical-technology-companies-and-other-interested-parties/payment/part-b-drugs (last accessed Apr. 24, 2026).

[75] Agreement at 43.

[76] *Part B Drugs Payment Systems*, MedPac (Oct. 2023), *available at* https://www.medpac.gov/wp-content/uploads/2022/10/MedPAC_Payment_Basics_23_PartB_FINAL_SEC.pdf.

[77] Agreement at 43.

██████████████████████████████████████████. As a result, reimbursement is insufficient to cover provider acquisition costs, such that each transaction would generate a negative financial outcome for providers and other value chain participants due to lack of demand. This misalignment creates a substantial barrier to prescribing, adoption, and longer-term utilization. Absent modification, the structure is inconsistent with the economic requirements of a provider-administered product reimbursed under Medicare Part B and would limit commercial adoption.

## C. Impact of the Pricing Structure on Medicaid Reimbursement and Commercial Viability

60. The Agreement's pricing structure similarly fails to support a commercially viable model under the Medicaid Drug Rebate Program. The Medicaid framework involves two distinct but related financial components. First, Medicaid programs reimburse providers for provider-administered products, and may use payment methodologies benchmarked to Medicare Part B and based on ASP.[78] Second, manufacturers are required to pay mandatory rebates to state Medicaid programs, which are calculated based on AMP and best price.[79] These two mechanisms operate independently but, together, determine the overall economics of a product in Medicaid.

61. As with ASP, AMP and best price are derived from the manufacturer's reported sales. Under the Agreement, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Best price would be determined based on the lowest price available from the manufacturer to any eligible purchaser in the U.S.

62. This structure creates a fundamental disconnect within the Medicaid framework. On the reimbursement side, provider payment remains tied to ASP-based benchmarks, which generally approximate provider acquisition cost, and, under this structure, may result in reimbursement levels

---

[78] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf.

[79] *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf.

that do not cover the price paid by providers. On the rebate side, manufacturer rebate obligations are determined under formulas tied to AMP and best price, which do not incorporate downstream pricing between distributors and providers.

63. In addition, the Agreement does not ██████████████████████████████████ ████████████████████████████████. Because ASP, AMP, and best price are all derived from ███████████████████, and are determined independently of downstream transactions, any increase in downstream prices does not translate into higher reported pricing benchmarks. As a result, provider reimbursement levels remain constrained.



64. The combined effect of these dynamics is that reimbursement benchmarks are disconnected from downstream pricing, resulting in transactions that generate negative economic outcomes for providers. This misalignment creates a substantial barrier to prescribing, adoption, and the development of a sustainable commercial market for the product within the Medicaid setting.

## D. Impact of the Pricing Structure on Commercial Payor Reimbursement and Commercial Viability

65. The Agreement's pricing structure similarly undermines a commercially viable model in the commercial payor market. Unlike Medicare, commercial reimbursement is not governed by a single statutory formula. However, in my experience, commercial payors, including private insurers, routinely rely on pricing benchmarks derived from Medicare Part B methodologies, particularly ASP, when establishing reimbursement rates for provider-administered products.[80] As a result, while negotiated, commercial reimbursement remains closely tied to the same underlying pricing metrics that govern Medicare payment.

66. Because ASP is derived from the manufacturer's reported sales, ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████. Consequently, the ASP calculated from this artificially low baseline constrains the reimbursement rates that commercial payors are willing to offer, regardless of the price at which the product is ultimately sold in the market.



---

[80] *2026 MPFS Rule: Part B MFPs Included in ASP, but Questions Remain,* Avalere Health (Nov. 6, 2025), *available at* https://advisory.avalerehealth.com/insights/2026-mpfs-rule-part-b-mfps-included-in-asp-but-questions-remain.

67. This structure imposes a direct constraint on provider economics in the commercial setting. Providers acquiring the product at or near market-based prices must rely on reimbursement rates that are benchmarked to ASP and therefore will not fully cover acquisition costs and will result in negative economic outcomes under prevailing reimbursement methodologies. Because commercial payors frequently adopt reimbursement methodologies that track or approximate Medicare rates, providers face limited ability to negotiate materially higher reimbursement to offset this disparity.

68. At the same time, the Agreement does not ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. As a result, increases in market pricing do not translate into higher reimbursement levels, and the economic constraints imposed by the initial pricing structure persist across the commercial channel.

69. The combined effect of these dynamics is to create negative economic outcomes throughout the pharmaceutical value chain and undermine the product's commercial viability. ████████████████ ████████████████████████████████████████████████████████████████████████████████, while providers lack a viable mechanism to recover their acquisition costs. This structural disconnect between reimbursement and market pricing results in transactions that generate negative economic outcomes for providers, reduces incentives for provider adoption, and impedes the development of a sustainable commercial market for the product.

70. In sum, these pricing dynamics across Medicare, Medicaid, and commercial payors reflect a structural limitation in the Agreement's pricing framework. As described above, the pricing structure does not produce reimbursement levels that are workable in the marketplace, as providers are unlikely to receive reimbursement sufficient to cover acquisition and administration costs or support sustained product adoption under prevailing reimbursement methodologies. This misalignment between reimbursement and market-based pricing results in transactions that generate negative economic outcomes for providers and constrains the economic viability of the product in the commercial setting. As discussed below, these pricing considerations are relevant to the broader assessment of commercial readiness.

## VI.   ASSESSMENT OF NS PHARMA'S COMMERCIAL READINESS

71. This section evaluates NS Pharma's commercial readiness across key dimensions relevant to the launch and commercialization of a rare disease cell therapy. The Agreement assigns NS Pharma responsibility for commercial readiness of the product, as described above. Based on my industry experience and the available record, I have identified material gaps in NS Pharma's level of preparedness. I describe these gaps and their implications for product launch execution and commercialization below. The discussion below first outlines the key components of commercial readiness and then assesses the extent to which those components have been addressed by NS Pharma.

72. As discussed in Section III.C. above, the pre-launch period and initial post-approval phase are important determinants of commercial success for biopharmaceutical products. In this context, launch preparation for complex biopharmaceuticals, including cell therapies, begins well in advance of approval and requires extended lead times to address market dynamics, manufacturing, site-of-care, and market access and reimbursement readiness prior to the anticipated approval date, reflecting the added logistical, clinical, and regulatory requirements relative to traditional therapies.[81] The initial months following product launch generally establish prescribing patterns, provider confidence, and payor positioning, with effects that can persist over the product's lifecycle.

## A. Key Activities Included in Rare Disease Commercial Readiness

73. In my experience, to support a successful product launch and ensure long-term commercial viability, I have identified multiple key areas that collectively represent commercial readiness. These categories are intended to capture the principle set of activities, at a high level, required to bring a product to market and sustain its adoption across stakeholders. This declaration is not a full product commercialization plan. Each area represents a distinct but interrelated workstream, and together they contribute to an integrated commercialization strategy and plan.

74. The topics outlined below are deliberately broad. Each encompasses a wide range of detailed activities, decisions, and cross-functional inputs that will need to be developed over time. The following

---

[81] *Overcoming Scalability Barriers to Advance Cell Therapies in Development: CDMOs Can Be the Key to Success*, BioProcess International (Oct. 15, 2024), *available at* https://www.bioprocessintl.com/cell-therapies/overcoming-scalability-barriers-to-advance-cell-therapies-in-development-cdmos-can-be-the-key-to-success.

discussion provides an overview of each area before turning to an assessment of NS Pharma's activities across each of them.

75. Based on my experience, the key areas of focus are: (1) the Patient Journey, which reflects the diagnostic and treatment paradigms for treating the disease or disorder, and the patient experience at each step;[82] (2) the Target Product Profile ("TPP"), which represents the description and expected value proposition of the product;[83] (3) the Marketing Plan that defines the product's positioning in the future Patient Journey, along with key messaging and materials for customers and providers, and revenue forecasts based on expected unit sales, pricing, market access, and reimbursement assumptions;[84] (4) Salesforce Strategy and Deployment, Payor facing teams, and Field Reimbursement;[85] (5) Medical Affairs Planning, including pre- and post-approval MSL strategy and deployment, patient advocacy, provider education, and clinical and economic publication strategy;[86] (6) Biopharmaceutical Hub Services and other patient support programs like patient reimbursement and financial support;[87] and (7) Supply Chain and Distribution.[88]

76. Each of these key areas represent a critical component of commercial readiness, particularly for a complex cell therapy product like Deramiocel, where successful commercialization depends on timely

---

[82] *Targeted Reach, Tighter Relationships: Why Rare Disease Launches Are Different*, Drug Channels (Jan. 9, 2026), *available at* https://www.drugchannels.net/2026/01/targeted-reach-tighter-relationships.html; *From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf; Bianchi, E., (2024). *Commercialization Strategies for Gene Therapy: Overcoming Regulatory and Financial Barriers*. Journal of Commercial Biotechnology, 29(4): 331-340.

[83] *Target Product Profiles (TPPs) for Medical Product Development,* National Institute on Drug Abuse (Feb. 14, 2025), *available at* https://nida.nih.gov/funding/small-business-innovation-research-sbir-technology-transfer-sttr-programs/target-product-profiles; *See also Mastering Rare Disease Launch Excellence,* IQVIA (June 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/articles/2025/mastering-rare-disease-launch-excellence-medadnews.pdf.

[84] *Rising to the Challenge: Launch Success Factors for an Intensifying Landscape, With a Spotlight on Rare Disease,* ClearView Healthcare Partners (Sept. 2025), *available at* https://clearviewhcp.com/wp-content/uploads/2025/09/LC-Launch-Excellence-White-Paper.pdf; *Pharma Commercial Operations: Bringing Products to Market,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharma-commercial-operations (last accessed Apr. 24, 2026).

[85] *Understanding Pharmaceutical Field Force Effectiveness,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharmaceutical-field-force-effectiveness (last accessed Apr. 24, 2026); *Targeted Reach, Tighter Relationships: Why Rare Disease Launches Are Different*, Drug Channels (Jan. 9, 2026), *available at* https://www.drugchannels.net/2026/01/targeted-reach-tighter-relationships.html.

[86] *From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf, at 14; *See also Engage MSLs Early and Often for Impact,* Journal of the Medical Science Liaison Society (Nov. 6, 2023), *available at* https://themsljournal.com/article/engage-msls-early-and-often-for-impact/.

[87] *Patient Support Hub Programs: An End-to-End Guide,* IntuitionLabs, https://intuitionlabs.ai/articles/guide-patient-support-hub-programs (last accessed Apr. 24, 2026).

[88] *See The Power of Exclusive Distribution Partnerships Within Specialty Drug & Rare Disease Channels*, BioCare (Apr. 15, 2025), *available at* https://biocare-us.com/2025/04/15/the-power-of-exclusive-distribution-partnerships-within-specialty-drug-rare-disease-channels/; *See also Pharma Supply Chain: A Competitive Guide,* PharmaSource, *available at* https://pharmasource.global/content/guides/category-guide/pharma-supply-chain-a-comprehensive-guide-to-the-pharmaceutical-supply-chain/ (last accessed Apr. 24, 2026).

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[  ]]                                                                                                          Page 23

and coordinated execution across multiple stakeholders, including providers, payors, patients, and distribution partners. Each is discussed in turn below.

77. The Patient Journey provides the foundational understanding of how patients are identified, diagnosed, treated, and supported within the current healthcare environment.[89] For a novel, complex therapy like Deramiocel, this includes awareness of the disease, symptom onset and recognition, referral pathways, diagnosis, treatment guidelines and decisions across various products and therapies, treatment initiation, site-of-care considerations and support, and ongoing patient management, including pricing, market access, and reimbursement, among others. Understanding how the patient interacts with each of the key stakeholders during their journey is critically important. Qualitative and quantitative market research interviews are often conducted with payors, providers, patients and other stakeholders during the product development process to develop this detailed understanding. Prescribing physicians can play an important role in the Patient Journey mapping process given their central role in diagnosis and treatment, as can KOLs who often have even broader perspectives, especially if they are experts in a particular disease or disorder. While there can be alignment in treatment pathways for managing patient outcomes, institutional formularies, pharmacy distribution and budgetary constraints may impact physician decision-making from one institution to another.

78. The TPP characterizes the key attributes of a biopharmaceutical product to guide clinical development, the regulatory process, and commercialization.[90] It describes the known product attributes as data and information become available and predicts what other attributes will be. More generally, it is a best guess of what future, approved product labeling might be at any moment in time and often changes over time. The TPP can include language regarding the expected indication(s) and use of the product, clinical trial design, data regarding efficacy, safety, adverse events, and tolerability, as well as expected dosing and route of administration, among others. The TPP reflects the product's value proposition and is used in many ways to guide commercial planning and engagement of various healthcare decision makers. It helps to shape the marketing and medical affairs strategies regarding promotional messaging and scientific communications, respectively. It is used with payors to inform pricing, market access, and reimbursement strategies, and with prescribing physicians and KOLs regarding

---

[89] *See Diagnostic odyssey in rare disease,* NHS England, *available at* https://www.genomicseducation.hee.nhs.uk/genotes/knowledge-hub/the-diagnostic-odyssey-in-rare-disease/ (last accessed Apr. 24, 2026); *See e.g., Patient Journey Handbook,* European Reference Networks, *available at* https://ern-rita.org/patient-journeys/ (last accessed Apr. 24, 2026).

[90] *Target Product Profiles (TPPs) for Medical Product Development,* National Institute on Drug Abuse (Feb. 14, 2025), *available at* https://nida.nih.gov/funding/small-business-innovation-research-sbir-technology-transfer-sttr-programs/target-product-profiles.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[   ]]                                                                                                    Page 24

potential future prescribing patterns. It is also used in market research to understand future unit sales demand that is combined with the pricing and reimbursement insights to develop launch adoption curves and revenue forecasts. It is a key tool for aligning key stakeholders and ensuring integration as part of product launch planning and commercialization.

79. The Marketing Plan represents the strategy and tactics for how the TPP will be translated into a product launch and commercialization plan to serve patients, enable providers to deliver the product, and ultimately generate revenue for the manufacturer and distributor(s).[91] There are many elements to creating a Marketing Plan, some of which will be described here at a high level. It includes development of promotional messaging and materials regarding the product's value proposition that will be used by the field salesforce, and scientific messaging and materials that will be used by the medical affairs and payor facing teams for education.[92] It is important to ensure alignment between commercial strategies and scientific evidence, which is essentially translating the TPP into future actions. The Marketing Plan identifies and creates strategies for interactions with prescribing physicians and KOLs to create future demand, payors, pharmacy benefit managers, etc. for pricing and reimbursement, distributors, and wholesalers for product distribution from manufacturer to site of care, and the support services that will be offered to patients. Also included in or as an adjunct to a Marketing Plan is pricing, market access, and reimbursement strategy. It translates the product's clinical value into economic terms, including cost effectiveness and budget impact models that support access decision-making reimbursement and adoption. This includes establishing pricing architecture, developing payor pre-and post-approval engagement strategies, and preparing supporting materials such as value dossiers and reimbursement guides. For provider-administered products, these activities are particularly important given the interdependence between pricing, reimbursement benchmarks, and provider economics.

---

[91] Sampathkumar, K., Kerwin, B.A., (2024). *Roadmap for Product Development and Manufacturing of Biologics,* Journal of Pharmaceutical Sciences, 113: 314-331; *See also Target Product Profiles (TPP): A Strategic Framework for Life Sciences Startup Success,* Bootcamp Bio (2025), *available at* https://bootcamp.bio/wp-content/uploads/2025/06/05.0-Pre-work-Target-Product-Profiles-TPP-2025-04-29-3.pdf.

[92] Matikainen, M., et al., (2015). *Determinants of New Product Launch Success in the Pharmaceutical Industry,* Journal of Pharmaceutical Innovation, 10: 175-189; *See also* Gupta, S.K., Nayak, N.P., (2013). *An insight into the emerging role of regional medical advisor in the pharmaceutical industry.* Perspectives in Clinical Research, 4(3):186-190, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3757584/; *See also Rare Disease Marketing,* Good Apple, *available at* https://goodapple.com/rare-disease-marketing/ (last accessed Apr. 24, 2026).

80. The Field Salesforce Strategy and its Deployment operationalize provider engagement to create demand for the product at launch and longer-term commercialization.[93] This includes determining field force size, identifying and targeting prescribing physicians and KOLs, and equipping sales representatives with the tools necessary to effectively communicate the product's value. Field salesforce teams frequently engage with KOLs as early adopters and centers of excellence to support broader dissemination of clinical experiences. For specialized rare disease therapies, sales efforts must be closely coordinated with medical affairs and field reimbursement teams to address the clinical, operational, and patient support factors that influence provider adoption.

81. Medical Affairs, including MSL deployment, engagement with prescribing physicians and KOLs, and a supporting medical education and publication strategy, plays a central role in establishing scientific credibility and supporting appropriate use.[94] In particular, MSL engagement and peer-reviewed publications are often primary mechanisms through which complex clinical data are communicated to providers and payors. MSLs provide non-promotional, evidence-based engagement with prescribing physicians and KOLs, while a robust publication strategy ensures that clinical data are disseminated in peer-reviewed forums. KOL engagement within medical affairs also supports clinical education, evidence generation, and the development and advancement of diagnosis and treatment guidelines. For a complex rare disease cell therapy like Deramiocel, these activities are essential to educating providers, supporting payor evaluations, and facilitating informed clinical decision-making.

82. Biopharmaceutical Hub Services are programs designed to help providers and patients navigate access requirements for specialty products like Deramiocel.[95] They are critical to enabling patient access along with therapy adherence and persistence. These services typically include patient benefits verification, product and procedure prior authorization support, financial support, if required, and clinical nursing support that may be coordinated by a nurse case manager. In short, Hub services can be critically important to ensure that the product is available at the site of care when the provider and

---

[93] *Understanding Pharmaceutical Field Force Effectiveness,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharmaceutical-field-force-effectiveness (last accessed Apr. 24, 2026); *Pharma Commercial Operations: Bringing Products to Market,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharma-commercial-operations (last accessed Apr. 24, 2026).

[94] *See What is the Role of Medical Affairs Within the Pharmaceutical Industry?,* Pharmiweb (Jan. 28, 2025), *available at* https://www.pharmiweb.jobs/article/what-is-the-role-of-medical-affairs-within-the-pharmaceutical-industry-/; *Engage MSLs Early and Often for Impact,* Journal of the Medical Science Liaison Society (Nov. 6, 2023), *available at* https://themsljournal.com/article/engage-msls-early-and-often-for-impact/; *Mastering Rare Disease Launch Excellence,* IQVIA (June 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/articles/2025/mastering-rare-disease-launch-excellence-medadnews.pdf.

[95] *Patient Support Hub Programs: An End-to-End Guide,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/guide-patient-support-hub-programs (last accessed Apr. 24, 2026).

patient need it to be, while ensuring that all of the background administrative details have been completed regarding prior authorization, coding and reimbursement, co-pays, and anything else required for a successful patient experience.

83. Supply Chain and Distribution ensure that the product can be reliably manufactured, stored, and delivered to the appropriate site of care.[96] For a cell therapy like Deramiocel, this includes managing ultra-cold-chain logistics, coordinating with specialized distributors, and ensuring compliance with regulatory and licensing requirements. As a critical operational link in the commercialization process, any deficiencies in this area can directly impact product availability, patient access, and possibly even patient safety.

84. Importantly, these key areas of focus are not discrete, one-time efforts undertaken solely in preparation for launch. Rather, they establish the strategic and operational foundation for ongoing commercialization. Each key area must be continuously refined and adapted based on real-world experience, evolving clinical data, and changing market conditions. Accordingly, the level of development of these activities prior to launch is not only indicative of launch readiness, but also of the product's ability to achieve sustained commercial success over time.

## B. Observations Regarding NS Pharma's Commercialization Readiness

85. Based on the materials reviewed to date, it is my understanding that, beginning no later than October 31, 2025, Capricor repeatedly requested substantive information concerning NS Pharma's progress on key pre-launch activities including, *inter alia*, ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████[97] Capricor followed up on these topics in January 2026, again seeking ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.[98]

---

[96] *Pharma Supply Chain: A Competitive Guide,* PharmaSource, *available at* https://pharmasource.global/content/guides/category-guide/pharma-supply-chain-a-comprehensive-guide-to-the-pharmaceutical-supply-chain/ (last accessed Apr. 24, 2026).

[97] *See* A22498-0002-005860.pdf ("Email RE: update on deal terms (Oct. 31, 2025)"); *See also* A22498-0002-006509.pdf ("Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 - Mar. 5, 2026)"); A22498-0002-012478.pdf ("Email RE: update on progress to commercialization of deramiocel (Jan. 15, 2026)"); A22498-0002-012302.pdf ("Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025)"); A22498-0002-008910.pdf ("Email RE: update (Mar. 13, 2025)").

[98] *See* Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 - Mar. 5, 2026) at 6; Email RE: update on progress to commercialization of deramiocel (Jan. 15, 2026).

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[  ]]                                                                                     Page 27

86. In my view, NS Pharma's responses to Capricor's requests are notable for their failure to provide direct, substantive, and timely information regarding Deramiocel launch readiness. At best, NS Pharma's responses can be characterized as ambiguous, vague, and non-substantive. For example, in response to the items requested in Capricor's January 2026 follow-up email, NS Pharma provided a "█████████████████████████████████████████" rather than a timeline specific to the launch of Deramiocel.[99] NS Pharma also did not provide the requested identification of key personnel responsible for launch execution, instead providing ████████████████ ████████████████████████████, thereby preventing Capricor from identifying and working directly with the NS Pharma personnel responsible for essential launch activities.[100] More broadly, rather than supplying clear deliverables or tangible progress updates, NS Pharma repeatedly responded with ambiguity, deflection, and non-substantive language regarding its pre-launch preparations.[101]

87. Consistent with NS Pharma's evasive communications, I have seen limited evidence demonstrating that critical commercialization activities across the key areas of focus have been sufficiently developed or operationalized. ████████████████████████████████ ████████ indicate that NS Pharma reported making progress on certain commercialization efforts during 2024 and early 2025, but that these activities were paused following Capricor's receipt of a CRL in July 2025.[102] While the CRL-related issues were resolved in December 2025,[103] NS Pharma indicated at the ████████████████████ that, despite an intention to "███████████," it had not yet ████████████████████████, suggesting that commercialization activities had not materially progressed during the intervening period.[104] Against this framework, the observations below are organized in alignment with the principal areas of commercial readiness and reflect areas where documentation, validation, or execution has not been substantiated in the current record.

---

[99] Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 - Mar. 5, 2026) at 6; *See* A22498-0002-006121.pdf ("Email: NSP Org Charts – Seeking Alignment on Launch Timeline, Requesting PI (Dec. 12, 2025)"); A22498-0002-006168.pdf ("NSP Expected Timeline email attachment").

[100] Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 - Mar. 5, 2026) at 6; *See* Email: NSP Org Charts – Seeking Alignment on Launch Timeline, Requesting PI (Dec. 12, 25 – Dec. 18, 2025); A22498-0002-006166.pdf ("NSP Commercial Organization Chart email attachment"); A22498-0002-006167.pdf ("NSP Medical Affairs Organization Chart email attachment").

[101] *See* Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 - Mar. 5, 2026).

[102] M██████████████ ("Mar. 2026 JSC/NSP Meeting Materials") at 5; ████████████████████ Mar. 2026 JSC/NSP Meeting Transcript") at 1.

[103] *Capricor Therapeutics Announces Positive Topline Results from Pivotal Phase 3 HOPE-3 Study of Deramiocel in Duchenne Muscular Dystrophy,* Capricor Therapeutics (Dec. 3, 2026), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/331/capricor-therapeutics-announces-positive-topline-results.

[104] Mar. 2026 JSC/NSP Meeting Materials at 5.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co., Ltd. and NS Pharma, Inc.*
Docket No. [[   ]]                                                                                    Page 28

88. For the Patient Journey, I have not seen evidence of a current or actively maintained view of the treatment and access landscape. ███████████████████████████████████████████, and no updated version has been provided that reflects more recent clinical or market developments.[105] As of March 10, 2026, NS Pharma reported that ██████████████████████████████████████████████ ████████████████████████[106]

89. For the TPP, I have not seen evidence that the document has been finalized or aligned across stakeholders. While NS Pharma has described the TPP as central to its market research and positioning, it remains incomplete more than four years after execution of the Agreement.[107] The parties had developed a TPP based on Phase 2 clinical trials of Deramiocel as early as April 2022 and their email correspondence reflects that they had aligned on a TPP in 2024.[108] Capricor provided detailed feedback by March 17, 2026,[109] and I have not seen evidence of timely substantive follow-up or incorporation of that feedback, despite stating ████████████████████████████████████ ██████████████████████[110] As discussed above, the absence of a finalized TPP limits the ability to align downstream commercial activities.

90. For the Marketing Plan, I have not seen evidence of several foundational elements being complete or ready for product launch. A wholesale price has not been established.[111] While it is common for payor research to be conducted during the pre-launch phase and iterated over time, the payor research here appears to be based on analyses conducted prior to the availability of more recent clinical data and still requires updating.[112] Key materials, including the ████████████████████████████████ ██████████████████, and core marketing tools have not been shown to be complete or current.[113] I also have not seen evidence that NS Pharma has made meaningful progress toward proposing Minimum Sales Requirements as contemplated under the Agreement, although NS Pharma has

---

[105] Mar. 2026 JSC/NCP Meeting Transcript at 5.
[106] Mar. 2026 JSC/NCP Meeting Transcript at 5.
[107] *See* Mar. 2026 JSC/NSP Meeting Materials at 6-7; Mar. 2026 JSC/NCP Meeting Transcript at 5; *See also* A22498-0002-006418.pdf ("Email: Request for Joint Regulatory Discussion on TPP Scenarios (Feb. 11, 2026)"); Email RE: update on progress to commercialization of deramiocel (Jan. 5 – Mar. 5, 2026).
[108] *See* A22498-0023-001024.pdf ("Apr. 2022 JSC Meeting – Capricor Materials") at 2.
[109] *See* █████████████████████████████████████████; *See also* ████████████████████████████████████.
[110] Mar. 2026 JSC/NCP Meeting Transcript at 5.
[111] *See* Mar. 2026 JSC/NCP Meeting Transcript at 6.
[112] *See* Mar. 2026 JSC/NSP Meeting Materials at 7; Mar. 2026 JSC/NCP Meeting Transcript at 8; *See also* A22498-0002-007630.pdf ("NS Pharma Deramiocel Launch Preparation (Sept. 12, 2024)") at 8.
[113] *See* Mar. 2026 JSC/NSP Meeting Materials at 6; Mar. 2026 JSC/NCP Meeting Transcript at 5-6.

recently expressed a willingness to "████████████████████████████████████████"[114] In addition, while a preliminary revenue model has been developed, at minimum, it requires updated clinical data, and there are questions in the record regarding its inputs and assumptions.[115] NS Pharma has also indicated that its gross-to-net model and other payor strategy inputs "████████████," and I have not seen evidence that key pricing and access considerations, including ████████ ████████, have been incorporated into commercialization planning.[116] I also have not seen evidence of foundational patient-facing infrastructure, such as a ████████████████████████████, which is typically established in advance of a product launch to support awareness and access.

91. For Field Sales Force Strategy and Deployment, I have not seen evidence of a clearly defined field strategy, including sizing, targeting, or deployment planning specific to Deramiocel. Generally, there appears to be limited visibility into how NS Pharma's commercialization activities extend beyond initial product distribution.[117] The record indicates that ████████████████████████



████████████████.[118] NS Pharma acknowledged in a July 29, 2025 communication that "████████ ████████████████████████████████████ ██.[119] This reallocation of field-focused resources further suggests that field sales strategy and deployment planning for Deramiocel had not been maintained or advanced during this period.

92. As discussed in ¶ 81, *supra*, Medical Affairs Planning, including MSL deployment, KOL and payor engagement / support of the payor team, and publication strategy, is a critical component of commercialization for a therapy of this complexity. At this stage, I have not seen evidence of a defined MSL strategy, including field deployment, structured KOL engagement, scientific engagement planning, or a coordinated publication plan.[120] For example, while NS Pharma referenced in June 2025 that it would ████████████████████████████,[121] ████████████████████████

---

[114] Mar. 2026 JSC/NCP Meeting Transcript at 6.

[115] *See* Mar. 2026 JSC/NSP Meeting Materials at 6; Mar. 2026 JSC/NCP Meeting Transcript at 4.

[116] Mar. 2026 JSC/NCP Meeting Transcript at 6. *See also* A22498-0002-008842.pdf (Email RE: Deramiocel WAC / GTN discussion (Feb. 4 – Mar.1, 2025); Email RE: update (Mar. 13, 2025); NS Pharma Deramiocel Launch Preparation (Sept. 12, 2024) at 8.

[117] *See* Email RE: update on progress to commercialization of deramiocel (Jan. 5, 2026 – Mar. 5, 2026).

[118] Mar. 2026 JSC/NCP Meeting Transcript at 4; Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025) at 3.

[119] Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025) at 3.

[120] Mar. 2026 JSC/NSP Materials at 11; Mar. 2026 JSC/NCP Meeting Transcript at 4, 8-10; *See also* Email: NSP Org Charts – Seeking Alignment on Launch Timeline, Requesting PI (Dec. 12, 2025), ("Further data is critically needed for MSL and commercial materials…"); NS Pharma Deramiocel Launch Preparation (Sept. 12, 2024) at 8.

[121] *See* A22498-0023-001045.pdf ("June 2025 JSC Meeting Minutes") at 4.

 [122] In addition, NS Pharma indicated it had "█████████████████████████" that included introductions to KOLs, yet I have not seen any evidence that such plans were fully developed and implemented. [123] The absence of a finalized TPP further limits the ability to develop a coherent and aligned medical affairs strategy.

93. For Biopharmaceutical Hub Services, I have not seen evidence of established infrastructure sufficient to support patient enrollment and initiation of therapy, reimbursement navigation, or ongoing therapy management. While NS Pharma has █████████████████████████████████████, I have not seen evidence of an individualized plan specifically designed to support the launch of Deramiocel. [124] The only evidence of relevant activity I have seen is that NS Pharma is purportedly █████████████████████████████████████████"[125] These capabilities are particularly important for complex therapies and typically require early development and coordination with providers and payors.

94. For Supply Chain and Distribution, I have not seen evidence sufficient to confirm that all required elements are in place. While NS Pharma has indicated █████████████████████████ █████████████████████, I have not seen evidence to support this assertion. To the contrary, the record indicates that ███████████████████████████████████████████ ███████████████████████████████████████████ when NS Pharma paused its activities. [126] ███████████████████████████████, resulting in disruption to warehouse contracts and logistics arrangements that had been established, and any progress made on distribution infrastructure was not maintained. [127] Despite NS Pharma's claim on March 10, 2026 that ███████████████████████████████████████████ █████████████,[128] I have not seen any evidence that Capricor approved ████████████ as is required under the Agreement. [129] Moreover, it is my understanding that NS Pharma has consistently refused to provide any information related to whether it has obtained the state licenses required to

---

[122] Mar. 2026 JSC/NSP Meeting Materials at 11.
[123] *See* Jun. 2025 JSC Meeting Minutes at 3.
[124] *See* A22498-0002-014903.pdf ("4th JSC Agenda / NS Pharma Supply Chain Capabilities, 1/27/2023") at 37-38.
[125] Jun. 2025 JSC Meeting Minutes at 5.
[126] *See* Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025) at 3; *See also* 4th JSC Agenda / NS Pharma Supply Chain Capabilities, 1/27/2023 at 34.
[127] *See* Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025) at 3.
[128] Mar. 2026 JSC/NCP Meeting Transcript at 6.
[129] Agreement § 4.2.

distribute Deramiocel in the target jurisdictions.[130] This situation is particularly troubling for a successful launch and commercialization of a complex therapy like Deramiocel, where, in my experience, establishing and operationalizing a functioning distribution network, including ultra-cold-chain requirements, involves months of intense planning and execution.

95. Collectively, the current record does not provide sufficient evidence to demonstrate that the key components of commercial readiness, including launch planning and execution, as well as longer-term commercial planning, have been fully developed, aligned, and operationalized across the key areas of focus described above.

96. Given the currently anticipated PDUFA target action date of August 22, 2026, the absence of demonstrated progress across these key commercialization activities is notable. Commercial readiness for a rare disease therapy of this complexity typically requires substantial lead time. Based on the materials reviewed, I have not seen evidence that these workstreams have progressed to the level expected at this stage in the pre-launch timeline to support a successful launch and longer-term commercialization. For that reason, based on the level of preparedness I have seen in the information NS Pharma has provided to Capricor, and that Capricor provided to me, it is my opinion that there is insufficient time to complete all necessary commercialization activities unless an alternative commercialization pathway is established immediately.

97. In my opinion, given the Agreement's current pricing structure constraints and NS Pharma's apparent state of commercial unreadiness, if Capricor is unable to pursue an alternative commercialization pathway, it would be much more difficult for Deramiocel to reach patients following FDA approval.

## VII.   CONCLUSION

98. The opinions and analyses described in this certification are based on my review of the documents and materials provided to me in this matter, my own independent research, and my extensive experience in the biopharmaceutical industry. My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions if I become aware of additional documents, facts, testimony, opinions, information, or contentions of the parties or witnesses, including in any expert report submitted by or on behalf of the defendant.

---

[130] *See* Email RE: update on progress to commercialization of deramiocel (Jan. 5 – Mar. 5, 2026) at 4, 11; *See also* Email RE: update on deal terms (Oct. 31, 2025) at 3-4.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  May 7, 2026

Richard Rieger

# Attachment 1

# Materials Considered

In addition to my education, training, and experience, I considered the materials below in forming my opinions in this matter. This disclosure is, at the time of its production, my best effort at identifying and disclosing all materials considered. I also reserve the right to rely upon any studies, articles, or other documents relied upon or considered by other expert witnesses in forming their opinions in this matter, as well as any expert reports submitted in this case to the extent they are relevant to my report.

**Case Filings**

1. Commercialization and Distribution Agreement (Jan. 24, 2022).

**Produced Documents**

1. A22498-0002-005860.pdf ("Email RE: update on deal terms (Oct. 31, 2025)").
2. A22498-0002-006121.pdf ("Email: NSP Org Charts – Seeking Alignment on Launch Timeline, Requesting PI (Dec. 12, 2025)").
3. A22498-0002-006168.pdf ("NSP Expected Timeline email attachment").
4. A22498-0002-006418.pdf ("Email: Request for Joint Regulatory Discussion on TPP Scenarios (Feb. 11, 2026)").
5. A22498-0002-006509.pdf ("Email RE: update on progress to commercialization of deramiocel (Jan. 5 – Mar. 5, 2026)").
6. A22498-0002-007630.pdf ("NS Pharma Deramiocel Launch Preparation (Sept. 12, 2024)").
7. A22498-0002-008842.pdf ("Email RE: deramiocel WAC / GTN discussion (Feb. 4 – Mar. 1, 2025).
8. A22498-0002-008910.pdf ("Email RE: update (Mar. 13, 2025)").
9. A22498-0002-012302.pdf ("Email Re: Concerns regarding commercial efforts (July 28, 2025 – July 31, 2025)").
10. A22498-0002-012478.pdf ("Email RE: update on progress to commercialization of deramiocel (Jan. 15, 2026)").
11. A22498-0002-014903.pdf ("4th JSC Agenda / NS Pharma Supply Chain Capabilities, 1/27/2023").
12. A22498-0002-006166.pdf ("NSP Commercial Organization Chart email attachment").
13. A22498-0002-006167.pdf ("NSP Medical Affairs Organization Chart email attachment").
14. A22498-0023-001024.pdf ("Apr. 2022 JSC Meeting – Capricor Materials").
15. A22498-0023-001045.pdf ("June 2025 JSC Meeting Minutes").
16. ██████████████████████████████
17. ██████████████████████████████
18. ████████████████████████ ("Mar. 2026 JSC/NSP Meeting Materials").
19. ████████████████████████ ("Mar. 2026 JSC/NSP Meeting Transcript").

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

Please note that the Produced Documents listed above are drawn from a volume of approximately 2,000 files that were produced to me by counsel for Capricor and encompass (i) email correspondence and attachment files and (ii) Joint Steering Committee ("JSC") meeting minutes and materials from 2022 through 2026. The email correspondence includes the following parties:

- L. Marban to ███████, dated from September 2020 to April 2026;
- L. Marban to Y. Sugiyama, dated from September 2020 to April 2026;
- ███████ to ███████ dated from September 2020 to April 2026;
- ███████ to L. Marban, dated from September 2020 to April 2026;
- Y. Sugiyama to L. Marban, dated from July 2024 to August 2025;
- Y. Sugiyama to ███████ dated from July 2024 to August 2025; and
- ███████ to ███████, dated from January 2022 to July 2024.

**Publicly Available Materials**

1. *2026 MPFS Rule: Part B MFPs Included in ASP, but Questions Remain,* Avalere Health (Nov. 6, 2025), *available at* https://advisory.avalerehealth.com/insights/2026-mpfs-rule-part-b-mfps-included-in-asp-but-questions-remain.

2. 21 C.F.R. § 601.2(a).

3. 42 C.F.R. § 414.804(a)(1)-(3).

4. 42 C.F.R. § 414.904(a)(2).

5. 42 C.F.R. § 414.904(c).

6. 42 U.S. Code § 1395w-3a.

7. 42 U.S.C. § 1395w-3a(b)(1)(B).

8. *About Duchenne,* Parent Project Muscular Dystrophy, *available at* https://www.parentprojectmd.org/about-duchenne/ (last accessed Apr. 24, 2026).

9. *About Us,* Capricor Therapeutics, *available at* https://www.capricor.com/about (last accessed Apr. 24, 2026).

10. *An Evaluation Framework for the Inflation Reduction Act's Medicare Prescription Drug-Related Provisions,* Office of the Assistant Secretary for Planning & Evaluation (ASPE), *available at* https://aspe.hhs.gov/sites/default/files/documents/73ab6a4ac654312dab18b69969106c60/aspe-ira-evaluation-framework-report.pdf.

11. *Average Sales Price (ASP) Quarterly Publication Process, Frequently Asked Questions,* CMS (March 9, 2026), *available at* https://www.cms.gov/files/document/frequently-asked-questions-faqs-asp-data-collection.pdf.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

12. Bianchi, E., (2024). *Commercialization Strategies for Gene Therapy: Overcoming Regulatory and Financial Barriers*. Journal of Commercial Biotechnology, 29(4): 331-340.

13. *Capricor Formally Submits BLA for Deramiocel in Duchenne Muscular Dystrophy Cardiomyopathy,* NeurologyLive (Jan. 2, 2025), *available at* https://www.neurologylive.com/view/capricor-completes-bla-submission-deramiocel-dmd-cardiomyopathy.

14. *Capricor Therapeutics Announces Establishment of New PDUFA Date for Deramiocel BLA,* Capricor Therapeutics (Mar. 10, 2026), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/338/capricor-therapeutics-announces-establishment-of-new-pdufa.

15. *Capricor Therapeutics Announces Positive 4-Year Data from HOPE-2 Open-Label Extension Study of Deramiocel in Duchenne Muscular Dystrophy*, Capricor Therapeutics (June 20, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/317/capricor-therapeutics-announces-positive-4-year-data-from.

16. *Capricor Therapeutics Announces Positive Topline Results form Pivotal Phase 3 HOPE-3 Study of Deramiocel in Duchenne Muscular Dystrophy,* Capricor Therapeutics (Dec. 3, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/331/capricor-therapeutics-announces-positive-topline-results.

17. *Capricor Therapeutics Provides Regulatory Update on Deramiocel BLA for Duchenne Muscular Dystrophy,* Capricor Therapeutics (July 11, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/319/capricor-therapeutics-provides-regulatory-update-on.

18. *Capricor Therapeutics Provides Regulatory Update on Deramiocel BLA for Duchenne Muscular Dystrophy,* Capricor Therapeutics (June 24, 2025), *available at* https://www.capricor.com/investors/news-events/press-releases/detail/318/capricor-therapeutics-provides-regulatory-update-on.

19. *Capricor's DMD Cardiomyopathy Cell Therapy Deramiocel Back Under Review by FDA,* NeurologyLive (Mar. 10, 2026), *available at* https://www.neurologylive.com/view/capricor-dmd-cardiomyopathy-cell-therapy-deramiocel-back-under-review-fda.

20. Chaudhary, A., Kumar, V., (2025). *Rare diseases: a comprehensive literature review and future directions*. Journal of Rare Diseases, 4(33), *available at* https://link.springer.com/article/10.1007/s44162-025-00099-6.

21. *Commercial reimbursement benchmarking,* Milliman (Nov. 20, 2023), *available at* https://www.milliman.com/en/insight/commercial-reimbursement-benchmarking-payment-rates-medicare-fee-for-service.

22. *Commercial Spillover Impact of Part B Negotiations on Physicians,* Avalere Health (Sept. 16, 2024), *available at* https://advisory.avalerehealth.com/insights/commercial-spillover-impact-of-part-b-negotiations-on-physicians.

23. *Community Bulletin: BLA Accepted for Filing With Priority Review,* Sarepta Therapeutics (Nov. 28, 2022), *available at* https://www.sarepta.com/community-bulletin-bla-accepted-filing-priority-review.

24. *Complete Response Letter: BLA 125842/0,* FDA (July 9, 2025), *available at* https://download.open.fda.gov/crl/CRL_BLA125842_20250709.pdf.

25. *Current Good Manufacturing Practice (CGMP) Regulations,* FDA, *available at* https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations (last updated Nov. 25, 2025).

26. *Diagnostic odyssey in rare disease,* NHS England, *available at* https://www.genomicseducation.hee.nhs.uk/genotes/knowledge-hub/the-diagnostic-odyssey-in-rare-disease/ (last accessed Apr. 24, 2026).

27. *Drug Shortages,* FDA, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/drug-shortages (last updated Dec. 23, 2025).

28. *Effective Strategies for Post-approval Lifecycle Management and Local Pharmacovigilance,* IQVIA (June 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/effective_strategies_for_post-approval_lcm.pdf.

29. *Engage MSLs Early and Often for Impact,* Journal of the Medical Science Liaison Society (Nov. 6, 2023), *available at* https://themsljournal.com/article/engage-msls-early-and-often-for-impact/.

30. *FDA grants priority review to deramiocel for DMD heart disease,* Muscular Dystrophy News (Mar. 6, 2025), *available at* https://musculardystrophynews.com/news/fda-priority-review-granted-deramiocel-dmd-heart-disease/

31. *Fifteen Year Registry Report,* Parent Project Muscular Dystrophy (2023), *available at* https://www.parentprojectmd.org/wp-content/uploads/2023/08/PPMD_15-Year-Registry-Report_2023.pdf.

32. *From ASP to WAC: 8 key drug pricing terms life science companies should know,* Milliman (Mar. 5, 2026), *available at* https://www.milliman.com/en/insight/asp-wac-8-key-drug-pricing-terms-life-science.

33. *From Orphan to Opportunity: Mastering Rare Disease Launch Excellence,* IQVIA (Apr. 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/white-papers/from-orphan-to-opportunity-mastering-rare-disease-launch-excellence.pdf.

34. Gupta, S.K., Nayak, N.P., (2013). *An insight into the emerging role of regional medical advisor in the pharmaceutical industry.* Perspectives in Clinical Research, 4(3):186-190*, available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3757584/.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

35. *HCP and KOL Mapping: A Comprehensive Guide for Pharma Teams (U.S.),* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/hcp-kol-mapping-comprehensive-guide-pharma-teams (last updated Jan. 11, 2026).

36. *International Reference Pricing for Prescription Drugs*, Brookings Inst. (July 9, 2025), *available at* https://www.brookings.edu/articles/international-reference-pricing-for-prescription-drugs/.

37. *Labeling and Promotion Guidances,* FDA, *available at* https://www.fda.gov/vaccines-blood-biologics/general-biologics-guidances/labeling-and-promotion-guidances (last updated Dec. 10, 2025).

38. *Mastering Rare Disease Launch Excellence,* IQVIA (June 2024), *available at* https://www.iqvia.com/-/media/iqvia/pdfs/library/articles/2025/mastering-rare-disease-launch-excellence-medadnews.pdf.

39. Matikainen, M., et al., (2015). *Determinants of New Product Launch Success in the Pharmaceutical Industry,* Journal of Pharmaceutical Innovation, 10: 175-189.

40. *Medicaid Coverage of Physician-administered Drugs,* Medicaid and CHIP Payment and Access Commission (Jan. 25, 2024), *available at* https://www.macpac.gov/wp-content/uploads/2024/01/06_January-Slides_Medicaid-Coverage-of-Physician-administered-Drugs.pdf.

41. *Medicaid Covered Outpatient Prescription Drug Reimbursement Information by State,* Medicaid.gov (Dec. 2025), *available at* https://www.medicaid.gov/medicaid/prescription-drugs/downloads/medicaid-prescription-reimbursement.pdf.

42. *Medicare Part B Average Drug Sales Price,* CMS, *available at* https://www.cms.gov/medicare/payment/fee-for-service-providers/part-b-drugs/average-drug-sales-price (last accessed May 5, 2026).

43. *Medicare Part B drug and oncology payment policy issues,* MedPac (June 2016), *available at* https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/chapter-5-medicare-part-b-drug-and-oncology-payment-policy-issues-june-2016-report-.pdf.

44. *Medicare Part B Reimbursement of Prescription Drugs,* ASPE Issue Brief (June 2014), *available at* https://aspe.hhs.gov/sites/default/files/private/pdf/106966/ib_mprpd.pdf.

45. *Orphan Drug Development – What are the Real Costs?,* Health Advances (Apr. 10, 2019), *available at* https://healthadvances.com/insights/blog/orphan-drug-development-what-are-the-real-costs.

46. *Overcoming Scalability Barriers to Advance Cell Therapies in Development: CDMOs Can Be the Key to Success*, BioProcess International (Oct. 15, 2024), *available at* https://www.bioprocessintl.com/cell-therapies/overcoming-scalability-barriers-to-advance-cell-therapies-in-development-cdmos-can-be-the-key-to-success.

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

47. *Part B Drugs and Biologicals,* CMS, *available at* https://www.cms.gov/cms-guide-medical-technology-companies-and-other-interested-parties/payment/part-b-drugs (last accessed Apr. 24, 2026).

48. *Part B Drugs Payment Systems*, MedPac (Oct. 2023), *available at* https://www.medpac.gov/wp-content/uploads/2022/10/MedPAC_Payment_Basics_23_PartB_FINAL_SEC.pdf.

49. *Patient Journey Handbook,* European Reference Networks, *available at* https://ern-rita.org/patient-journeys/ (last accessed Apr. 24, 2026).

50. *Patient Support Hub Programs: An End-to-End Guide,* IntuitionLabs, https://intuitionlabs.ai/articles/guide-patient-support-hub-programs (last accessed Apr. 24, 2026).

51. *Patient Support Programs: A Guide for Pharma Leaders,* Zelthy, *available at* https://www.zelthy.com/blog/what-are-patient-support-programs-a-complete-guide (last updated Mar. 31, 2026).

52. *Pharma Commercial Operations: Bringing Products to Market,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharma-commercial-operations (last accessed Apr. 24, 2026).

53. *Pharma Supply Chain: A Competitive Guide,* PharmaSource, *available at* https://pharmasource.global/content/guides/category-guide/pharma-supply-chain-a-comprehensive-guide-to-the-pharmaceutical-supply-chain/ (last accessed Apr. 24, 2026).

54. *Postmarketing Requirements and Commitments: Introduction,* FDA, *available at* https://www.fda.gov/drugs/guidance-compliance-regulatory-information/postmarketing-requirements-and-commitments-introduction (last updated Aug. 9, 2024).

55. *Rare Disease Marketing,* Good Apple, *available at* https://goodapple.com/rare-disease-marketing/ (last accessed Apr. 24, 2026).

56. *Rising to the Challenge: Launch Success Factors for an Intensifying Landscape, With a Spotlight on Rare Disease,* ClearView Healthcare Partners (Sept. 2025), *available at* https://clearviewhcp.com/wp-content/uploads/2025/09/LC-Launch-Excellence-White-Paper.pdf.

57. Sampathkumar, K., Kerwin, B.A., (2024). *Roadmap for Product Development and Manufacturing of Biologics,* Journal of Pharmaceutical Sciences, 113: 314-331.

58. *State Prescription Drug Resources,* Medicaid.gov, *available at* https://www.medicaid.gov/medicaid/prescription-drugs/state-prescription-drug-resources (last accessed Apr. 24, 2026).

59. *Target Product Profiles (TPP): A Strategic Framework for Life Sciences Startup Success,* Bootcamp Bio (2025), *available at* https://bootcamp.bio/wp-content/uploads/2025/06/05.0-Pre-work-Target-Product-Profiles-TPP-2025-04-29-3.pdf.

60. *Target Product Profiles (TPPs) for Medical Product Development,* National Institute on Drug Abuse (Feb. 14, 2025), *available at* https://nida.nih.gov/funding/small-business-innovation-research-sbir-technology-transfer-sttr-programs/target-product-profiles.

61. *Targeted Reach, Tighter Relationships: Why Rare Disease Launches Are Different*, Drug Channels (Jan. 9, 2026), *available at* https://www.drugchannels.net/2026/01/targeted-reach-tighter-relationships.html.

62. *The Drug Development Process,* FDA, *available at* https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process (last updated Jan. 1, 2018).

63. *The Pharmaceutical Manufacturing Process – Steps, Tools, and Considerations,* ThomasNet, *available at* https://www.thomasnet.com/articles/chemicals/the-pharmaceutical-manufacturing-process-steps-tools-and-considerations/ (last accessed Apr. 24, 2026).

64. *The Power of Exclusive Distribution Partnerships Within Specialty Drug & Rare Disease Channels*, BioCare (Apr. 15, 2025), *available at* https://biocare-us.com/2025/04/15/the-power-of-exclusive-distribution-partnerships-within-specialty-drug-rare-disease-channels/.

65. *The Role of Medical Affairs from Research & Design to Commercialization*, Accreditation Council for Medical Affairs (Oct. 8, 2018), *available at* https://medicalaffairsspecialist.org/blog/the-role-of-medical-affairs-from-research-design-to-commercialization.

66. *The Unique Clinical and Economic Challenges of Rare Disease Diagnosis,* Rare Disease Company Coalition (Jan. 11, 2022), *available at* https://www.rarecoalition.com/2022/01/11/unique-clinical-and-economic-challenges-of-rare-disease/.

67. *Understanding Pharmaceutical Commercialization: Stages of Launching to Market*, Medical Packaging, *available at* https://medpak.com/pharmaceutical-commercialization/ (last accessed Apr. 24, 2026).

68. *Understanding Pharmaceutical Field Force Effectiveness,* IntuitionLabs, *available at* https://intuitionlabs.ai/articles/pharmaceutical-field-force-effectiveness (last accessed Apr. 24, 2026).

69. *Understanding the FDA Approval Process,* Pharmacy Times (Mar. 20, 2025), *available at* https://www.pharmacytimes.com/view/understanding-the-fda-approval-process-and-pdufa-dates.

70. *Unlocking Pharma Launch Excellence: Key Drivers of Product Success,* Indegene, *available at* https://www.indegene.com/what-we-think/reports/achieving-product-launch-success-in-the-biopharma-industry (last accessed Apr. 24, 2026).

71. Weidner et al., (2021). *Observations Regarding the Average Sales Price Reimbursement Methodology.* Evidence-Based Oncology, 27(4), *available at* https://www.ajmc.com/view/observations-regarding-the-average-sales-price-reimbursement-methodology.

72. *What is the Role of Medical Affairs Within the Pharmaceutical Industry?,* Pharmiweb (Jan. 28, 2025), *available at* https://www.pharmiweb.jobs/article/what-is-the-role-of-medical-affairs-within-the-pharmaceutical-industry-/.

Attachment 2

Richard Rieger CV

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

 **Curriculum Vitae**                    INTELLIGENCE THAT WORKS

**Curriculum Vitae**

# Rich Rieger

BRG
70 W. Madison Street, Suite 5000 | Chicago, IL 60602
Email: rrieger@thinkbrg.com | Mobile: 847.636.8134

## SUMMARY

Rich Rieger is a Managing Director and Global Healthcare & Life Sciences Leader at BRG with over 30 years of experience as a senior operating executive and advisor to Pharmaceutical, Biotech, and MedTech companies, private equity and credit, their portfolio companies, law firms and their clients.

Mr. Rieger's experience spans global growth and performance improvement initiatives. He works across corporate strategy, R&D and marketed product portfolios, strategic alliances/M&A, commercialization, manufacturing, supply chain, and operations. He has evaluated >1000 Pharmaceutical and MedTech products and technologies at preclinical, clinical development, and marketed stages, hundreds of companies, executed global strategic alliance/M&A deals, and sold/marketed Pharmaceutical and MedTech products in many countries.

Mr. Rieger also provides litigation support and advisory services to law firms and their Life Sciences clients. It includes expert support and testimony on issues involving economics, disputes, and investigations across federal and state litigation and arbitration.

## EDUCATION

MBA, Finance and General Management        University of Chicago
BS, Electrical Engineering                          University of Notre Dame

## PRESENT POSITION

Managing Director, BRG

## SELECT PREVIOUS POSITIONS

Managing Director, Life Sciences, Alvarez & Marsal
Managing Director, Life Sciences, Huron Consulting Group (Oliver Wyman)
Vice President, Business Development, Horizon Therapeutics (Amgen)
General Manager/Head, Global Pharmaceuticals, Baxter Healthcare Corporation
Principal, Life Sciences, LEK Consulting
Director, Business Development & International Marketing, Abbott Laboratories (AbbVie)

**BRG** Curriculum Vitae                                    INTELLIGENCE THAT WORKS

## BOARD APPOINTMENTS

Gateway for Cancer Research – IIT Grant Funding, Scientific Advisory Board, 2014 – Present
National Marrow Donor Program (NMDP) – Cell Therapy Leader, Board Member, 2013 – 2020

## ECONOMICS, DISPUTES, AND INVESTIGATIONS SERVICE OFFERINGS

- Pharmaceutical, Biotech, and MedTech cases globally
- Expert analysis, report development, and testimony
- Economics damages, financial assessments, and testimony
- Litigation and arbitration for State and Federal cases
- Turnaround, restructuring, and bankruptcy processes
- Representative disputes/issues include company, institution, and investor expectations; R&D program process and valuations; preclinical and clinical development processes; regulatory and compliance processes; intellectual property; strategic alliances/M&A; product claims; sales, marketing, distribution, and medical affairs practices; pricing and market access; reimbursement; lifecycle management; manufacturing and supply chain; commercially reasonable efforts; representations and warranties; product/company valuations; among others

## CORPORATE AND PRIVATE EQUITY SERVICE OFFERINGS

- Corporate Strategy (growth objectives, products/services, geography)
- R&D Portfolio (preclinical, clinical, approved, therapeutic areas, intellectual property, valuation)
- Clinical and Regulatory (trial design/execution, regulatory filings, compliance, NDA, BLA, 510(k), PMA)
- Strategic Alliances/M&A (strategy, due diligence, valuation, execution, integration, divestment)
- Deal Structuring (licensing, M&A, joint ventures, upfront payment, milestones, royalties, profit sharing)
- Commercialization (pre-launch, launch, sales, marketing, lifecycle management)
- Operations (manufacturing, supply chain, technology enablement, P&L optimization)
- Financial Management (structuring/use of capital, royalty monetization)
- Technology Partners (global governments, NIH, universities, venture capital, incubators)
- Key Technologies (small molecules, peptides, biologics, mAbs, ADCs, BsAbs, Checkpoint Inhibitors)
- Specialty Markets (rare diseases, cell & gene therapy, precision medicine, companion diagnostics)
- Loss of Exclusivity (generic and biosimilar offense and defense strategies)
- Pharmaceutical Services (CMO, CDMO, CRO, CCO – Contract Commercialization Organization)

## SELECT OPERATING AND ADVISOR EXPERIENCE

### Baxter Healthcare Corporation
- $625Mn Claris Injectables (India) and $380Mn Baxa Corporation (US) acquisitions and integration
- ScinoPharm Taiwan and Dorizoe Lifesciences (India) R&D, manufacturing, and commercialization alliances utilizing upfront, milestone, and royalty-based deal structures

2

**BRG** Curriculum Vitae                                    INTELLIGENCE THAT WORKS

- Water Street Healthcare Partners (US) R&D and commercialization joint venture utilizing a unique development funding and commercial rights buyback structure

### Horizon Therapeutics (now Amgen)
- TEPEZZA acquisition from River Vision Development Corporation for the treatment of Thyroid Eye Disease; included R&D, commercialization, manufacturing, and operations that led to it becoming a successful rare disease medicine based on an upfront, milestone, and royalty-based deal structure
- Advised PE firm on its acquisition of KRYSTEXXA at the Savient Pharmaceuticals' auction for $120Mn and its commercial strategy for the formation of Crealta Holdings; was later acquired by Horizon Therapeutics for $510Mn in an all-cash transaction
- TEPEZZA and KRYSTEXXA annual net sales of ~$2Bn and $716Mn, respectively, in 2022 were key value drivers for Amgen's $28Bn acquisition of Horizon Therapeutics

### Abbott Laboratories (now AbbVie)
- Global licensing, acquisition, and/or co-promotion deals, including R&D, manufacturing and commercialization of primary care and specialty pharmaceuticals like SYNAGIS, HUMIRA, LUPRON, FLOMAX, MOBIC, MICARDIS, and emtricitabine that later became part of Gilead Sciences' HIV combination products; these products generated billions of dollars in annual net sales and became leaders in their respective therapeutic/disease area categories
- Divestment of medical products business

### Sun Pharmaceuticals (Growth and Performance Improvement) – As Consulting Advisor
- Developed sales growth and profit improvement initiatives for specialty pharmaceutical products ILUMYA and ODOMZO
- Supported acquisition and integration of Concert Pharmaceuticals for the development and commercialization of LEQSELVI

### Private Equity Transaction Support in Pharmaceutical Services – As Consulting Advisor
- Alcami acquisition by The Vistria Group and GHO Capital Partners
- CordenPharma acquisition by Astorg
- Softgel Healthcare Private Limited (SHPL) acquisition by Everstone Capital
- Paratek Pharmaceuticals acquisition by Gurnet Point Capital

Other Corporate and PE experiences available upon request.

## SELECT CASE EXPERIENCE

- United States of America v TAP Pharmaceutical Products
  - 1:01-cr-10354
  - United States District Court, Massachusetts

3

- o   Testified in a case between the Department of Justice and multiple states versus Abbott Laboratories, Takeda Pharmaceuticals, and TAP Pharmaceutical Products due to alleged illegal sales and marketing practices regarding LUPRON for the treatment of prostate cancer.

- United States of America v Aegerion Pharmaceuticals
  - o   1:13-CV-11785
  - o   United States District Court, Massachusetts
  - o   Testified before a Grand Jury regarding the potential indictment of a CEO due to alleged false claims he made regarding JUXTAPID for the treatment of hypercholesterolemia.

- Mallinckrodt Pharmaceuticals Chapter 11 Bankruptcy
  - o   United States Bankruptcy Court, Wilmington, Delaware
  - o   Advised Mallinckrodt's Unsecured Creditors Committee regarding: i) its business plan; ii) a rare disease product pricing assessment of Acthar Gel for the treatment of multiple diseases and disorders; and iii) a product divestment as part of a bankruptcy process. The product pricing assessment was used to inform commercial and Medicare claim estimates in connection with potential damages owed by Mallinckrodt. Prepared the testifying witness who had been named before I joined the case team.

- Sandoz v Cediprof
  - o   20 Civ. 5568
  - o   American Arbitration Association and United States District Court, Southern District of New York
  - o   Retained by Sandoz in a supply chain dispute regarding levothyroxine for the treatment of hypothyroidism. Generated an expert rebuttal report regarding business practices, breach of contract, and damages. Was scheduled to testify but wasn't needed after the opposing expert failed in their testimony.

- University of Tennessee Research Foundation v Caelum Biosciences
  - o   Case No. 3:19-cv-508
  - o   United States District Court, Eastern Division, Tennessee
  - o   Retained by Caelum Biosciences in an intellectual property dispute regarding CAEL-101 for the treatment of AL Amyloidosis. Rebutted the commercial and damages assessments provided by an opposing expert on behalf of the University of Tennessee Research Foundation.

- Free State of Bavaria, Represented by the University of Wurzburg v The Ohio State University
  - o   Case No. 2:22-cv-2580
  - o   US District Court, Southern District of Ohio Eastern Division
  - o   Advised Free State of Bavaria in an intellectual property dispute regarding ZOLGENSMA, a gene therapy for the treatment of Spinal Muscular Atrophy (SMA). Developed pharmaceutical industry business practices and damages expert report, provided a deposition, and testified.

 **Curriculum Vitae**

INTELLIGENCE THAT WORKS

- Brammer Bio MA v Sarepta Therapeutics
  - ○ Case No. 01-22-0002-3393
  - ○ American Arbitration Association
  - ○ Retained by Sarepta Therapeutics in a supply chain dispute regarding ELEVIDYS, a gene therapy for the treatment of Duchenne muscular dystrophy (DMD). Generated expert and rebuttal reports for the American Arbitration Association. Was scheduled to testify but the case was settled the day before the arbitration hearing was to commence.

- Currently retained on several other cases. Developing expert reports regarding multiple issues and expected to testify in each of the cases.

**Attachment 3**

**Richard Rieger Testifying
Experience**

*Capricor Therapeutics, Inc. v. Nippon Shinyaku Co, Ltd. and NS Pharma, Inc.*

Rich Rieger
*Managing Director*
312.588.7106
RRieger@thinkbrg.com
Chicago, IL

---

**TESTIFYING EXPERIENCE**

Case No. 2:22-cv-2580
*Free State of Bavaria, represented by the University of Wurzburg v The Ohio State University*
United States District Court for the Southern District of Ohio



Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE,**
 **MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and <br> NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION: BERGEN COUNTY <br> Docket No. BER-C-000117-26 <br><br><br> Civil Action <br><br> **CERTIFICATION OF ARAVINDHAN** <br> **VEERAPANDIYAN, M.D.** |

To whom it may concern

Aravindhan Veerapandiyan, M.D., certifies as follows:

I am a board certified child neurologist and neuromuscular physician licensed to practice medicine in the State of Arkansas. I currently serve as the Director of the Comprehensive Neuromuscular Program, Director of Certified Duchenne Care Center, and Co-Director of the Muscular Dystrophy Association Pediatric Care Center at Arkansas Children's Hospital. I am also an Associate Professor of Pediatrics at University of Arkansas for Medical Sciences. I have personal knowledge of the facts set forth herein.  I have devoted my career to children and adolescents with neuromuscular diseases, with a particular focus on Duchenne muscular dystrophy ("DMD"). Over the course of a decade of clinical practice and research, I have personally evaluated and treated over a hundred patients with DMD. My research has centered on the development of novel therapeutics for neuromuscular diseases, as well as the design and execution of clinical trials. Since joining Arkansas Children's Hospital in 2018, I have served as the Principal Investigator for more than fifteen Duchenne clinical trials, including the HOPE-3 pivotal Phase 3 clinical trial evaluating Deramiocel (CAP-1002) in patients with DMD.

I have not been retained as a paid expert in this litigation. I offer this declaration based on my individual professional opinion, informed by my clinical and research experience, and my commitment to my patients and the broader DMD community.

**DUCHENNE MUSCULAR DYSTROPHY IS A PROGRESSIVE AND FATAL DISEASE WITH NO CURE**

DMD is the most common and severe form of inherited muscular dystrophy. It is caused by mutations in the dystrophin gene on chromosome Xp21 that result in the absence or near-absence of the protein dystrophin—a structural protein essential to the integrity of muscle cell

membranes. Without functional dystrophin, muscle fibers are damaged with every contraction, undergo cycles of necrosis and incomplete regeneration, and are progressively replaced by fibrotic (scar) tissue and fat. This process is irreversible. In both skeletal and cardiac muscle, dystrophin deficiency leads to repeated contraction-induced injury, chronic inflammation, and ongoing fibrosis. Because the dystrophin gene is located on the X chromosome, DMD overwhelmingly affects boys and young men, with an estimated incidence of approximately 1 in 3,600 male live births. Roughly 15,000 individuals in the United States are living with this disease. DMD follows a predictable, progressive course of muscle deterioration. It begins in early childhood with subtle motor delays causing difficulty running, frequent falls, trouble climbing stairs, and use of Gower's maneuver to stand due to proximal weakness. Between ages 8 and 12, most boys lose the ability to walk. These losses are irreversible, as muscle tissue is progressively replaced by fat and fibrosis and does not regenerate.

After loss of ambulation, DMD continues to affect the remaining musculature, with progressive decline in upper limb function through adolescence and early adulthood. This represents the last major domain of physical independence, and patients gradually lose the ability to feed themselves, perform basic hygiene, write, and use a phone or computer. The Performance of the Upper Limb (PUL) assessment quantifies this decline across shoulder, elbow, and distal hand function. For non-ambulatory patients, upper limb function is not just another clinical measure; it is the primary means of interacting with the world.

Respiratory function also declines as the muscles of the chest wall and diaphragm weaken. Most patients eventually require mechanical ventilation, initially at night and ultimately around the clock. Scoliosis develops as trunk muscles can no longer support the spine, further

compromising pulmonary capacity. Pharyngeal weakness leads to difficulty swallowing, aspiration risk, and changes in voice quality.

DMD cardiomyopathy, the progressive weakening and scarring of the heart muscle due to the same dystrophin deficiency, is the leading cause of death in this patient population. By their twenties, virtually all patients with DMD have evidence of cardiomyopathy. I will not address cardiac pathophysiology in extensive detail, but I note that the cardiac manifestations of DMD are inseparable from the overall disease burden and represent a critical area of unmet need.

There is no cure for DMD. All currently available treatments aim at slowing decline and managing symptoms rather than halting or reversing the disease process. Corticosteroids such as prednisone, deflazacort, and vamorolone remain the foundation of therapy and can decelerate skeletal muscle deterioration, but they carry substantial side effects including weight gain, growth suppression, bone fragility, and immunosuppression. Their benefits diminish as the disease advances. Delandistrogene moxeparvovec (Elevidys), a more recently approved gene therapy, has shown modest benefits but carries substantial safety risk and has not been thoroughly studied in the non-ambulatory population that stands to benefit most from Deramiocel. Exon-skipping agents apply only to patients with specific mutations and have shown limited clinical efficacy to date. No approved therapy has demonstrated clinically meaningful preservation of upper limb function, particularly in non-ambulatory patients, and no approved therapy addresses both the skeletal and cardiac manifestations of DMD.

**DERAMIOCEL IS A MEANINGFUL THERAPEUTIC ADVANCE**

Deramiocel (CAP-1002) is an investigational allogeneic cell therapy composed of cardiosphere-derived cells ("CDCs"), a population of cardiac progenitor cells that have been studied extensively and administered to more than 250 human subjects across multiple clinical trials.

3

Based on my review of the published literature and my involvement in the clinical trial program, I understand that CDCs change the immune system and exert anti-fibrotic effects through a mechanism called paracrine signaling. Specifically, they secrete exosomes that reprogram macrophages from a pro-inflammatory to a reparative phenotype. In addition to exosomes, CDCs secrete soluble factors associated with anti-inflammatory, immunomodulatory, and anti-fibrotic activity. Nonclinical studies have demonstrated reduced myocardial fibrosis and preservation of cardiac and skeletal muscle function. The therapy is administered intravenously every three months and, as an allogeneic product, does not require genetic matching or individualized manufacturing for each patient. Deramiocel has received Orphan Drug Designation from both the FDA and the European Medicines Agency, Regenerative Medicine Advanced Therapy ("RMAT") designation, and Rare Pediatric Disease Designation from the FDA.

**THE HOPE-3 TRIAL DEMONSTRATED SIGNIFICANT CLINICAL BENEFIT**

I served as a Principal Investigator for the HOPE-3 trial, a pivotal Phase 3, randomized, double-blind, placebo-controlled study evaluating Deramiocel in boys and young men with DMD. The trial enrolled 106 participants across 20 leading clinical sites in the United States. Participants received intravenous Deramiocel (150 million cells per infusion) or placebo every three months for 12 months. The study population had a mean age of approximately 15 years. All participants were on stable corticosteroid regimens. Approximately 90 percent were receiving cardiac medications at baseline, and over 75 percent had a clinical diagnosis of cardiomyopathy at enrollment. This was a population representative of later-stage disease with substantial unmet need: predominantly non-ambulatory, medically complex, and already experiencing clinically significant cardiac involvement.

4

The trial met its primary endpoint. Deramiocel slowed the progression of upper limb functional decline, as measured by the PUL v2.0 Total Score, by 54% compared to placebo (p=0.029). Based on my experience in managing patients with DMD, I can state with confidence that the treatment effect of this magnitude on upper limb function is unprecedented in this disease. PUL v2.0 captures tasks that are directly meaningful to patients' daily lives such as reaching, lifting, manipulating objects and the preservation of these abilities translates directly into preserved independence and quality of life.

The trial also met its key secondary cardiac endpoint, with Deramiocel slowing the decline in left ventricular ejection fraction ("LVEF") by 91% compared to placebo (p=0.041). LVEF was assessed using centrally reviewed cardiac magnetic resonance imaging, and the treatment effect was even more pronounced in the subgroup of patients with documented cardiomyopathy at baseline. Statistical significance was achieved across all type 1 error-controlled secondary endpoints, including benefit in the mid-level PUL domain (which captures elbow and proximal forearm activities critical to feeding and self-care), a Global Statistical Test integrating upper limb function, cardiac function, and patient-reported severity, and statistically significant attenuation of myocardial fibrosis progression as measured by late gadolinium enhancement on cardiac MRI.

In my assessment, these results across functional, structural, and patient-centered measures materially strengthens the conclusion that the treatment effect is real and clinically meaningful. These findings are also consistent with and build upon the results of the earlier HOPE-2 trial and its open-label extension, which demonstrated durable benefits sustained over more than 48 months of treatment. The HOPE-2 open-label extension showed long-term stabilization of cardiac function and progressively slower rates of upper limb decline with continued treatment.

5

In my view, this pattern of reproducibility across independent trials showing concordant benefit in both skeletal and cardiac muscle domains is consistent with a genuine disease-modifying effect rather than a fleeting improvement in symptoms.

**DELAY IN ACCESS CAN CAUSE IRREVERSIBLE HARM TO PATIENTS**

The patients who stand to benefit from Deramiocel are those in an active phase of irreversible deterioration. They are predominantly non-ambulatory boys and young men, average age approximately 15, the majority of whom are already living with clinical cardiomyopathy. Over 75 percent of HOPE-3 participants had a diagnosis of cardiomyopathy at enrollment, and approximately 90 percent were receiving cardiac medications. These are patients already experiencing clinically meaningful cardiac and skeletal muscle decline despite receiving the current standard of care. Deramiocel does not reverse existing damage. It substantially slows the rate at which damage accumulates. This distinction is critical: because the therapy preserves existing functions rather than restoring what has been lost, any delay in access results in permanent, irrecoverable harm. Muscle tissue that is destroyed and replaced by scar tissue and fat during a period without treatment will never recover, even if Deramiocel is eventually administered. Cardiac scar tissue that forms during untreated progression will remain permanently, reducing the heart's capacity for the remainder of the patient's life.

To frame this in human terms: for a non-ambulatory teenager whose arms and hands are his last remaining tools for any degree of independence, a 54% reduction in the rate of upper limb decline can mean the difference between being able to feed himself and needing someone else to bring a fork to his mouth. From a cardiac perspective, a 91% slowing of LVEF decline in a population whose cardiomyopathy is the most likely cause of death translates directly into preserved years of cardiac function and, by extension, preserved years of life. That is not an

abstract statistical distinction. It is the preservation of remaining independence, remaining cardiac reserve, and remaining time.

**DERAMIOCEL ADDRESS BOTH CARDIAC AND SKELETAL MUSCLE DISEASE**

There is no approved therapy that addresses both the skeletal and cardiac manifestations of DMD. There is no other therapy that has demonstrated a 54% slowing of upper limb disease progression and a 91% slowing of cardiac decline in a Phase 3 clinical trial. No approved therapy carries a regulatory indication for DMD-associated cardiomyopathy or for preservation of upper limb function in non-ambulatory patients. If Deramiocel is not distributed to eligible patients in a timely manner following anticipated FDA approval, there is no equivalent alternative therapy to which these patients can turn. Every day of delay is a day of irreversible disease progression that cannot be recovered.

**CONCLUSION**

Based on my clinical experience caring for patients with DMD, my role as a Principal Investigator in the HOPE-3 trial, and my understanding of the disease's pathophysiology, it is my professional opinion that any delay in access to Deramiocel will result in irreversible harm. DMD is characterized by relentless, progressive muscle degeneration that cannot be reversed. Deramiocel is the first therapy to demonstrate, in a randomized, double-blind, placebo-controlled Phase 3 trial, a statistically significant slowing of decline in upper limb function and progression of cardiomyopathy, with supportive evidence of reduced fibrosis progression on cardiac MRI. For the patients and families, I have cared for over more than a decade, this represents a meaningful and long-awaited advance. Any delay in availability risks permanent loss of function in a population with limited remaining reserve.

7

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  May 5, 2026                                 _____

Aravindhan Veerapandiyan, M.D.

8

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE,**
 **MEAGHER & FLOM LLP**
**(**A Delaware Limited Liability Partnership)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NS PHARMA, INC., and<br>NIPPON SHINYAKU CO., LTD.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: BERGEN COUNTY<br>Docket No. BER-C-000117-26<br><br>Civil Action<br><br>**CERTIFICATION OF JONATHAN<br>SOSLOW, M.D., M.S.C.I** |

I, Jonathan Soslow, M.D., M.S.C.I. declare as follows:

1. I am a physician licensed to practice medicine in the State of Tennessee. I am board-certified in pediatric cardiology. I serve as Professor of Pediatrics in the Division of Cardiology at Vanderbilt University Medical Center, where I also serve as Director of Clinical Research for Pediatric Cardiology, Co-Director of the DMD Multispecialty Clinic, and Director of the Gene Therapy Clinic. I hold a Master of Science in Clinical Investigation from Vanderbilt University. Except as indicated below, I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. My clinical practice and research program are focused on the cardiac manifestations of Duchenne muscular dystrophy ("DMD"). I specialize in echocardiography and cardiac magnetic resonance imaging ("cMRI"), and my research centers on the identification and validation of serum and imaging biomarkers for DMD cardiomyopathy. I have served as principal investigator on grants funded by the American Heart Association, the National Heart, Lung, and Blood Institute (including K23, R56, and multiple R01 awards), and the Food and Drug Administration. I currently lead a multi-site FDA-funded study evaluating the longitudinal progression of DMD cardiomyopathy a multi-site NIH/NHLBI-funded studies evaluating clinical outcome measures for DMD cardiomyopathy, and a multi-site NIH/NHLBI clinical trial in patients with DMD cardiomyopathy. Over the course of my career, I have cared for and monitored the cardiac health of a substantial number of patients with DMD, and I am intimately familiar with the trajectory of cardiac disease in this population.

3. I serve as a consultant for Capricor Therapeutics, a biotechnology company that has developed a potential treatment for DMD. My responsibilities focus on scientific advising, and my provision of this statement is not part of my duties as a consultant. I have not been retained

2

as a paid expert in this litigation. I offer this declaration based on my clinical and research experience and out of genuine concern for the patients I treat and the broader DMD community.

## DUCHENNE MUSCULAR DYSTROPHY

4. DMD is a fatal, X-linked genetic disorder caused by mutations in the dystrophin gene that result in the absence of functional dystrophin protein. Dystrophin is a structural protein that stabilizes muscle cell membranes during contraction. In its absence, both skeletal and cardiac muscle fibers sustain progressive, contraction-induced injury, undergo chronic inflammation, and are irreversibly replaced by fat and scar tissue. The disease affects approximately 1 in 3,600 male live births, and roughly 15,000 individuals in the United States currently live with DMD.

5. The symptomatic manifestations of DMD are devastating. Boys typically present with motor delays in early childhood and lose the ability to walk between ages 8 and 12. After loss of ambulation, upper limb function deteriorates progressively. Patients lose the ability to feed themselves, to perform basic self-care, and eventually to communicate except through minimal finger movements or eye-tracking devices. Respiratory insufficiency develops as the muscles of the chest wall weaken, eventually requiring mechanical ventilation.

6. The heart is a muscle, and in DMD, the absence of dystrophin affects cardiac muscle through the same mechanism that destroys skeletal muscle. Cardiomyopathy, the progressive weakening and fibrotic remodeling of the myocardium, is now the leading cause of death in patients with DMD. Most patients with DMD die in their twenties or early thirties, and cardiomyopathy is the primary driver.

7. In my experience monitoring DMD patients with advanced cardiac imaging, the onset of cardiomyopathy is often earlier than clinical symptoms would suggest. Cardiac MRI can detect subclinical myocardial abnormalities well before overt systolic dysfunction is apparent on echocardiography or other standard measures. Late gadolinium enhancement ("LGE") on cMRI

(which shows that viable myocardium has been replaced with fibrotic tissue) is frequently detectable in the early teenage years and sometimes earlier. The fibrosis characteristically begins in the subepicardium of the lateral left ventricular free wall and progressively extends to involve additional myocardial segments, including the interventricular septum. This fibrosis is not known to regress. Once healthy myocardium has been replaced by scar, it is permanently lost.

8.    As fibrosis accumulates, the heart's pumping capacity declines. This is measured clinically as a reduction in left ventricular ejection fraction ("LVEF"). The heart dilates as it attempts to compensate for the progressive loss of contractile tissue, mitral regurgitation develops as the papillary muscles are involved, and arrhythmias—particularly supraventricular arrhythmias—become increasingly frequent. By their twenties, virtually all DMD patients exhibit dilated cardiomyopathy.

9.    Current cardiac management in DMD relies on the same pharmacological agents used for heart failure in the general population: ACE inhibitors, angiotensin receptor blockers (ARBs), beta-blockers, and mineralocorticoid receptor antagonists (MRAs). These agents can modestly slow the progression, but they do not target the underlying pathology—the ongoing fibrotic destruction of myocardium driven by dystrophin deficiency. There is no approved therapy specifically indicated for DMD-associated cardiomyopathy, and no approved therapy has been shown to directly modify the myocardial fibrosis that defines this disease. Corticosteroids, the mainstay of skeletal muscle management in DMD, have not been shown to provide disease-modifying effects on the cardiac manifestations of DMD.

10.    There is no cure for DMD. All currently available treatments are palliative. Gene therapies and exon-skipping agents, while representing important advances for specific patient subsets, are limited to patients with particular mutations and have not demonstrated meaningful

4

cardiac benefit. DMD cardiovascular disease, which typically leads to death in these patients, remains without a targeted, disease-modifying therapy.

## DERAMIOCEL (CAP-1002) AND THE HOPE-3 STUDY

11. I have reviewed the published scientific literature describing Deramiocel (CAP-1002), an investigational allogeneic cell therapy composed of cardiosphere-derived cells ("CDCs"). CDCs are cardiac progenitor cells that, based on the literature I have reviewed, exert their therapeutic effects predominantly by secreting exosomes and soluble factors that shift the local immune environment from a pro-inflammatory, pro-fibrotic state to a reparative, anti-fibrotic one. I understand that nonclinical studies have demonstrated reduced myocardial fibrosis and preservation of cardiac and skeletal muscle function, and that the manufactured product undergoes testing designed to confirm anti-fibrotic bioactivity through suppression of profibrotic expression. The anti-fibrotic mechanism is of particular relevance to DMD cardiomyopathy, where progressive fibrosis is the central driver of cardiac deterioration and death.

12. I understand that Deramiocel is administered intravenously every three months and, as an allogeneic therapy derived from donor cardiac tissue, does not require patient-specific genetic matching or individualized manufacturing. CDCs have been investigated in more than 250 peer-reviewed scientific publications and administered to more than 250 human subjects across multiple clinical trials. I am aware that Deramiocel has received Orphan Drug Designation from both the FDA and the European Medicines Agency, Regenerative Medicine Advanced Therapy ("RMAT") designation, and Rare Pediatric Disease Designation from the FDA.

13. The HOPE-3 trial is a pivotal Phase 3, randomized, double-blind, placebo-controlled study of Deramiocel in 106 patients with DMD conducted across 20 clinical sites in the United States. The trial enrolled a population representative of later-stage disease: mean age approximately 15 years, the majority non-ambulatory and on stable corticosteroid regimens,

5

approximately 90 percent receiving cardiac medications at baseline, and over 75 percent carrying a clinical diagnosis of cardiomyopathy at enrollment.

14.     Of particular significance from my perspective as a cardiologist and cardiac imaging specialist is the key secondary cardiac endpoint. In the HOPE-3 trial, Deramiocel slowed the decline in LVEF by 91% compared to placebo (p=0.041), as assessed by centrally reviewed cMRI. A treatment effect of this magnitude on cardiac function in a DMD population is, to my knowledge, without precedent. The LVEF result was even more pronounced in the subgroup of patients with documented cardiomyopathy at baseline—precisely the patients at greatest risk of cardiac morbidity and mortality.

15.     Equally important, the trial demonstrated statistically significant attenuation of myocardial fibrosis progression as measured by LGE on cMRI. As someone whose research program is built around the detection and quantification of myocardial fibrosis in DMD, I find this result particularly compelling. LGE reflects irreversible replacement of functional myocardium by scar tissue. A therapy that slows the accumulation of LGE is, in practical terms, preserving viable heart muscle that would otherwise be permanently lost. The concordance between the functional cardiac measure (LVEF preservation) and the structural cardiac measure (attenuated LGE progression) materially strengthens the inference that the observed treatment effect reflects genuine myocardial protection rather than a statistical artifact.

16.     The HOPE-3 study demonstrated statistical significance across all type 1 error-controlled secondary endpoints, including benefit in a Global Statistical Test integrating upper limb function, cardiac function, and patient-reported severity. In my opinion, this concordance across functional, structural, and patient-centered outcome measures meaningfully reinforces the conclusion that the treatment effect is real, clinically significant, and biologically coherent.

17. Additionally, the earlier HOPE-2 trial and its open-label extension demonstrated sustained cardiac benefit over more than 48 months of continued treatment, including long-term stabilization of LVEF. The reproducibility of cardiac benefit across independent studies is, in my view, consistent with a durable, disease-modifying effect on the myocardium rather than a short-lived symptomatic improvement.

**ELIGIBLE PATIENTS HAVE NO ALTERNATIVE CARDIAC THERAPY: EACH DAY WITHOUT DERAMIOCEL RESULTS IN IRREVERSIBLE HARM**

18. Cardiac fibrosis in DMD is irreversible. Every segment of myocardium replaced by scar tissue is, with current medical technology, permanently lost. The heart does not regenerate functional cardiac muscle once fibrosis has occurred. This is a fundamental principle of cardiac pathology that I observe in my patients regularly and that advanced imaging confirms with clarity.

19. Deramiocel, based on the data I have reviewed, does not reverse existing fibrosis. It slows the rate at which new fibrosis develops. This means that any period during which an eligible patient does not have access to the therapy is a period during which fibrosis accumulates at the faster, untreated rate—and that accumulation is permanent. Cardiac reserve lost during a period of delay cannot be recovered even if treatment is subsequently initiated.

20. This point is especially critical because cardiac deterioration in DMD is frequently clinically silent in its early and middle stages. Patients may have extensive myocardial fibrosis visible on cMRI while exhibiting only modest reductions in LVEF. By the time overt heart failure symptoms manifest, substantial and irreversible myocardial damage has already occurred. The therapeutic window during which the greatest amount of viable myocardium can still be preserved is not when heart failure becomes clinically obvious, but before. Delay forfeits that window.

21. In the HOPE-3 trial, the placebo group showed measurable decline in LVEF and progression of LGE over just 12 months. The Deramiocel-treated group showed near-stabilization

7

of cardiac function over the same period. For a population in whom cardiomyopathy is the most common cause of death, a 91% reduction in the rate of cardiac decline can preserve years of cardiac function and, therefore, lead to a significant delay in mortality.

22.     There is no approved alternative that provides comparable cardiac protection for DMD patients. No other therapy has demonstrated statistically significant preservation of LVEF or attenuation of myocardial fibrosis progression in DMD in a controlled trial. If Deramiocel is not made available to eligible patients in a timely manner, there is no substitute cardiac therapy to which these patients can be directed. Every day of delay is a day of irreversible cardiac disease progression.

**CONCLUSION**

23.     Based on my clinical experience monitoring and treating the cardiac manifestations of DMD, my research into the imaging biomarkers that track cardiac disease progression, and the HOPE-2, HOPE-2 open label extension, and HOPE-3 trial data and the broader Deramiocel clinical program, it is my professional opinion that any delay in the distribution of Deramiocel to eligible patients following FDA approval will result in irreversible cardiac harm. Deramiocel is the first therapy to demonstrate, in a rigorous Phase 3 controlled trial, statistically significant preservation of cardiac function and attenuation of myocardial fibrosis in DMD. For my patients and the broader DMD community, it represents a critical advance that has been long awaited. Delay is not a neutral event—it is permanently harmful.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on April __19__, 2026, in Nashville, Tennessee

8

Jonathan Soslow, M.D., M.S.C.I.

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE,**
 **MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION: BERGEN COUNTY <br> Docket No. BER-C-000117-26 <br><br> Civil Action <br><br> **CERTIFICATION OF** <br> **AIDAN LEFFLER** |

Aidan Leffler hereby certifies as follows:

1. I am 22 years old and I live in Seattle, Washington. I am a graduate student at the University of Washington.

2. At the age of three, I was diagnosed with Duchenne Muscular Dystrophy ("DMD"), a rare genetic disease that affects all of my voluntary muscles, my heart, and my breathing muscles. DMD is a debilitating disease affecting young boys. Without treatment, DMD causes individuals to lose function of their arms and legs, before eventually the heart and lungs stop working and the disease leads to early death.

3. As a young child, there were signs that something was wrong—I did not jump or run as fast as other kids my age. At five, there were further signs of health impacts. At age 12, after I broke my leg in the backyard, I could no longer run and struggled to participate in other physical activities.

4. I have spent years of my life away from school and family participating in clinical trials, desperately searching for something which could arrest my inevitable decline. My mother has devoted incredible and sustained effort to this cause since my diagnosis. From age eight to now, my family and I have been traveling around the country, from three months in Boston to years visiting Kansas City.

5. When I was 10, I participated in a clinical trial for a drug called Prosensa that required me to travel from Seattle to Vancouver every week for 48 weeks. I remember when we knew that all of this effort had been for a placebo, after a kid who went before me came out crying, saying the injection had felt like sharks biting his arm, and I, after being dragged into the exam room, felt nothing. After several phases of clinical testing, Prosensa was deemed ineffective for DMD, and my treatment was immediately

discontinued. Since then, I have participated in two other long-term clinical trials, both of which were unable to effectively slow my decline.

6. The summer before I started college at the University of Washington, I began a clinical trial for Deramiocel. My health at that time was going through a period of rapid decline, and I was losing the ability to walk. I also was exhausted from the time spent participating in clinical trials and close to giving up actively searching for a drug which could help me. At first, I was started on a placebo, but I was eventually put into what is called an "open label study" and started receiving the actual drug. I finally started active treatment in 2021, while I was preparing for my freshman year of college. At the time, I was still capable of everything I needed to get through the day – getting out of bed, getting dressed, taking a shower. I could live mostly independently. But we did not expect any of this to last. We even planned for someone to live in my dorm with me, figuring I would quickly need more help. That is how the trajectory of Duchenne muscular dystrophy works.

7. We never expected that four years later, I would be able to do every single one of the tasks I need to get through the day. I have not lost any arm function, and my ejection fraction is completely stable. I have been able to live almost completely independently in my dorm for all four years of college. That independence has given me the chance to have a true college experience, where I have gotten to build the friendships and connections that I will treasure for life. Now, I have just graduated from the University of Washington this past spring, and plan to go to graduate school this fall. I recently started my first relationship and plan to visit her at her study abroad program in Argentina. There is so much to look forward to.

3

8. I strongly believe that my continuing stability is a result of my treatment, and I will continue to be treated with Deramiocel.

9. It is critical that Deramiocel be made available and distributed to those with DMD because of the clear and significant evidence, whether looking at heart health or muscle strength, that it halts the decline of this debilitating disease.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: April 28 2026

Aidan Leffler
Aidan Leffler

4

Andrew Muscato (NJ Bar No. 18661978)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and <br> NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION:BERGEN COUNTY <br> Docket No.  BER-C-000117-26 <br><br> Civil Action <br><br> **CERTIFICATION OF** <br> **ELIJAH J. STACY** |

Elijah J. Stacy hereby certifies as follows:

1. I am 24 years old, and I live in Norco, California. At 15 years old, I founded a nonprofit organization called Destroy Duchenne, which advocates for a complete cure to Duchenne Muscular Dystrophy ("DMD").

2. I believe deeply in Capricor Therapeutics and its mission, and serve as a consultant and shareholder. My responsibilities focus on patient support and advocacy, and my provision of this statement is not part of my duties as a consultant.

3. At age six, I was diagnosed with DMD, a rare genetic disease that affects all of my voluntary muscles and vital organs, including my heart and lungs. DMD is a fatal disease that affects thousands of children. At age eleven, I lost the ability to walk and since then have been completely dependent on a power-wheelchair. Today, my heart health is in decline. And it has become exceedingly difficult to maintain my independence. Basic things that people take for granted every day, like sleeping comfortably, have become incredibly difficult, and they are only getting harder with time.

4. My brothers were also diagnosed with this disease. My younger brother Max passed away from DMD at the age of 14 in 2019. My brother Kai, who is now 18 years old, is also living with DMD.

5. Finding an effective treatment for DMD has been a huge part of my life. I have been a part of other clinical trials that were not successful. I had hoped to be a part of the Hope-3 trial for Deramiocel but unfortunately did not qualify. My brother Kai, however, was able to participate in the Hope-3 trial of Deramiocel, and through him I've seen firsthand the life-changing impact Deramiocel can have for young men living with DMD.

6.      It is critical that treatments such as Deramiocel be made available and distributed to individuals like me and Kai as soon as possible. My friends in the DMD community, also young men in their 20s, are in even more dire need of intervention. Any further delays in the availability of Deramiocel would pose an immediate threat to their survival as well.

7.      I believe Deramiocel can stabilize my heart and extend my life. My understanding is that the clinical data indicates Deramiocel can stabilize cardiac functions and that it targets the number-one cause of death for patients afflicted with DMD, cardiomyopathy.

8.      My brother and I need access to this treatment right away. For the first time in my life, my heart is beginning to fail. My left ventricular ejection fraction ("LVEF") has dropped. My understanding is that the LVEF number is the number cardiologists watch (because once it slips the effects of DMD tend to worsen fast) and that patients who start at or above a 45% LVEF on Deramiocel tend to maintain cardiac function while those who start below 45% show slowed decline but not full maintenance. That makes every month of delayed approval consequential—because patients who could still maintain heart function may cross below that threshold while we wait. For patients like me, those months are not abstract—they are cardiac cells dying and eligibility slipping away.

9.      Without immediate treatment I will continue to suffer the irreversible course of this disease, and my dreams of getting married, starting a family, and starting an investment firm devoted to advancements in medical science will be lost. For patients like me and my brother, every day matters.

10. At the same time, this is not just about me and my brother. I say all of this with a larger purpose. It has always been my perspective, and the focus of my life's work, that no one should suffer from DMD as we have. Deramiocel offers hope to those in the DMD community, and it is urgently needed.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: April 30, 2026

_____
Elijah J. Stacy

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE,**
 **MEAGHER & FLOM LLP**
(A Delaware Limited Liability Partnership)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NS PHARMA, INC., and<br>NIPPON SHINYAKU CO., LTD.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: BERGEN COUNTY<br>Docket No. BER-C -000117-26<br><br>Civil Action<br><br>**CERTIFICATION OF**<br>**HEATHER HAY** |

Heather Hay hereby certifies as follows:

1.      I am a mother of two young sons who have been diagnosed with Duchenne Muscular Dystrophy (DMD), a rare and fatal genetic disease that causes progressive muscle wasting, ultimately affecting all voluntary muscles, the heart, and the lungs. My family and I live in Olympia, Washington.

2.      In 2021, both of my sons were diagnosed with DMD. My younger son, ▮▮▮▮ is currently eight years old, and my older son, ▮▮▮▮, is eleven. Living with DMD is extremely difficult. The disease is fast-progressing, and with each passing day, my sons lose muscle function that they will never recover. Recently, my oldest son ▮▮▮▮ has faced some big changes in his progression. In a matter of 2 months, he went from being able to walk on his own to being in a wheelchair fulltime. DMD is a disease that doesn't slow down because we want it to. My boys don't have weeks to waste and most certainly not months or years. To stop progression and to stabilize them, we need real drugs now! The progressive nature of this disease means that delays in access to treatment translate directly into irreversible damage.

3.      Our family has experienced firsthand how limited and uncertain the treatment landscape is for DMD patients. Each of my children has participated in clinical trials, as there are very few drugs available to them. The goal is to slow this disease so that my sons can enjoy life and live it to the fullest. I want my children to be on this earth as long as possible. That is why expanded access to promising treatments such as Deramiocel is so critically important.

4.      I am aware that Capricor Therapeutics has developed Deramiocel as a potential treatment for DMD, and that clinical data indicates Deramiocel targets cardiomyopathy. For my sons, whose hearts will be progressively weakened by this disease, a therapy that can stabilize cardiac function could make the difference between life and death.

2

5.    Every day without access to an effective treatment is a day that the disease progresses.  My sons deserve the chance to grow up, become independent and dream about their future. Treatments like Deramiocel may be what gives them that chance.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: April 27, 2026

Heather Hay

3

PUBLIC - REDACTS MATERIALS FROM
CONDITIONALLY SEALED RECORD

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., | SUPERIOR COURT OF NEW JERSEY |
| | CHANCERY DIVISION: BERGEN COUNTY |
| Plaintiff, | Docket No. BER-C- 000117-26 |
| | |
| v. | Civil Action |
| | |
| NS PHARMA, INC., and | |
| NIPPON SHINYAKU CO., LTD., | **CERTIFICATION OF** |
| | **DR. LINDA MARBÁN** |
| Defendants. | |

## I.   INTRODUCTION AND PARTIES

Dr. Linda Marbán certifies as follows:

1.   I am the Chief Executive Officer of Capricor Therapeutics, Inc. ("Capricor"), and have served in this capacity since 2009. My responsibilities at Capricor include overseeing and directing the advancement of our drug pipeline from early development through potential approval, ensuring our clinical, regulatory, and manufacturing strategies are aligned and well-executed. At the same time, I maintain strong financial discipline as a public company, with accountability to our board, regulators, and shareholders.

2.   Except as otherwise indicated, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

3.   I submit this certification in support of Capricor's motion for a preliminary injunction against Nippon Shinyaku Co., Ltd. and its subsidiary NS Pharma, Inc. ("NS Pharma"),

1

the entity serving as the subdistributor for the Company's product, Deramiocel, in the United States pursuant to a Commercialization and Distribution Agreement (the "Distribution Agreement"), executed on January 24, 2022 by and between Capricor and Nippon Shinyaku Co., Ltd. ("Nippon Shinyaku," and together with NS Pharma and Capricor, "the Parties"). Attached hereto as Exhibit 1 is a true and accurate copy of the Distribution Agreement.

4.     Capricor is a clinical-stage biotechnology company that, through its subsidiary, Capricor, Inc., has developed a cell therapy for Duchenne muscular dystrophy. For nearly two decades, Capricor has devoted hundreds of millions of dollars to developing CAP-1002 ("Deramiocel" or the "Product"), its lead product candidate, shepherding it through preclinical research, Phase 1 studies, Phase 2 and Phase 3 clinical trials, and the FDA regulatory process.

5.     Capricor is incorporated under the laws of the State of Delaware, with principal offices located at 10865 Road to the Cure, Suite 150, San Diego, California 92121. Capricor is a publicly-traded company listed on Nasdaq Global Select Market.

6.     Nippon Shinyaku is a Japanese pharmaceutical corporation headquartered in Kyoto, Japan. NS Pharma, Inc. is Nippon Shinyaku's wholly-owned U.S. subsidiary, with its principal place of business in Paramus, New Jersey. NS Pharma markets Viltepso (viltolarsen), an exon-skipping therapy for a genetically defined subset of DMD patients. Upon information and belief, Viltepso is the only product NS Pharma currently distributes in the United States.

7.     Upon information and belief, Nippon Shinyaku has appointed NS Pharma as its subdistributor for the distribution of Deramiocel in the U.S.

## II.     MY BACKGROUND AND CAPRICOR'S MISSION

8.     My entire career has focused on the discovery of and understanding of human disease. To that end, I chose a career in science. I followed the traditional path of pursuing and

2

gaining a Ph.D. in cardiovascular physiology from Case Western Reserve University. Following completion of my doctorate, I was a postdoctoral fellow and then junior faculty at Johns Hopkins University in the division of cardiology. All of my academic work focused on elucidating the mechanisms of the development of congestive heart failure (CHF) by studying the contractile and biophysical properties of the heart. My goal has always been to develop medicines to treat disease, and with that goal in mind, I transitioned into the biotechnology industry, where I gained experience in building startups in gene and cell therapy prior to co-founding Capricor.

### A.      The Founding of Capricor

9.      Capricor's path has not been easy. Funding regenerative medicine and cell therapy in the early 2000s was extraordinarily difficult. We survived by accessing every source of non-dilutive capital we could find, including substantial grants from the National Institutes of Health and the California Institute of Regenerative Medicine.

10.      Capricor became a public company in November 2013 by merger with a subsidiary of Nile Therapeutics, Inc. and is listed on Nasdaq Global Select Market under the symbol CAPR. Over approximately 20 years, Capricor has raised over $500 million focused primarily on advancing Deramiocel from an early-stage scientific concept into a potential therapeutic product. That effort has required sustained investment across preclinical and clinical development, intellectual property, CMC, manufacturing, quality systems, regulatory engagement, and the specialized infrastructure needed to support a complex biologic therapy.

11.      The entire branding of the company is centered around this one product. In my experience, it is a rarity in biotechnology for a product to go from discovery to commercialization with the same management team, and Capricor has done that. Bringing Deramiocel to patients is the mission of the company but also a fulfillment of my life's work.

3

**B.      The Science Behind Deramiocel**

12.      Capricor was founded out of a discovery made regarding a population of cardiac stromal cells that appeared to have healing properties. As the science regarding these cells matured, we learned that they work principally by releasing exosomes. Exosomes are nanometer-sized lipid bilayer vesicles that mediate communication between cells and drive healing through changes in protein expression.

13.      What we also learned is that these cells are profoundly immunomodulatory: they calm down harmful inflammation while at the same time stimulating the body's own repair pathways. When a muscle is injured, it is critical to stimulate its repair. In other words, you do not want to knock down all inflammation. Instead, you want to suppress the harmful inflammatory pathways while encouraging those that drive repair. Our cells slow down the bad and speed up the good.

14.      The dual mechanism is what has made our cells uniquely well-suited to treat Duchenne muscular dystrophy ("DMD"). DMD patients are battling two destructive processes simultaneously: the absence of dystrophin, which causes their muscle cells to be injured very easily and to break down, and, in addition, that cellular breakdown provokes chronic inflammation leading to a continuous cycle of cellular destruction and inflammation. This combination leads to a worsening of the disease process. In order to effectively battle DMD, there must be medicines that try to repair the broken dystrophin and those that battle the consequences of such.  Capricor's cells, which we originally referred to as CAP-1002, and which are now being developed under the proprietary name Deramiocel, address the inflammatory aspect of the disease by immunomodulation, stimulating endogenous repair, and supporting new muscle development.  Both in preclinical and in 4 clinical trials, Deramiocel has demonstrated clinically and statistically significant attenuation of the disease process.

4

### C. What Duchenne Muscular Dystrophy Does to Boys and Their Families

15.      DMD is an X-linked genetic disorder. It overwhelmingly affects boys. DMD affects approximately 1 out of 5,000 live male births. Mothers are carriers but, because they have two X chromosomes, are typically not affected and often do not know they carry it. A boy with DMD has a life expectancy that goes until the middle of the third decade of life, but every day along that journey, he loses function. The moms of DMD boys say their last words at night are "no worse tomorrow" please. It is a devastating disease, and to date, no approved therapies address both the inflammation and the fibrosis (scarring) that is caused by DMD.

16.      A boy with DMD looks perfectly normal at age two or three. His parents will start to notice that he is walking a little differently, falling more, or struggling to climb stairs which is obviously not expected of a healthy child. A simple blood test will confirm the diagnosis. With each passing day, instead of gaining strength and motor skills the way other children do, he will lose them. He will typically lose the ability to walk between the ages of 10 and 14. He will then progressively lose the use of his shoulders, arms and hands. Feeding himself will become difficult. Raising a glass to his mouth to drink  will become difficult. Using his own wheelchair will become difficult. The diaphragm muscles that support breathing will weaken and they usually need respiratory support. As the heart is a muscle as well, DMD is silently killing the boy by destroying his heart. Slowly the heart muscle cells die leading to fibrosis or scarring. Soon, the heart can no longer compensate for the loss of muscle, and cardiac failure ensues. DMD cardiomyopathy is the leading cause of death in these boys and young men. Currently, the only approved therapies for DMD cardiomyopathy are those that were developed to treat heart attacks and are palliative. There is nothing specific, or wasn't until Deramiocel.

### D.     Two Decades of Work

17.     Capricor and I have devoted nearly two decades to bringing Deramiocel to the boys and young men who need it. Capricor has invested hundreds of millions of dollars in developing this product. We have shepherded it through preclinical research, Phase 1 studies, Phase 2 and Phase 3 clinical trials, and the FDA regulatory process.

18.     The development of Deramiocel has been a long and rigorous process. Capricor's earliest clinical work with cardiosphere-derived cells ("CDCs") began with the goal of treating adult heart disease, initially in addressing cardiac dysfunction caused by heart attacks which could be a precursor to heart failure, and both the CADUCEUS (autologous) and the ALLSTAR (allogeneic) clinical trials were designed to evaluate that opportunity. Following ALLSTAR, Capricor explored the role of CDCs in treatment of advanced heart failure (DYNAMIC), and to that end, presented and published intriguing preliminary data in the bioactivity of CDCs in attenuating cardiac dysfunction. Due to limited knowledge about cell delivery at that time, both trials underdosed patients and so the results were not conclusive in either study.

19.     As the science evolved, we recognized that our cells' mechanism of action – releasing exosomes that suppress harmful inflammation while stimulating the body's own repair pathways – changed the cell delivery paradigm, leading to intravenous delivery which allowed for higher and more frequent doses. Capricor identified the cardiomyopathy associated with DMD to be a unique and powerful opportunity to show the potential efficacy of CDCs in treating heart disease.

20.     In February 2018, a Cedars-Sinai study published in Stem Cell Reports confirmed that CDCs improved both cardiac and skeletal muscle function in a mouse model of DMD, establishing for the first time that the improvements Capricor had observed in its earlier HOPE-

6

Duchenne clinical trial could be directly attributed to CDC treatment. The study also demonstrated a minor, unanticipated restoration of dystrophin expression.

21.     In November 2017, the FDA cleared Capricor's Investigational New Drug application to conduct the HOPE-2 trial – a randomized, double-blind, placebo-controlled clinical trial of Deramiocel in boys and young men in advanced stages of DMD. HOPE-2 was designed as a potential registration trial that could support a Biologics License Application. The trial was conducted under the supervision of Dr. Craig M. McDonald at the University of California, Davis. The FDA recognizes the difficulty in bringing therapies for rare disease to fruition, and here are several regulatory opportunities that can speed the path to approval. To that end, the FDA granted Deramiocel Regenerative Medicine Advanced Therapy ("RMAT") designation, Orphan Drug Designation, and Rare Pediatric Disease Designation.

22.     In May 2020, Capricor announced positive topline twelve-month results from HOPE-2. The trial enrolled twenty patients – eight treated, twelve on placebo – approximately eighty percent of whom were non-ambulant and all of whom were on stable course of steroids. Treated patients received 150 million cells per intravenous infusion every three months. The results were striking across both skeletal muscle and cardiac endpoints: treated patients showed a mean improvement of 2.4 points over placebo on the PUL 2.0 upper-limb performance measure ($p=0.05$); cardiac ejection fraction favored the treatment group with high statistical significance ($p=0.004$); and left ventricular end-systolic volume was significantly reduced ($p=0.01$). HOPE-2 was also the first DMD study to demonstrate a correlation between cardiac stabilization and a reduction in CK-MB, a biomarker of cardiac cell damage ($p=0.006$). The results of the original HOPE-2 trial were published in the high impact factor academic journal, The Lancet.

23.     Based on the request of the DMD patients, Capricor initiated an open-label extension ("OLE") arm of the HOPE-2 clinical trial, in which patients from both the treatment and placebo arms had the option to receive Deramiocel. In June 2022, Capricor announced one-year OLE results showing statistically and clinically significant benefits of Deramiocel: the treatment difference on the PUL 2.0 was 3.8 points compared to the original HOPE-2 treatment difference ($p=0.023$), and 2.8 points compared to the HOPE-2 placebo group's off-treatment decline ($p=0.006$). These results were particularly meaningful because all patients had been off treatment for an average of approximately 392 days before entering the OLE trial, yet the benefits of prior treatment persisted, suggesting disease modification rather than merely symptom management.

24.     Long-term follow-up of the OLE trial continued to demonstrate durable benefit. These data are the best seen in treating DMD by any drug. By June 2024, three-year OLE data showed that Deramiocel patients maintained a 3.7-point advantage in upper-limb function over an external comparator cohort ($p<0.001$), with concurrent cardiac benefits, including improvements in ejection fraction and reductions in indexed ventricular volumes. By June 2025, four-year OLE data showed that the rate of skeletal muscle decline had actually slowed over time, with patients losing an average of only 0.6 points per year in year four compared to 1.8 points in year one.  Patients in our OLE trial anxiously await their infusions every three months because they can feel the difference in how they function.

25.     In June 2022, Capricor commenced enrollment in the HOPE-3 Phase 3 pivotal trial which is a randomized, double-blind, placebo-controlled study of 106 DMD patients. Its topline results, announced on December 3, 2025, were striking: Deramiocel slowed skeletal muscle deterioration by approximately **54%** ($p=0.029$) and slowed cardiac decline by

8

approximately **91%** (p=0.041)**,** both with statistical significance. Deramiocel also significantly reduced the progression of myocardial fibrosis, which is aggregation of scar tissue and which prevents normal contraction. To my knowledge, Deramiocel is the first and only therapy that has been shown in a Phase 3 trial to preserve both skeletal muscle function and cardiac function in DMD patients.

26.     In our San Diego manufacturing facility where Capricor manufactures Deramiocel, the company has invested approximately $35 - $40 million for capital expansion, equipment and buildout necessary for CMC production. Capricor has a secondary manufacturing facility at Cedars-Sinai Medical Center in Los Angeles, California.

27.     Deramiocel is the culmination of nearly two decades of work by my team and me. Deramiocel reflects nearly 20 years of sustained investment by Capricor across the core elements required to develop a complex biologic therapy, including foundational preclinical research, multiple clinical studies, intellectual-property licensing and protection, CMC and process development, analytical assay development, quality-system buildout, supply-chain and vendor qualification, regulatory engagement, long-term safety monitoring, and specialized personnel across scientific, clinical, regulatory, quality, manufacturing, and commercial functions. Collectively, these efforts required substantial capital, institutional knowledge, technical expertise, and enabled Capricor to advance Deramiocel from early scientific discovery toward potential commercialization. The drug substance is already being manufactured. The boys are waiting.

9

## III.   DEVELOPMENT OF THE RELATIONSHIP

### A.   The Commercialization and Distribution Agreement

28.   By 2021, Capricor had been developing Deramiocel for about 16 years. Capricor had advanced the therapy through multiple clinical trials, had secured multiple regulatory designations from the FDA, and was preparing to conduct the pivotal Phase 3 HOPE-3 trial. Capricor was not a commercial-stage company and did not have internal U.S. commercial launch infrastructure. Capricor accordingly sought an experienced U.S. distribution partner with the infrastructure, personnel, and expertise to bring Deramiocel to market upon FDA approval.

29.   Capricor and Nippon Shinyaku began discussing a potential distribution relationship in 2021. On December 21, 2021, Nippon Shinyaku delivered to Capricor a detailed capability presentation titled "█████████████████████████ █████████████████" (the "Capability Presentation"). In the Capability Presentation, NS Pharma represented that it had the █████████████████████████ ███████████████████████████. Among other things, NS Pharma touted its "███████████████████████" and highlighted ████████ ████████████████████████████████ ████████████████████. NS Pharma cited its ████████████ ████████████████████████. NS Pharma also presented ████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████████. The Capability Presentation also included NS Pharma's financial projections for Deramiocel. Most importantly, the Capability Presentation

detailed their expertise in the ability to distribute sell and market the product, commercial capabilities that Capricor did not have at that time. These representations were material to my, and Capricor's, decision to enter into the Distribution Agreement.

30.     On November 20, 2020, Nippon Shinyaku and Capricor signed a mutual nondisclosure agreement to explore a possible transaction.

31.     On January 24, 2022, Capricor and Nippon Shinyaku entered into the Distribution Agreement, which appointed Nippon Shinyaku as the exclusive distributor for Deramiocel in the United States ▉▉▉▉▉▉▉. The Distribution Agreement permits Nippon Shinyaku to appoint its U.S. affiliate, NS Pharma, to be a subdistributor of the Product in the United States without further consent from Capricor. Distribution Agreement § 4.2. Upon information and belief, Nippon Shinyaku did appoint NS Pharma as its subdistributor.

32.     During the period leading up to the execution of the Distribution Agreement, I, along with several of my colleagues at Capricor, actively participated in negotiating the Distribution Agreement. These negotiations took place from approximately late 2021 through January 2022 (the "Negotiation Period").

33.     During the Negotiation Period, and consistent with the representations made in the Capability Presentation, NS Pharma offered ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

34.     Under the Distribution Agreement, Capricor agreed to sell Deramiocel to NS Pharma ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████,

Ex. A (the "Pricing Structure"). Representatives from Nippon Shinyaku, NS Pharma, and I

specifically discussed the Pricing Structure during the Negotiation Period. At no point during the

Negotiation Period did any person on the Capricor team or any representative from NS Pharma

or Nippon Shinyaku broach the possibility that the federal reimbursement regime under

Medicare Part B would interact with this Pricing Structure to drive down the effective price of

Deramiocel shortly following launch. During the Negotiation Period, I was not aware that

Medicare reimbursement could impact pricing in that way, and to my knowledge, none of the

other parties that negotiated the Distribution Agreement were either. The parties' shared

expectation that the Pricing Structure would support commercially viable margins for both

parties was reflected in NS Pharma's own Capability Presentation projections.

35. ██████████████████████████████████████████████

████████████████████████████. Under the Distribution Agreement, Nippon Shinyaku

was required to ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████. Pending a final

judgment, the narrow preliminary relief Capricor seeks in this action does not have a bearing on

the equity Nippon Shinyaku holds in Capricor, the payments it has made under the Distribution

12

Agreement, and its contractual obligations to make the remaining milestone and sales-based payments.

## IV.   NS PHARMA'S OBLIGATIONS REGARDING LAUNCH READINESS

36.    As noted above, the Distribution Agreement requires Nippon Shinyaku to make commercially reasonable efforts to achieve a First Commercial Sale of the Product "as promptly as practicable. . ." *See* Distribution Agreement § 5.2. Moreover, Nippon Shinyaku is required to "vigorously promote the sale of the Product in a manner that preserves the existing goodwill and promotes the good image of the Product and of Capricor in the Territory. . ." *See id.* § 5.4.  As Nippon Shinyaku's subdistributor, NS Pharma is subject to the same obligations. *See id.* § 4.2.

37.    In order to achieve a prompt first sale of the Product, significant preparatory work must be done before FDA approval. As explained above, the willingness and ability of NS Pharma to be prepared for a timely launch was an express premise for negotiations between the Parties during the Negotiation Period and the reason by Capricor entered into the Distribution Agreement.

38.    Moreover, after the Distribution Agreement was executed, NS Pharma represented itself to be preparing for commercialization in advance of FDA approval. However, and most importantly, when Capricor hit a roadblock in the approval process, the receipt of a CRL (Complete Response Letter) from the FDA asking for more clinical data, instead of continuing to support Capricor and believe in the future and opportunity of the product, NS put "pencils down" and did not continue to build towards commercialization, despite the need to do so in order to be prepared for a successful launch of the product. Capricor continuously implored NS to continue preparations, to no avail. Capricor, on the other hand, marshalled all hands and was able to submit the HOPE-3 data in under 5 months following receipt of the CRL to reopen

13

regulatory review and proceed on the path to approval. Based on what NS Pharma shared with Capricor, it appears that NS still did not resume work on commercial planning or execution until March, 2026, egregiously late in the process for launch planning. Representatives from Nippon Shinyaku and NS Pharma acknowledged this "pause" in several emails and at a ██████████ ██████████ ("JSC") meeting ███████████████████████████. Based on the information available to me, NS Pharma is materially underprepared for a prompt commercial launch.

### A.        Preparatory Work for Launch Readiness

39.        In the years since the Distribution Agreement was executed, the Parties collaborated with each other, engaging in regular telephone conversations, frequent email exchanges at informal meetings and at jointly-held meetings of the JSC, the Chemistry Manufacturing and Controls ("CMC") Committee, and the Promotional Review Committee ("PRC"), all with a goal of getting the Product approved and to prepare for commercial launch. Those collaborative efforts proceeded apace, while in parallel Capricor conducted its clinical trials and engaged in the FDA approval process, until July 2025.

40.        At a CMC meeting in April 2024, for example, NS Pharma reported ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████  ██████████████████████████ █████████████████████████████████████████████████. That was prior to Capricor submitting a BLA and at least a year in advance of when the Parties expected the FDA to approve Deramiocel. Capricor never provided written consent to the use by NS Pharma of

14

subdistributors to distribute Deramiocel, which consent is required under § 4.2 of the

Distribution Agreement.

41.     The following pre-launch activities were specifically identified as NS Pharma's

responsibility or as requiring NS Pharma's active participation prior to final FDA approval:

- Selection of a third-party logistics ("3PL") partner with cryogenic storage capabilities for distribution in lieu of establishing a distribution warehouse which NS Pharma was required to do pursuant to the Distribution Agreement. Distribution Agreement § 5.5.6.

- Obtaining state distribution and pharmacy licenses in all states where NS Pharma planned to sell Deramiocel.

- Establishing a distribution model, including the second shipping leg from the 3PL to infusion sites.

- Developing demand forecasts to guide Capricor's manufacturing capacity expansion.

- Establishing market access and payer engagement plans, including the AMCP dossier, PIE decks, payer research, and pricing strategy.

- Developing a Target Product Profile ("TPP") to inform pricing, promotional materials, and marketing strategy.

- Recruiting, organizing, and maintaining a dedicated launch team.

- Establishing patient support infrastructure, including a patient hub vendor, co-pay programs, and disease education campaigns.

- Conducting mock distribution runs and end-to-end launch exercises.

- Retaining and deploying a launch consultant to advise on launch planning.

- Developing a channel strategy addressing specialty pharmacy, specialty distribution, 3PL logistics, institutional (HOPD) purchasing, and 340B Drug Pricing Program exposure mitigation.

- Establishing a patient journey map for DMD patients receiving Deramiocel, addressing pediatric versus adult infusion sites, cardiologist versus neurologist care pathways, and cross-boundary care coordination.

- Creating an integrated evidence generation plan, including a clinical/economic evidence gap assessment.

15

- Preparing billing and coding guides, including J-code application status and CPT/HCPCS codes for administration.

- Developing a Medicaid rebate strategy addressing supplemental rebate scenarios and state drug price reporting obligations.

- Preparing government price reporting infrastructure and gross-to-net revenue modeling.

- Establishing shipment monitoring protocols from packout to site of care.

## V.   DETERIORATION OF THE RELATIONSHIP

### A.   BLA Submission and the CRL (December 2024–July 2025)

42.   Between October and December 2024, Capricor submitted its formal application for FDA approval (called a Biologics License Application, or "BLA") on a rolling basis, meaning it sent in completed sections as they were ready rather than waiting to file everything at once.  Capricor's formal BLA submission was completed Dec 30, 2024.

43.   A BLA is the formal submission a pharmaceutical company makes to the FDA requesting approval to market a biological product in the United States. BLAs specifically apply to biological products (things like gene therapies, cellular therapies, vaccines, blood-derived products, and monoclonal antibodies). A BLA includes the intended use indications (i.e., what condition the drug should be approved to treat,  the intended patients, and how it should be used) as well as data from clinical trials demonstrating the product's safety and effectiveness, information about how it's manufactured and tested for quality, and details about the facilities where it will be made.

44.   In March 2025, the FDA accepted the BLA, granted Priority Review, and set a PDUFA date of August 31, 2025.  Priority Review is an FDA designation that shortens the standard review timeline from 12 months down to 6 months. It's granted when a drug shows the potential to offer significant improvements in treating a serious condition compared to available therapies. It doesn't change the approval standard – the drug still has to meet the same safety and

efficacy bar – it just means the FDA commits to reviewing the application faster, prioritizing it over standard submissions. At the time of acceptance, the FDA advised Capricor that it had identified "no potential review issues." Six days later, on March 10, 2025, NS Pharma issued its own press release confirming the BLA acceptance and the grant of Priority Review for Deramiocel.

45.     In January 2025, Capricor confirmed receipt of the first Information Request from the FDA and scheduled the mock pre-license inspection.

46.     At the mid-cycle review in May 2025, the FDA reported no significant deficiencies and confirmed the application was on track.

47.     From May 27–30, 2025, the FDA conducted and successfully completed a pre-approval inspection of Capricor's San Diego manufacturing facility, a step the FDA takes to verify that a company can reliably produce its product to the required standards before granting approval. As part of that inspection, the FDA issued a 483 notification, identifying 5 areas of concern.  Capricor addressed those concerns and later received a letter from FDA confirming that all such matters had been reviewed and found acceptable. My understanding is that 483 notifications are quite common in PLI inspections and if corrected, as Capricor did, are not a roadblock to FDA approval.

48.     In June 2025, without prior notice the FDA abruptly cancelled a previously scheduled meeting of the Advisory Committee. This occurred after there were multiple discharges of FDA personnel including those who had been working on Capricor's BLA.

49.     On July 9, 2025, the FDA issued a Complete Response Letter ("CRL") to Capricor for Deramiocel for the treatment of DMD. A CRL is a formal communication from the FDA to a company indicating that the agency will not approve the BLA in its current form. It

17

outlines the specific deficiencies the FDA found, such as needing more clinical data, manufacturing issues, or labeling concerns, that must be addressed before approval can be granted. It doesn't mean the drug is permanently rejected; the company can respond by submitting additional information to address the FDA's concerns and reapply for approval.

50. The CRL was issued amid significant leadership changes at the FDA and a widely reported shift toward stricter requirements for rare-disease therapies that resulted in at least 23 Complete Response Letters relating to rare-disease treatments, many of which, upon information and belief, similar to Capricor, reversed prior regulatory agreements and guidance.

51. The July 9, 2025 CRL indicated that the FDA could not approve the BLA in its current form without additional clinical data. This came as a surprise given that the FDA had reported no significant deficiencies at mid-cycle review, had conducted and successfully completed a pre-license inspection of the manufacturing facility in May 2025 and most importantly, the FDA had communicated to Capricor that the data from the HOPE-2 trial could serve to support the BLA application. During the review period from January to July 2025, the FDA had issued more than fifty Information Requests during the review – all of which I believe Capricor had answered satisfactorily. As my team explained to representatives of NS Pharma and Nippon Shinyaku at a CMC meeting in July 2025, I believed the issues raised in the CRL could be addressed and that Capricor fully intended to continue pursuing FDA approval. I also communicated that view to NS Pharma and Nippon Shinyaku at the time.

18

**B.      Capricor Prepares to Submit CRL Response; Meanwhile NS Pharma Goes "Pencils Down" (July 2025–Fall 2025)**

52.      In order to respond to the CRL, Capricor needed to provide additional clinical results. Fortunately, at that time, we were in the process of concluding our HOPE-3 Phase III clinical trial so we knew that the data from that trial would be available sometime before the end of 2025 and should suffice to support removal of the CRL and reopen the BLA with a new PDUFA date. Capricor kept NS Pharma apprised of its progress every step of the way. NS Pharma understood that Capricor was still proceeding full-force toward FDA approval. We believed that we would be in a position to provide the FDA with the additional information the FDA requested by the end of 2025, and I, and others, told NS Pharma and Nippon Shinyaku that.

53.      However, I learned that NS Pharma halted its launch preparation activities altogether in July 2025, and that they did not substantially resume them until March 2026.

54.      In or around July 2025, several Capricor employees were informed by NS Pharma that they were pausing their pre-launch preparation activities and also suggested that they were not sure we would get approval for Deramiocel in DMD at any point.

55.      On or around July 15, 2025, NS Pharma's Commercial Lead reportedly instructed NS Pharma employees to "████████████████████████████████████ ████████████████████████████."[1] On or around early July 2025, NS Pharma unilaterally cancelled all future meetings for the PRC. Other joint committee meetings were summarily halted. I was also informed by ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

---

[1] ████████████████████████████████████████████ ████████████████████████████.

19

56.     On July 28, 2025, I sent an email to NS Pharma to get clarity regarding the pause in NS Pharma's commercial preparation activity. As I explained in my email, Capricor was not slowing down. ███████████████████████████████████████████████ ██████████████████. Attached hereto as Exhibit 2 is a true and accurate copy of my July 28, 2025 email to ██████████ of Nippon Shinyaku, and ████████████████████████ of NS Pharma.

57.     On July 29, 2025, NS Pharma responded to me, writing █████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████." NS Pharma additionally wrote that:

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████.

Attached hereto as Exhibit 3 is a true and accurate copy of the email ████████████████ of NS Pharma sent to me on July 29, 2025.

58.     On July 30, 2025, in response to NS Pharma's July email, I took issue with the content of said email ████████████████████████████████████████████████ ████████████████████████████████████████████

20

████████████████████████████████████████████. On information and belief, NS Pharma misled Capricor into thinking the pause was only partial. I believe ██████████ suggestion that NS Pharma "███████████████████████████████████████████████████ ████.[2]

59. I had to make sure that the launch of Deramiocel would stay on track. To that end, on October 31, 2025, I sent an email to NS Pharma requesting updates on where NS Pharma stood on launch preparation with specific regard to ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████. As I noted in that email, "███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████." Attached hereto as Exhibit 4 is a true and accurate copy of my October 31, 2025 email to ████████████ of NS Pharma.

60. On November 6, 2025, NS Pharma's General Counsel, ████████████, sent a response, on which I was copied, to Capricor's general counsel Karen Krasney. Attached hereto as Exhibit 5 is a true and accurate copy of ████████████ November 6, 2025 email to Karen Krasney.

61. It bears emphasizing that this response included zero information about the status of NS Pharma's commercial preparation, and that it was emblematic of a pattern in which representatives of NS Pharma stonewalled whenever I sought information about NS Pharma's

---

[2] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

21

progress towards commercial readiness in the months that followed. In his response, Mr.

██████████████████████████████████████████████████████

████████████████████████████████████████. He took the

position that ████████████████████████████████. No information was

forthcoming from NS Pharma, not even in response to my simple request that ████████

██████████████████████████████████████. I found Mr.

████████ response deeply disturbing: the Parties had already spent tens of hours at joint

meetings discussing the commercial preparation efforts that NS Pharma was purportedly

undertaking, and Section 5.4 of the Distribution Agreement expressly requires NS Pharma to use

Commercially Reasonable Efforts to prepare for the commercial launch of Deramiocel. Given

the complete lack of JSC meetings after July 2025, I grew increasingly concerned that NS

Pharma may have resolved to abandon commercial preparations for Deramiocel altogether.

62.     On December 3, 2025, Capricor announced positive Phase 3 HOPE-3 topline

results. The Phase 3 HOPE-3 trial was a randomized, double-blind, placebo-controlled study of

106 DMD patients. As noted above, the results were striking: Deramiocel slowed skeletal muscle

deterioration by approximately 54% and slowed cardiac decline by approximately 91%, both

with statistical significance. Deramiocel also significantly reduced the progression of myocardial

scarring. These results built on years of prior clinical data, including the HOPE-2, Phase 2 trial

published in The Lancet and the open-label extension of the HOPE-2 trial demonstrating durable

benefits sustained over more than four years.

63.     On December 12, 2025, NS Pharma sent along materials purporting to show its

launch readiness, including ██████████████████████████████████████

██████████████████████████████████████████████████

22

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ .

64.     On January 13, 2026, Capricor sent its CRL response letter to the FDA to address all the outstanding issues the FDA had with the BLA for Deramiocel.

65.     Meanwhile, NS Pharma declined to provide any more details regarding ████████ ████ during a call on December 22, 2025, and proposed ██████████████████████████ ████████████████████████ . I made it clear on that call that ████████████████████ ████████████████████████████████████████████████████████ . Apparently, they were intent on addressing topics other than commercial readiness.

66.     In an email sent on January 5, 2026, I asked ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ . That day, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ . Attached hereto as Exhibit 6 is a true and accurate copy of my January 5, 2026 email to ████████████ and ██████████████ of NS Pharma, as well as ████████ response on January 5, 2026.

67. On January 21, 2026, NS Pharma represented ███████████████████████

████████████████████████████████████████████████████████████████████

███████████. Those ██████████ were not shared with my team.

68. On January 23, 2026, NS Pharma responded to my January 5, 2026 email regarding launch preparations once more, albeit again without substantively answering my questions regarding its launch preparations. NS Pharma stated that ████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████. NS Pharma expressed ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████. I found it quite concerning that NS Pharma questioned our desire for an

████████████████ especially because it was ████████████████████████████

████████████████████████████████████████.[3] NS Pharma also noted ████

████████████████████████████████████████████████

██████████ Attached hereto as Exhibit 7 is a true and accurate copy of the email ████████████ of NS Pharma sent to me on January 23, 2026.

69. On February 11, 2026, I followed up once again to get assurance that NS Pharma was doing what was necessary to prepare for the commercial launch of Deramiocel. In this email, I noted that ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. I also noted that ████████████████████████

_____

[3] ████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████.

24

██████████████████████████████████████████████████

███████████████████████████████████. Attached hereto as Exhibit 8 is a true and

accurate copy of my February 11, 2026, email to ███████████████████████████ of NS

Pharma.

70.     On February 20, 2026, at a joint meeting with NS Pharma, when ████████

████████████████████████████████████████████████

██████████████████████████████████████████.” That comment

from ███████████████████████████████ came as a shock, as it directly violated the

spirit of our collaboration on the Deramiocel launch. It was, and still is, ████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.

71.     On March 5, 2026, NS Pharma responded, asserting ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████. Attached hereto as Exhibit 9 is a true and accurate

copy of the email ███████████ of NS Pharma sent to me on March 5, 2026.

72.     On March 10, 2026, the FDA responded to Capricor's response to the Complete

Response Letter and set a new PDUFA target action date of August 22, 2026. This assignment of

a target action date is a signal to significantly scale up plans for launch, and that an anticipated

launch date should be set. Thus far, none of this has been done by NS Pharma. Many physicians

25

have begun to ask questions at this point as they are anticipating having to provide relevant information to patients and determine their strategy for prescribing. We are currently addressing many of the questions by these health care providers in order to adequately prepare for market introduction. Many state that NS has been either inactive or noncommittal as to discussing the opportunity for Deramiocel in DMD.

73.   ████████████████████████████████████████████████████████. Capricor was ready: it had built a  commercial  manufacturing plant and was in the process of expanding capacity by adding additional clean rooms, hired  and trained personnel, as Capricor prepares for commercial launch. NS Pharma was not. I am informed and believe that NS Pharma has failed to accomplish even the most fundamental preparations required for the distribution and marketing of Deramiocel.

**C.   The ████████ JSC Meeting Reveals Pervasive Deficiencies in Preparations**

74.   At the ████████ JSC meeting, NS Pharma admitted to pausing commercial preparation efforts ████████████████████████████████.

75.   While NS Pharma attempted at the JSC meeting to make a plausible case that they would be able to pick up where they left off, they represented to us the following, which demonstrated numerous and significant deficiencies in NS Pharma's launch preparedness:





---

27

- █████████████████████████████████████
  █████████████████████████████████████
  █████████████████████████████████████
  ███████████████

- █████████████████████████████████████
  █████████████████████████████████████
  ██

- █████████████████████████████████████
  █████████████████████████████████████
  █████████████████████████████████████
  ████████████

- █████████████████████████████████████
  █████████████████████████████████████
  █████████████████████████████████████
  ████████████████████████.

## D. Following the JSC Meeting, NS Pharma Insists on PLD Pricing Rather than Showing Commercial Readiness

76. On March 17, 2026, Capricor sent NS Pharma ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. NS Pharma's

only response was ███████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████. Attached hereto as Exhibit 10 is a

true and accurate copy of the feedback we provided.

77. On March 27, 2026, Nippon Shinyaku's ██████████████████████████,

traveled from Japan to meet with me in person.  At  that  meeting,  █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

28

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████ .

78.     On April 1, 2026, I wrote to NS Pharma's ███████████ confirming his understanding of NS Pharma's position: "██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ ." Attached hereto as Exhibit 11 is a true and accurate copy of my April 1, 2026 email to ███████████████ ███████ of NS Pharma.

79.     ███████████ responded the same day: "███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ." Attached hereto as Exhibit 12 is a true and accurate copy of the email ██████████ of NS Pharma sent to me on April 1, 2026.

80.     Because Deramiocel's sole distributor had indicated it would not perform under the current Distribution Agreement, and because it became apparent that they had not adequately prepared for launch, Capricor took its own steps to prepare for distribution. This included increasing headcount and commercial investment. On the personnel side, the company has ████

29

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████   ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████t.

81.      On April 10, 2026, NS Pharma sent Capricor a formal draft amendment to the Distribution Agreement (the "Proposed Amendment") that confirmed in writing the terms NS Pharma had previously communicated verbally. Under the Proposed Amendment, NS Pharma would ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. The Proposed Amendment would ████████████████████████████████████████ ████████████████████. Attached hereto as Exhibit 13 is a true and accurate copy of the email, including the attached Proposed Amendment, that ████████████ of NS Pharma sent to me on April 10, 2026.

30

82.     On May 6, 2026, I sent a letter to ███████ formally rejecting the Proposed Amendment and accepting NS Pharma's repudiation of the Distribution Agreement. In that letter I explained that the Proposed Amendment was not a proposal Capricor could accept: ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████. Attached hereto as Exhibit 14 is a true and correct copy of my letter to ███████.

### E.     Capricor's Launch Readiness

83.     Capricor has now substantially completed those parts of the launch preparation process for which it is responsible under the Distribution Agreement, and NS Pharma's inaction threatens to render those efforts meaningless.

84.     Capricor's manufacturing facility is up and running and generating commercial doses of Deramiocel, including some of the largest lots Capricor has ever produced.

85.     The current facility can supply doses for an estimated 250–500 patients per year, with six new cleanrooms in the same facility targeted for early 2027 that would scale capacity to 2,500–4,000 patients per year. The plant operates two shifts per day with approximately 100 FTEs.

86.     Capricor has also started construction on expanding its facilities, and is aimed at being ready to support an additional 10,000 patients per year by 2030.

87.     Capricor has begun to manufacture commercial supply and intends to have the product available at the 3PL's facilities if and when the FDA gives its approval.

88.     Capricor is training the call center on HOPE-3 data and expects it to be up and running about one month before the PDUFA date.

89.     Additionally, Capricor has hired numerous people with expertise in market access as well as outside consulting companies to help us assess our performance capabilities and assist with execution, if necessary, to make sure that we will be prepared to launch no matter what the circumstances.[5]

## VI.     IMPACT ON CAPRICOR

### A.     Threat to Timely First Commercial Sale

90.     With a PDUFA target action date of August 22, 2026, ███████████████ ██████████████████████████████████████████, and given the current state of NS Pharma's state of unpreparedness, the window for achieving a prompt First Commercial Sale following Marketing Approval is extremely narrow.

91.     Notably, NS Pharma's projected timeline has shifted: ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████." 

92.     The pervasive deficiencies in NS Pharma's launch readiness, documented in the ████████ JSC meeting and the extensive correspondence recounted above, demonstrate that

---

[5] An overview of the steps Capricor has taken upon itself to prepare for launch is outlined above in ¶ 80.

NS Pharma cannot reasonably be expected to meet its obligation to achieve the First Commercial Sale "as promptly as practicable" as required by Section 5.2 of the Agreement.

### B.      Harm to Capricor's Business

93.      Capricor has invested nearly two decades of research and clinical development and hundreds of millions of  dollars in the development of Deramiocel, currently their sole clinical asset.

94.      NS Pharma's failure to prepare for launch jeopardizes Capricor's ability to realize the commercial value of the Product and also risks Capricor's entire business as this is their sole product.

95.      At the same time, NS Pharma has received substantial benefits under the Distribution Agreement, including exclusive distribution rights over a potentially transformative cellular therapy and the reputational and commercial benefits of being the named U.S. distributor of Deramiocel.

96.      A delayed or tepid launch will also cause incalculable harm to Capricor's reputation and goodwill in the DMD community, among healthcare providers, patient advocacy groups, and payers. Such reputational harm cannot be adequately compensated by monetary damages

### C.      Harm to Patients

97.      Deramiocel does not reverse existing damage; it slows the rate at which new fibrosis and muscle deterioration develop. Every day of delay in making Deramiocel available to eligible patients is a day during which irreversible skeletal and cardiac damage accumulates at the untreated rate. Patients with advanced DMD who have not been able to enroll in clinical trials due to the severity of their disease are anxiously waiting for Deramiocel to be available

33

commercially so that they have a chance to see the potential benefits of Deramiocel as demonstrated in the clinical trials.

98.     There is no approved alternative therapy I am aware of that provides comparable cardiac or skeletal muscle protection for DMD patients. If Deramiocel is not distributed in a timely manner, there is no substitute treatment to which these patients can be directed.

99.     I have spent nearly two decades building Capricor with one goal in mind: making Deramiocel available to treat  these boys. I know what every additional month of delay costs them, because I know what is happening inside their muscles when they cannot be treated.  There is no version of this case in which I am willing to watch NS Pharma's inaction take that away from them.

100.    As a scientist, I understand the pathophysiology of DMD, however, even more powerful, as a mother myself, I am keenly aware of how hard it must be to watch, helplessly, as your child gets sicker and sicker. What is even more egregious is if there is a drug or therapy available that could potentially improve their quality of life and yet it is not accessible due to inappropriate management. I am committed as an executive, as a scientist and as a mother to do everything possible to make sure Deramiocel is available to everyone who wants it.

101.    There are young men with DMD, such as Aidan Leffler, whose entire life has been improved by access to Deramiocel. Aidan was on a downward trajectory when he went on deramiocel 5 years ago. He was lucky enough to be eligible for one of our clinical trials (HOPE-2), and after 1-year on placebo, he has received continuous quarterly treatments with deramiocel for 4 years. He has been able to maintain independence that was completely not predictable by natural history. He is living a much better life as a result. Most young men with DMD cannot access clinical trials. They wait in the wings to get access to commercial deramiocel. We must be

able to provide it to Aidan and all those waiting, which will require an effective launch and distribution.

## II.     CONCLUSION

102.     Based on my personal knowledge of the facts and circumstances described in this certification, it is my assessment that NS Pharma has failed to fulfill its obligations under the Distribution Agreement to prepare for the commercial launch of Deramiocel. Despite nearly two years of engagement through JSC and CMC meetings, and repeated written requests for information from Capricor, NS Pharma has not completed fundamental launch readiness activities.

103.     NS Pharma's unilateral decision to "put pencils down" following the CRL, and its subsequent assertion that its ███████████████████████████████████ ████████, reflect a fundamental unwillingness to use Commercially Reasonable Efforts to prepare for a prompt First Commercial Sale.

104.     I respectfully submit this certification not only as the Chief Executive Officer of Capricor, but as the person who has been  the leader in bringing this product from bench to bedside since its initial discovery. The relief Capricor seeks is necessary to ensure that Deramiocel reaches the boys and young men who have been waiting for it.

35

I certify that the foregoing statements made by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 6, 2026

Linda Marban, Ph.D.

# EXHIBIT 2

## Public - Redacts Materials From
## Conditionally Sealed Record

# EXHIBIT 3

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 4

## Public - Redacts Materials From Conditionally Sealed Record

# EXHIBIT 5

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 6

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 7

## Public - Redacts Materials From Conditionally Sealed Record

# EXHIBIT 8

## Public - Redacts Materials From
## Conditionally Sealed Record

# EXHIBIT 9

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 10

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 11

**Public - Redacts Materials From
Conditionally Sealed Record**

# EXHIBIT 12

## Public - Redacts Materials From Conditionally Sealed Record

# EXHIBIT 13

## Public - Redacts Materials From
## Conditionally Sealed Record

# EXHIBIT 14

## Public - Redacts Materials From
## Conditionally Sealed Record

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY Docket No. BER-C-000117-26 <br><br> Civil Action <br><br> **ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION PURSUANT TO RULE 4:52** |

This matter being brought before the Court by Andrew Muscato of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Plaintiff Capricor Therapeutics, Inc. ("Plaintiff" or "Capricor"), seeking relief by way of a preliminary injunction at the return date set forth below pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint and accompanying Certifications and the supporting brief filed herewith, and for good cause shown;

It is on this _____ day of  May 2026,

**ORDERED** that Defendants NS Pharma, Inc. and Nippon Shinyaku Co., Ltd. (collectively, "Defendants"), appear and show cause before the Honorable _____, Superior Court of New Jersey, Chancery Division, General Equity Part, Bergen County, at the Bergen County Justice Center, 10 Main Street, Hackensack, New Jersey 07601, at _____ , or as

soon thereafter as counsel can be heard, on the _____ day of _____, 2026 why an

Order should not be issued preliminarily enjoining and restraining Defendants from:

A.     Holding themselves out as the exclusive distributor of Deramiocel (CAP-1002) in the United States;

B.     Taking any action, directly or indirectly, to interfere with Plaintiff's efforts to commercialize and distribute Deramiocel in the United States, either directly or through one or more third parties;

C.     Enforcing, attempting or purporting to enforce any exclusivity provision of the Commercialization and Distribution Agreement dated January 24, 2022 (the "Agreement") against Plaintiff or against any third party with which Plaintiff seeks to partner for the commercialization or distribution of Deramiocel; and

D.     Granting such other relief as the Court deems equitable and just; and it is

**FURTHER ORDERED** that:

1.     A copy of this Order to Show Cause, the Verified Complaint, supporting Certifications, the brief, and any other papers submitted in support of this Order to Show Cause shall be served upon Defendants personally, or by such other means as the Court may direct, within _____ days of the date hereof, in accordance with Rules 4:4-3 and 4:4-4, this being original process.

2.     Plaintiff shall file with the Court its proof of service of the pleadings on Defendants no later than three (3) days before the return date.

3.     Defendants shall file and serve a written response to this Order to Show Cause and the request for entry of injunctive relief, together with proof of service, by _____. The original documents must be filed with the Clerk of the Superior Court in Bergen County

through eCourts Civil, and a courtesy copy of the opposition papers must be delivered directly to the chambers of Judge _____, whose address is:  Bergen County Justice Center, Room _____, 10 Main Street, Hackensack, New Jersey 07601. You must also send a copy of your opposition papers to Plaintiff's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary if you want the Court to hear your opposition to the injunctive relief Plaintiff is seeking.

4.    Plaintiff must file and serve any written reply in further support of the Order to Show Cause by _____. The reply papers must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, and a courtesy copy of the reply papers must be delivered directly to the chambers of Judge _____.

5.    If Defendants do not file and serve an opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiff files proof of service and a proposed form of order at least three (3) days prior to the return date.

6.    If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date must be submitted to the Court no later than three (3) days before the return date.

7.    Defendants take notice that Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written answer to the Complaint and proof of service within thirty-five (35) days from the date of service of this Order to Show Cause, not counting the day you received it. These documents must be

3

filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, along with a filing fee payable to "Treasurer, State of New Jersey." You must also send a copy of your Answer to Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: opposition to this Order to Show Cause is not an Answer, and you must file both. If you do not file and serve an Answer within thirty-five (35) days of this Order, the Court may enter a default against you for the relief Plaintiff demands.

8.      If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in Bergen County and online at njcourts.gov/sites/default/files/forms/10153_deptyclerklawref.pdf.

9.      The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than _____ days before the return date.

_____
Honorable

4

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY Docket No. BER-C-000117-26 <br><br> Civil Action <br><br> **ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION PURSUANT TO RULE 4:52** |

This matter being brought before the Court by Andrew Muscato of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Plaintiff Capricor Therapeutics, Inc. ("Plaintiff" or "Capricor"), seeking relief by way of a preliminary injunction at the return date set forth below pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint and accompanying Certifications and the supporting brief filed herewith, and for good cause shown;

It is on this _____ day of  May 2026,

**ORDERED** that Defendants NS Pharma, Inc. and Nippon Shinyaku Co., Ltd. (collectively, "Defendants"), appear and show cause before the Honorable _____, Superior Court of New Jersey, Chancery Division, General Equity Part, Bergen County, at the Bergen County Justice Center, 10 Main Street, Hackensack, New Jersey 07601, at _____ , or as soon thereafter as counsel can be heard, on the _____ day of _____, 2026 why an Order should not be issued preliminarily enjoining and restraining Defendants from:

A.     Holding themselves out as the exclusive distributor of Deramiocel (CAP-1002) in the United States;

B.     Taking any action, directly or indirectly, to interfere with Plaintiff's efforts to commercialize and distribute Deramiocel in the United States, either directly or through one or more third parties;

C.     Enforcing, attempting or purporting to enforce any exclusivity provision of the Commercialization and Distribution Agreement dated January 24, 2022 (the "Agreement") against Plaintiff or against any third party with which Plaintiff seeks to partner for the commercialization or distribution of Deramiocel; and

D.     Granting such other relief as the Court deems equitable and just; and it is

**FURTHER ORDERED** that:

1.     A copy of this Order to Show Cause, the Verified Complaint, supporting Certifications, the brief, and any other papers submitted in support of this Order to Show Cause shall be served upon Defendants personally, or by such other means as the Court may direct, within _____ days of the date hereof, in accordance with Rules 4:4-3 and 4:4-4, this being original process.

2.     Plaintiff shall file with the Court its proof of service of the pleadings on Defendants no later than three (3) days before the return date.

3.     Defendants shall file and serve a written response to this Order to Show Cause and the request for entry of injunctive relief, together with proof of service, by _____. The original documents must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, and a courtesy copy of the opposition papers must be delivered directly to the chambers of Judge _____, whose address is:  Bergen County

2

Justice Center, Room _____, 10 Main Street, Hackensack, New Jersey 07601. You must also send a copy of your opposition papers to Plaintiff's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary if you want the Court to hear your opposition to the injunctive relief Plaintiff is seeking.

4.      Plaintiff must file and serve any written reply in further support of the Order to Show Cause by _____. The reply papers must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, and a courtesy copy of the reply papers must be delivered directly to the chambers of Judge _____.

5.      If Defendants do not file and serve an opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiff files proof of service and a proposed form of order at least three (3) days prior to the return date.

6.      If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date must be submitted to the Court no later than three (3) days before the return date.

7.      Defendants take notice that Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written answer to the Complaint and proof of service within thirty-five (35) days from the date of service of this Order to Show Cause, not counting the day you received it. These documents must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, along with a filing fee payable to "Treasurer, State of New Jersey." You must also send a copy of your

3

Answer to Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: opposition to this Order to Show Cause is not an Answer, and you must file both. If you do not file and serve an Answer within thirty-five (35) days of this Order, the Court may enter a default against you for the relief Plaintiff demands.

8.     If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in Bergen County and online at njcourts.gov/sites/default/files/forms/10153_deptyclerklawref.pdf.

9.     The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than _____ days before the return date.

_____
            Honorable

4

Andrew Muscato (NJ Bar ID 18661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY |
| Plaintiff, | |
| v. | Docket No. _____ |
| NS PHARMA, INC., and NIPPON SHINYAKU CO., LTD., | Civil Action |
| Defendants. | **APPENDIX OF UNPUBLISHED CASES CITED IN PLAINTIFF CAPRICOR THERAPEUTICS BRIEF IN SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION** |

1. <u>Lakshmi Grocery & Gas, Inc. v. GRJH, Inc.</u>, 138 A.D.3d 1290 (3d Dep't 2016)

2. <u>Somerset Air Service, Inc. v. Township of Bedminster</u>, 2006 WL 861498 (N.J. Super. Ct. Law Div. Apr. 4, 2006), <u>aff'd</u>, No. A-5311-05T2, 2007 WL 1774058 (N.J. Super. Ct. App. Div. June 21, 2007).

1

1.    <u>Lakshmi Grocery & Gas, Inc. v. GRJH, Inc.,</u>
138 A.D.3d 1290 (3d Dep't 2016)

30 N.Y.S.3d 743, 2016 N.Y. Slip Op. 02891



**New York**
Official Reports

**138 A.D.3d 1290, 30 N.Y.S.3d
743, 2016 N.Y. Slip Op. 02891**

**\*\*1** Lakshmi Grocery & Gas, Inc., Respondent

v

GRJH, Inc., Defendant and Third-Party
Plaintiff-Appellant. Ravinder Sharma et
al., Third-Party Defendants-Respondents.

Supreme Court, Appellate Division,
Third Department, New York
521567
April 14, 2016

CITE TITLE AS: Lakshmi
Grocery & Gas, Inc. v GRJH, Inc.

**HEADNOTES**

Pleading
Conforming Pleading to Proof

Contracts
Rescission
Mutual Mistake

E. Stewart Jones Hacker Murphy, Troy (John F. Harwick of
counsel), for defendant and third-party plaintiff-appellant.
Hug Law PLLC, Troy (Matthew C. Hug of counsel), for
respondent and third-party defendants-respondents.

Garry, J. Appeal from a judgment of the Supreme Court
(Muller, J.), entered January 8, 2015 in Warren County, upon
a decision of the court in favor of plaintiff.

Plaintiff is a corporation owned by third-party defendants,
Ravinder Sharma and Yosho Lakshmi. In the summer of
2010, Sharma contacted James Metz, an officer of defendant
with whom Sharma had previously had successful business
dealings, to inquire about commercial opportunities in New
York. **\*1291** Metz responded that a gas station and
convenience store owned by defendant was available for
lease. After discussions with Metz and defendant's president,
Alicia Metz, plaintiff agreed to take over the store and
made certain payments to defendant. Third-party defendants

signed a combined lease and contractor agreement but, almost
immediately after taking control of the store, discovered
records indicating that the store's sales were lower than
plaintiff had been led to believe. After **\*\*2** attempting
unsuccessfully to modify the contract terms, third-party
defendants vacated the store and requested a refund of their
initial payments, which defendant refused to pay.

Plaintiff brought the instant action for rescission of the
contract based upon fraudulent inducement. Defendant joined
issue and commenced a third-party breach of contract action
against third-party defendants. During the subsequent bench
trial, plaintiff moved to conform the pleadings to the proof and
pursue rescission based upon an additional theory of mutual
mistake. Supreme Court granted the motion, found that a
mutual mistake had occurred, awarded damages to plaintiff,
rescinded the contract and dismissed the third-party action.
Defendant appeals.

Supreme Court did not err in granting plaintiff's motion
to conform the pleadings to the proof. Such a motion
may be made at any time and should be liberally granted
"unless doing so results in prejudice to the nonmoving
party" (*Matter of Mogil v Building Essentials, Inc.*, 129 AD3d
1378, 1380 [2015]; *see* CPLR 3025 [c]; *Murray v City of
New York*, 43 NY2d 400, 405 [1977]; *Lewis & Clarkson v
October Mtn. Broadcasting Co.*, 131 AD2d 15, 17 [1987]).
Plaintiff's complaint alleged that defendant acted intentionally
in misrepresenting the store's sales as being greater than they
actually were. At trial, Sharma testified that before he signed
the contractor agreement, he repeatedly asked for the store's
inside sales figures—that is, sales of such items as groceries,
coffee and cigarettes, which he testified are a critical factor
in a convenience store's profitability. Early in September
2010, Alicia Metz responded with an email stating that the
store's sales for August 2010 totaled approximately $22,000.
Several days after taking over the store, however, Sharma
discovered sales records revealing that the true figure for
August 2010 was approximately $15,500, an amount that
he testified was too low to permit the successful operation
of the store. He stated that he would not have signed the
contract if he had known the correct sales figures. Alicia
Metz testified that the figures she provided to Sharma actually
represented the store's inside sales for August 2009 and
were **\*1292** provided as "representative sales" because the
complete figures for August 2010 were not yet available.
She stated that she "mismarked" the figures as representing
August 2010 sales, acting in error and good faith.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

The burden was upon defendant, as the party opposing plaintiff's motion, to establish that it was "hindered in the preparation of [its] case or . . . prevented from taking some measure in support of [its] position" (*Loomis v Civetta Corinno Constr. Corp.*, 54 NY2d 18, 23 [1981]; *accord Kimso Apts., LLC v Gandhi*, 24 NY3d 403, 411 [2014]). That burden cannot be met when the difference between the original pleading and the evidence results from "proof admitted at the instance or with the acquiescence of [the opposing] party" (*Murray v City of New York*, 43 NY2d at 405). Here, the proof upon which plaintiff's motion was based was the testimony of defendant's president that she acted mistakenly in providing the wrong sales figures to Sharma. Given this testimony, defendant cannot have been surprised or unduly prejudiced by plaintiff's assertion of the theory of mutual mistake; thus, leave to conform the pleadings to the proof was properly granted (*see Kimso Apts., LLC v Gandhi*, 24 NY3d at 414; *Murray v City of New York*, 43 NY2d at 406; *Bay Plaza Estates v New York Univ.*, 257 AD2d 472, 473 [1999]; *Weisberg v My Mill Holding Corp.*, 205 AD2d 756, 757 [1994]).

Supreme Court did not err in rescinding the contract on the basis of mutual mistake. A contract may be rescinded when it is shown by clear and convincing proof that a mutual mistake existed when the contract was executed that was so substantial that there was no "true meeting of the parties' minds" (*Carney v Carozza*, 16 AD3d 867, 868-869 [2005]; *see Matter of Gould v Board of Educ. of Sewanhaka Cent. High School Dist.*, 81 NY2d 446, 453 [1993]; *Adalian v Stuyvesant Plaza*, 288 AD2d 789, 791 [2001]). Here, the testimony that defendant's president acted erroneously in sending incorrect sales figures to Sharma, as well as Sharma's testimony that the true figures were not discovered until after the contract was signed and were too low to **\*\*3** permit successful operation of the business, constituted clear and convincing proof that a substantial mutual mistake occurred such that there was no meeting of the minds as to the basis for the store's profitability (*see Matter of Gould v Board of Educ. of Sewanhaka Cent. High School Dist.*, 81 NY2d at 453).

As for defendant's claim that plaintiff was negligent in failing to obtain more complete sales records before signing the contract, negligence may bar rescission when a party fails to **\*1293** take advantage of "easily accessible" means of ascertaining the truth (*Da Silva v Musso*, 53 NY2d 543, 551 [1981] [internal quotation marks and citation omitted]; *accord Gitelson v Quinn*, 118 AD3d 403, 404 [2014]). Here, in addition to Sharma's testimony that he asked repeatedly for the August 2010 sales records before receiving what proved to be erroneous information, he also testified that he asked to inspect the store's books but was not permitted to do so. Sharma stated that he was told that he could visit the store while posing as a customer, but could not speak to employees or inspect sales records. Alicia Metz and James Metz both denied that Sharma had asked to inspect the store's records, but Alicia Metz admitted that defendant had a policy of prohibiting prospective contractors from speaking with employees to avoid warning them of the potential transfer. Sharma testified that he trusted James Metz based upon their longstanding business relationship and relied upon his assurances that the store was profitable. Supreme Court credited Sharma's testimony that a level of trust existed between them and found that plaintiff's exercise of due diligence, although minimal, was reasonable. Upon this Court's independent assessment of the weight of the evidence supporting the judgment in a nonjury trial, we "giv[e] due deference to the trial court's determinations of witness credibility unless such findings are contrary to a fair interpretation of the evidence" (*Mazza v Fleet Bank*, 16 AD3d 761, 762 [2005]). Given plaintiff's lack of ready access to the store records and the longstanding trusting relationship between Sharma and James Metz, we find no negligence sufficient to bar rescission (*compare Da Silva v Musso*, 53 NY2d at 550-551). Accordingly, Supreme Court properly dismissed defendant's third-party action.

Peters, P.J., Rose and Devine, JJ., concur. Ordered that the judgment is affirmed, without costs.

Copr. (C) 2026, Secretary of State, State of New York

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2.   <u>Somerset Air Service, Inc. v. Township of Bedminster,</u> 2006 WL 861498 (N.J. Super. Ct. Law Div. Apr. 4, 2006), <u>aff'd</u>, No. A-5311-05T2, 2007 WL 1774058 (N.J. Super. Ct. App. Div. June 21, 2007).

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)

2006 WL 861498

2006 WL 861498
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey, Law Division,
Somerset County.

SOMERSET AIR SERVICE INC.
v.
TOWNSHIP OF BEDMINSTER, Geoffrey Price
(Bedminster Township Zoning Officer), and
Paul Ferriero (Bedminster Township Engineer).

Decided April 4, 2006.

**Synopsis**
**Background:** Airport operator sought injunction preventing township from interfering with medevac helicopter operation at airport.

**Holdings:** The Superior Court, Law Division, Somerset County Reed, J., held that:

[1] airport operator was entitled to preliminary injunction preventing township from interfering with medevac helicopter operation, and

[2] medevac helicopter operation at airport was a permitted use.

Ordered accordingly.

West Headnotes (3)

[1] **Aviation** Aviation facilities and services; airports

**Zoning and Planning** Aviation and airports

Under Aviation Act, aeronautical activity included the use of and basing of helicopters at a public use airport, and thus, zoning officer's interpretation of ordinance to exclude helicopters

from township's airport was void ab initio. N.J.A.C. 16:54-1.3, 16:54-3.2(b).

[2] **Zoning and Planning** Interim relief; preliminary injunction

Airport operator was entitled to a preliminary injunction preventing township from interfering with medevac helicopter services at airport; the abrupt termination of the emergency medical service helicopter response unit would adversely affect public health and safety and constituted an irreparable harm.

[3] **Aviation** Operation and use of facilities in general

**Zoning and Planning** Aviation and airports

Medevac helicopter service constituted a permitted use at airport.

**Opinion**

REED, J.

**\*1** This matter was before the court on the return of an Order to Show Cause signed by this court on March 20, 2006, concerning the continued use of medevac helicopters at Somerset Airport (the "Airport"). On March 31, 2006, oral argument was held on the matter. As a result, the court entered an Order 1) enjoining the Defendants from interfering with the NorthSTAR medevac operation at the Airport and staying all proceedings against Somerset Air Service ("SAS"), the Airport, and NorthSTAR medevac in any way related to medical evacuation (medevac) operations / services at the Airport pending the resolution of the matter; 2) Declaring that the medevac operation is a permitted use at the Airport; and 3) Declaring that jurisdiction for SAS's site plan application is vested with the Bedminster Township Planning Board, and remanded the matter back to the Planning Board.

BACKGROUND:
This matter is before the court on the return of an Order to Show Cause signed by this court on March 20, 2006. The

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1

BER-C-000117-26   05/07/2026 6:56:16 PM   Pg 7 of 22   Trans ID: CHC2026148395
Case 2:26-cv-05788   Document 1-3   Filed 05/20/26   Page 189 of 236 PageID: 290
Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)

2006 WL 861498

Order to Show Cause requires that on March 31, 2006, the Defendants show cause:

> why an order should not be entered in favor of the Plaintiff preliminarily enjoining the Defendants, until final disposition of this matter or further order of the Court, as follows:
>
> 1. Enjoining the Defendants from interfering with the NorthSTAR medevac operation at the Somerset Airport and staying all proceedings against Somerset Air Service, Somerset Airport, and NorthSTAR medevac in any way related to medical evacuation (medevac) operations / services at Somerset Airport; and
>
> 2. Declaring that the medevac operation is a permitted use at Somerset Airport; and
>
> 3. Declaring that jurisdiction for Somerset Air Service's site plan application is vested with the Bedminster Township Planning Board ...

The relevant facts to the matter at hand are convoluted and complex. They are as follows: Somerset Airport has been licensed by the State of New Jersey as an aeronautical facility since 1946, in the Township of Bedminster. SAS operates the Airport, to which the NorthSTAR medevac service relocated from the University of Medicine and Dentistry of New Jersey ("UMDNJ") in *February 2005.* The Township issued SAS a Special Use Permit in 2004 for the facilities necessary to support the operation of NorthSTAR medevac helicopters at the Airport. This Special Use permit was due to expire on *May 31, 2005,* and SAS and UMDNJ applied to the Bedminster Township Committee on March 28, 2005 for an extension / renewal of the Special Use Permit. A hearing was conducted by the Township Committee on this request on *April 18, 2005,* and the Committee voted to renew the permit for a nine (9) month period, to expire next on *February 28, 2006,* upon the condition that no further renewal, extension, or re-application would be considered in the absence of final approval for the construction of a permanent medevac hanger / office facility. In advance of the Special Use Permit's expiration, NorthSTAR medevac personnel vacated the temporary office trailer, which was the subject of the permit. Having been displaced, the medevac administrative operation relocated to the Airport office building, apparently without Planning Board review or approval of the site plan waiver application.

 **\*2**  On or about *November 3, 2005,* SAS applied to the Bedminster Township Board of Health for approval of the

construction of a new septic system to provide sewage disposal capacity for increased flow occasioned by the medevac operations at the Airport. A hearing was held on this application on *November 17, 2005,* and the Board of Health, after hearing the evidence, voted to approve SAS's application for construction of the new septic system to accommodate increased flow for a 24 hour / 7 days a week medevac operation. The Bedminster Branchburg Bridgewater Concerned Citizens Coalition, Inc. ("BBBCCC") filed a Complaint in Lieu of Prerogative Writs challenging the Board of Health approval of SAS's application regarding the septic system at the Airport (SOM–L–135–06). Pursuant to correspondence dated February 28, 2006 from the Township Engineer, construction commenced on the septic system, and has continued to date. This court, in a separate decision on this date, declined the application of intervenors Malcolm Forbes, Jr. and Sabina Forbes to halt construction.

On *November 16, 2005,* SAS submitted an application to the Planning Board seeking 1) conditional use approval and related site plan waiver to permit interior renovations to less than 2,000 square feet of an existing hangar building, to service and support the NorthSTAR medevac operation; 2) in the alternative, to condition approval and related Amendment to the (previously) submitted site plan for the Airport property, so as to permit the interior renovation of the existing hangar building to service the NorthSTAR medevac activities. On *January 5, 2006,* the Planning Board addressed the completeness of SAS's application, finding it incomplete as to a single issue. It is unclear to this court as to whether that issue has been addressed, or whether another completeness hearing is required.

On *January 23, 2006,* SAS appeared before the Bedminster Township Environmental Commission seeking waiver of the need to submit an Environmental Impact Statement (EIS) in connection with the site plan application. The Commission denied such a waiver, and the Planning Board, at its February 6, 2006 meeting, determined to require SAS to submit an EIS.

On *February 28, 2006,* SAS received a letter from the Bedminster Township Engineer stating that 1) the use of the existing office building by NorthSTAR was neither a specifically permitted use or a customary accessory use, and 2) substantiation of septic capacity needed to be documented, or in the alternative the new septic system approved by the Board of Health, could be installed. A letter was then received on *March 9, 2006,* from the Bedminster Township Zoning Officer stating that within 15 days from the receipt of that

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)

2006 WL 861498

letter, the medevac office must be removed from the Airport "unless the necessary approvals have been obtained." Any enforcement or other action by the Township to remove or interfere with the medevac operation had been stayed by this court, when it entered a temporary restraining order on March 20, 2006.

ARGUMENT:

*3 The heart of SAS's Complaint is that it has endured eleven (11) public meetings and has had four (4) lawsuits brought against it by the BBBCCC and other opponents to its operations, and has yet to have the opportunity to present the merits of its application for a permanent medevac facility at the Airport for consideration. Further, any interference with the medevac operation should be restrained preliminarily, pending final resolution.

The Township of Bedminster's opposition focuses on two main issues: 1) that Plaintiff has failed to exhaust its administrative remedies by not appealing the Zoning Officer's and the Townships Engineer's determination that the use of helicopters at the airport is not a permitted use; and 2) that the determination of the zoning officer that a medevac operation is not a permitted use at the airport, is correct.

[1] However, as this court previously held, the Zoning Officer and Township Board of Adjustment *could not* have interpreted the ordinance as prohibiting helicopters. The Bedminster Township Zoning Ordinance from which their authority is derived would be inoperative if it did not permit the use of the Airport by helicopters, because *N.J.S.A.* 6:1–33 states:

> Airport regulations adopted by any local subdivisions operating an airport shall be inoperative in so far as such regulations are inconsistent with the provisions of this act or with the rules, regulations and orders issued and promulgated pursuant thereto.

SAS is authorized under the Aviation Act to operate the Airport as a licensed aeronautical facility in the State of New Jersey, and is, therefore, licensed for use by *any aircraft,* the definition of which includes airplanes *and*

helicopters. *N.J.A.C.* 16:54–1.3. In fact, *N.J.A.C.* 16:54–3(d) specifically forbids prohibition of helicopter operations at the Airport. Importantly, *N.J.A.C.* 16:54–3.2(b) states that: *"For purposes of land use and zoning, aeronautical activity(ies) are normally considered permitted uses at public use aeronautical facilities," N.J.A.C.* 16:54–3.2(b), and the municipal zoning board is specifically prohibited from designating an airport as a non-conforming use, *N.J.A.C.* 16:62–2.1(e). *N.J.A.C.* 16:54–1.3 defines "Aeronautical Activity" as:

> "any of the following aviation related commercial activities generally provided to the public or any segment thereof, at an aeronautical facility either by the licensee or his tenants or invitees, with or without compensation:
>
> 1) Aircraft: sales, charter, rental, lease, storage, operation, hangaring, tiedown, and parking; and parachute operations;
>
> 2) Instruction: aircraft flight and ground instruction of all types, license examinations and proficiency checks, crew member training, parachute jumping training,
>
> 3) Maintenance: all types of maintenance, repair, inspection, testing, modification, overhaul, corrosion control or painting of aircraft, engines, systems, avionics, parachutes, or ancillary air or ground support equipment; and
>
> *4 4) Servicing: aircraft fueling, using fixed, hydrant, mobile, or portable equipment, aircraft engine or systems servicing including hydraulics, pneumatics, oxygen, lavatory, aircraft catering, electronics, aircraft cleaning."

The definition of "Aircraft" in *N.J.A.C.* 16:54–1.3 includes all devices for flight through the air, and *specifically* includes helicopters. Therefore, "Aeronautical Activity" includes the use of and basing of helicopters at a public use airport, and clearly such activities were contemplated by the New Jersey Legislature as permitted uses at an airport. Such is the case here. Therefore, the action of the Zoning Officer and Township Engineer is void *ab initio,* and of no force or effect.

Therefore, the issue now devolves to whether a helicopter medevac operation is a permitted use under the Township zoning ordinance. This draws a distinction with a difference between helicopter use of the Airport. and medevac helicopter use of, and basing at, the Airport. Whether the proposed interior building renovations and septic system "affect,

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)

2006 WL 861498

increase or diminish the airport's operational capabilities," and thus constitute an "alteration" under *N.J.A.C.* 16:54–1.3 subject to the Commissioner's jurisdiction over "regulating and licensing of aeronautical activities and facilities," *N.J.A.C.* 16:54–1.1(b) or whether it is strictly a matter of local zoning, the review of which would be in lieu of prerogative writ, is a question which can be answered later, in the context in which it is raised.

Intervenor BBBCCC also submitted a brief in opposition to the Order to Show Cause. The thrust of BBBCCC's argument is that SAS has failed to show any true irreparable harm, as there is no claim that SAS is being individually harmed, but only that the "people of New Jersey" are. BBBCCC contends that SAS has no standing to assert harm on behalf of the medevac program or the people of New Jersey. The BBBCCC contends that financial reasons, not the 'public good', are the genesis of the relocation of the medevac operation to the Airport, and that other medevac services offer coverage to protect the people of New Jersey.

THE COURT'S OPINION:
The court does not find the argument advanced by the BBBCCC to be persuasive in light of *N.J.S.A.* 26:2k–37:

> The Division of State Police of the Department of Law and Public Safety shall establish an emergency medical transportation service to provide medical transportation service pursuant to this amendatory and supplementary act. The superintendent shall operate and maintain at least one dedicated helicopter for each emergency medical service helicopter response unit designated by the commissioner pursuant to section 2 of this amendatory and supplementary act.

 **[2]**   Maintaining the efficacy of the location chosen by the Division of State Police and Commissioner (of the New Jersey Department of Health) to fulfill this duty created by the legislature, is certainly a matter within the penumbra of the public good, which will be deleteriously effected if the

temporary restraints presently in place are not continued. Further, the abrupt termination of this emergency medical service helicopter response unit does constitute irreparable harm. The harm to the public health and safety is in the danger of increased mortality to potential users of the service, and is as irreparable a harm as any that can be imagined.

 **\*5**   The court finds the case of *Jump, et. al v. Township of Andover, et al.,* decided by the Appellate Division on March 9, 2006, to be particularly demonstrative of the issues in this case, and helpful to their resolution. Therein, the Appellate Division said:

> Plaintiffs also argue that the trial court erred when it held that the New Jersey Aviation Act, *N.J.S.A.* 6:1–20 to –62, does not preempt local land use ordinances. According to plaintiffs, "[t]he existence of a valid license to operate a public use airport ... precludes regulation by municipal zoning boards over 'aeronautical uses' allowed by such a license at the airport," and although a licensee must provide "notice of an intended aeronautical use there is no need to file an 'application' with a municipal zoning board for permission to use the airport facility for that which it has been licensed."

The regulatory scheme adopted by the Commissioner and the relevant case law interpreting the Commissioner's powers over aviation in this State do not comport with plaintiffs' argument. Plaintiffs attempt to limit the existing cases to aeronautical facilities before licensing. Once licensed by the State, plaintiffs argue the municipality can not limit any licensed airport's activity, and no prior judicial decision supports Andover's contrary position. We do not read the controlling cases in this limited fashion.

As our Supreme Court has pointed out, "the Aviation Act of 1938 is preemptive," but the Commissioner of Transportation is not free to ignore conflicting provisions of a local zoning ordinance. *Garden State Farms, Inc. v. Mayor Bay, II,* 77 *N.J.* 439, 451–53, 390 A.2d 1177 (1978). Neither the federal nor the State legislation dealing with aviation was intended to be exclusive in the field. *Id.* at 449, 452, 390 A.2d 1177. Although the State, acting through the Commissioner of Transportation, maintains "the ultimate power and responsibility of determining where aeronautical facilities may be located," *id.* at 450, 390 A.2d 1177 (internal quotations omitted), "the Legislature desired to leave to the municipalities certain responsibilities over the area of land use, development and location of aeronautical facilities." *Id.* at 452, 390 A.2d

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)

2006 WL 861498

1177. Local power over the use of land for aeronautical purposes has not been completely displaced. *Id.* at 453, 390 A.2d 1177. But municipalities "must not exercise their zoning authority so as to collide with expressed policy goals of the State legislation, *N.J.S.A. 6:1–20,* or the final decision of the Commissioner." *Id.* at 454, 390 A.2d 1177.

The Commissioner is "to pay due attention to the lawful zoning expressions of local governments and not '[ ] act in an unreasonable fashion so as to arbitrarily override all important legitimate local interests." ' *Id.* at 455 (quoting *Rutgers v. Piluso,* 60 *N.J.* 142, 153, 286 A.2d 697 (1972)). "[A] failure on the Commissioner's part to weigh conscientiously local interests, to examine carefully whether the proposed aviation facility is compatible with the surrounding land uses and to consult the local ordinances and authorities in making its licensing decision would constitute an abuse of discretion." *Id.* at 456, 286 A.2d 697.

**\*6** The Commissioner has adopted regulations to implement the relationship between local interests and aeronautical concerns. *N.J.A.C.* 16:54–1.1 to –10.1. "All persons proposing the opening of a new aeronautical facility [or] *the alteration ...* of, an existing aeronautical facility" must submit an application to the Commissioner that demonstrates "conformance with existing zoning and land use ordinances." *N.J.A.C.* 16:54–2.1(a)6 (emphasis added). The regulations define "alteration" as "any construction, demolition, or modification to the surface, design, or operational areas of an aeronautical facility which affects, increases, or diminishes its operational capabilities." *N.J.A.C.* 16:54–1.3. The application must also include "the final determination, from the appropriate planning authority having jurisdiction, regarding the proposed changes or new facility." *N.J.A.C.* 16:54–2.1(a)6i. The rule also provides that "no final licensing decision will be made until the Department reviews and considers the final determination made by the appropriate planning authority having jurisdiction." *Id.* at 6ii.

These rules requiring the applicant to submit its plans for proposed airport changes to local authorities, *N.J.A.C.* 16:54–2.1(a)6, were in existence in 1999 and therefore we disagree with the prior Law Division judge's decision, in December of that year, precluding municipalities "from enacting zoning ordinances regarding the use of the property within the airport." The judge was mistaken when she found there was "no specific provision here that requires the licensees to make application to municipal zoning boards for any expanded or changed uses within the boundaries of the airport." *See N.J.A.C.* 16:54–2.1(a)6 (Supp. April 6, 1998); 30 *N.J.R.* 1629 (May 4, 1998); 25 *N.J.R.* 2719 (July 6, 1993).

Thus, the Commissioner must consider and weigh the local concerns against the aeronautical needs contained in any application for alteration of an airport. There may be situations where the local zoning concerns relate to public safety and outweigh proposed recreational aeronautical activities. On the other hand, those aeronautical activities that must be observed nationwide or pertain to safety or public usage of air transportation, may predominate over many restrictive local zoning concerns. *See N.J.A.C.* 16:54–2.5(a). In addition, any proposed change or modification that does not affect, increase, or diminish the airport's operational capabilities would not meet the regulatory definition of alteration, *N.J.A.C.* 16:54–1.3, and consequently would be a matter solely for local concern and review.

It is clear, however, that while the Commissioner must carefully consider the local municipality's zoning concerns, the " 'ultimate authority over the regulating and licensing of aeronautical activities and facilities," ' remains with the Commissioner. *Tanis v. Twp. of Hampton,* 306 *N.J.Super.* 588, 599, 704 A.2d 62 (App.Div.1997) (quoting *N.J.A.C.* 16:54–1.1(b). The Commissioner has sufficient statutory authority "to override local zoning decisions," *id.* at 600, 704 A.2d 62, and retains "supervision over aeronautics within this State, including, but not by way of limitation, the navigation, flight and operation of aircraft, the establishment, location, maintenance, operation, size, design, repair, management and use of airports...." *N.J.S.A.* 6:1–29.

**\*7** Finally, we leave for another day the question of what process is due when the Commissioner receives an application for alteration of an airport that has been denied by the appropriate local zoning or planning authority. We await development of a proper record before deciding whether such a dispute must be transmitted to the Office of Administrative Law as a contested case, *N.J.S.A.* 52:14B–2(b); *N.J.S.A.* 52:14F–7a; *N.J.A.C.* 1:1–8, or may be resolved without a trial-like proceeding.

In seeking Planning Board approval of its site plan, SAS is doing what it is required to do under the rules promulgated pursuant to the Aviation Act: namely seeking local approval of its alteration of the airport facility to improve support

**Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)**

2006 WL 861498

facilities for the medevac service. Parenthetically, that status gives SAS standing to bring this action. Instead of determining whether SAS's plans to accommodate the State Police medevac operation are in conformance with existing zoning and land use ordinances, Bedminster has continued to focus on whether the use of helicopters at the airport is a permitted use. [1] As held by this court in its most recent decision, helicopters are a permitted use at the Airport and the Township of Bedminster is impotent to find that its zoning ordinance provides otherwise. The delay in resolving this dispute is created by emphasis on the wrong issue, and has prejudiced SAS and NorthSTAR. To vacate the restraints and permit the Township of Bedminster to terminate local availability of this emergency medical service helicopter response unit, before a final resolution, would be inconsistent with the applicable law applied to the facts here, and would be a dereliction of this court's responsibility. Those restraints will therefore be continued.

[1]  It is noteworthy that the contemplated use is not a recreational aeronautical activity, but one which involves public safety and therefore is a matter impacting the public good and of concern to the citizens of this state. As such use pertains to public safety, such concerns "may predominate over many restrictive local zoning concerns." See *Jump, supra,* and *N.J.A.C.* 16:54–2.5(a).

According to the case of *Isphani v. Allied Domecq Retailing,* USA, 320 *N.J.Super.* 494, 498, 727 A.2d 1023 (App.Div.1999), the court has the power to issue a preliminary restraining order if the plaintiff produces sufficient evidence of an unavoidable, substantial and irreparable injury. See *Crowe v. De Gioia,* 90 *N.J.* 126, 132–34, 447 A.2d 173 (1982). To obtain a preliminary injunction, it must be shown that:

1) the applicant will suffer irreparable injury if the requested relief is denied;

2) that applicant's claim is based on a settled legal right;

3) that the material facts are substantially undisputed; and

4) that the harm to the applicant if the injunction is denied will be greater than the harm to the opposing party if the injunction is granted.

This court is convinced by the arguments of Plaintiff, that a preliminary injunction is warranted under the circumstances of this case, as they exist at this time.

Therefore, pending a final decision in this matter, the court will continue its restraint of any interference with the operation of NorthSTAR medevac at the Airport.

 [3]   Whether the existing medevac operation is an accessory use to the permitted helicopter principal use of the Airport is before the court for decision.

 **\*8**  In *Charlie Brown of Chatham, Inc. v. Board of Adjustment,* 202 N.J.Super. 312, 495 A. *2d* 119 (1985), the Appellate Division reviewed the law defining "accessory" uses. Zoning ordinances that allow "customarily incidental" accessory uses to the main activity "permit, by implication, any use that logic and reason dictate are necessary or expected in conjunction with the principal use of the property. 6 *Powell, Law of Real Property,* (1979) para. 869[2][e] ... The court viewed the term "incidental" in the definition of "accessory use" to incorporate two concepts. The use must be "subordinate and minor in significance" and must also bear a "reasonable relationship with the primary use." Id. *at 324, 495* A.*2d 119*. "It is not enough that the use be subordinate; it must also be attendant or concomitant." *Ibid.*

*Wyzykowski v. Rizas,* 132 *N.J.* 509, 518–519, 626 A.2d 406 (1993).

If basing of helicopters is a permitted use at the Airport, a medevac operation should be considered a type or kind of helicopter use (e.g. traffic helicopters), rather than an "accessory" to helicopter use. It is not that which aides or assists the principal helicopter use, it is just a particular type of that principal use. The difference is one of kind within helicopter use, not one of substance. In other words, the renovations to the hangar / office facility are accessory to helicopter use of the Airport. The fact that it is a *medevac* helicopter use, does not change that character of use.

Jurisdiction of planning and zoning issues regarding SAS's site plan application is vested in the Bedminster Township Planning Board. It was argued on the return date of the Order to Show Cause that the action of the Zoning Officer divested the Planning Board of jurisdiction, and vested the Board of Adjustment with exclusive jurisdiction. Curiously, this was an argument by both parties, to advance different

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2006)**

2006 WL 861498

objectives. By doing so, the Defendant Township cannot avoid the substantive considerations associated with site plan review, nor can the Plaintiff SAS co-opt this court into taking action in derogation of the municipality's local authority and responsibility.

The action of the Bedminster Township Zoning Officer is vacated. Therefore, there is nothing to appeal to the Board of Adjustment and the matter will be remanded to the Planning Board to proceed with site plan review, as the appropriate administrative forum and remedy. This will permit the exercise of local power over the use of land for aeronautical purposes, in order to permit development of a local planning / zoning record, with recognition of the proviso that municipalities must not exercise their zoning authority so as not to collide with expressed policy goals of the State legislation, *N.J.S.A.* 6:1–20, or the final decision of the Commissioner, *Garden State Farms, Inc. v. Mayor Bay II,* 77 N.J. 439, 454, 390 A.2d 1177 (1978). Proceeding in such a manner will operate to satisfy SAS's complaint that it has never had the opportunity to present its plans for review by the Township Planning Board. It will have that opportunity now.

**\*9** The municipality, intervenors, and BBBCCC, subject to the discretion of the Planning Board, will have the forum to express their local concerns. That is the opportunity which they seek.

The court will then have the benefit of a record to review in the context of a prerogative writ action, if and when appropriate. Or, the parties may argue at that time that the Commissioner of Transportation has jurisdiction and any review can be conducted by him, if that is appropriate, instead.

Parenthetically, the potential independent dispositive issue of whether a medevac operation must be tethered to a medical facility only, under New Jersey law, will move toward resolution before this court on May 11, 2006. Neither process will interfere with or overlap the other, and either may result in a resolution of the extant disputes. This court will abide that result.

**All Citations**

Not Reported in A.2d, 2006 WL 861498

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1774058
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

SOMERSET AIR SERVICE, INC., Plaintiff-Respondent,

v.

The TOWNSHIP OF BEDMINSTER;
Geoffrey Price, Bedminster Township Zoning
Officer; and Paul Ferriero, Bedminster
Township Engineer, Defendants-Respondents,

and

Malcolm S. Forbes, Jr. and Sabina Forbes;
Township of Bridgewater; Phoebe Weseley; and
Bedminster, Branchburg, Bridgewater Concerned
Citizens Coalition, Inc., Intervenors-Respondents.
Somerset Air Service, Inc., Plaintiff-Respondent,

v.

The Township of Bedminster; Geoffrey
Price, Bedminster Township Zoning Officer;
Paul Ferriero, Bedminster Township
Engineer, Defendants-Respondents,

and

Malcolm S. Forbes, Jr. and Sabina
Forbes; Phoebe Weseley; and Bedminster,
Branchburg, Bridgewater Concerned Citizens
Coalition, Inc., Intervenors-Respondents,

and

Township of Bridgewater, Intervenor-Appellant.
Somerset Air Service, Inc., Plaintiff-Respondent,

v.

The Township of Bedminster; Geoffrey
Price, Bedminster Township Zoning Officer;
Paul Ferriero, Bedminster Township
Engineer, Defendants-Respondents,

and

Malcolm S. Forbes, Jr. and Sabina Forbes; and
Township of Bridgewater, Intervenors-Respondents,

and

Phoebe Weseley; and Bedminster,
Branchburg, Bridgewater Concerned Citizens
Coalition, Inc., Intervenors-Appellants.

Argued June 5, 2007.

|

Decided June 21, 2007.

On appeal from the Superior Court of New Jersey, Law
Division, Somerset County, L-419-06.

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

**Attorneys and Law Firms**

John M. Lore argued the cause for Bedminster Township Planning Board and Bedminster Township Board of Adjustment, appellants in A-5311-05T2, and respondents in A-5341-05T2 and A-5353-05T2 (DeMarco & Lore, attorneys; Mr. Lore, on the brief). [1]

[1]    The Law Division ordered that the Bedminster Township Planning Board and the Bedminster Township Board of Adjustment be joined as indispensable parties. However, the record does not contain an order adding these parties to the caption; therefore, they are added only to the attorney appearances as the appellants in A-5311-05T2, and respondents in A-5341-05T2 and A-5353-05T2.

Alan Bart Grant argued the cause for the Township of Bridgewater, appellant in A-5341-05T2, and respondent in A-5311-05T2 and A-5353-05T2 (Mauro, Savo, Camerino & Grant, attorneys; Edward A. Halpern and Mr. Grant, on the brief).

Robert F. Simon argued the cause for Phoebe Weseley and Howard A. Teichman argued the cause for Bedminster, Branchburg, Bridgewater Concerned Citizens Coalition, Inc., appellants in A-5353-05T2, and respondents in A-5311-05T2 and A-5341-05T2 (Herold & Haines, and Morgan Melhuish Abrutyn, attorneys; Mr. Simon and Alan L. Harwick, of counsel; Mr. Simon, Mr. Teichman, and Lisa M. Gowen, on the joint brief).

Daniel S. Bernstein argued the cause for Somerset Air Service, Inc., respondent in A-5311-05T2, A-5341-05T2, and A-5353-05T2 (William G. Mennen, attorney; Mr. Bernstein, of counsel; Mr. Bernstein and Mr. Mennen, on the brief).

DiFrancesco, Batemen, Coley, Yospin, Kunzman, Davis & Lehrer, attorneys for the Township of Bedminster, respondent in A-5311-05T2, A-5341-05T2, and A-5353-05T2, did not file a brief.

Richard M. Sasso, attorney for Malcolm S. Forbes, Jr., respondent in A-5311-05T2, A-5341-05T2, and A-5353-05T2, did not file a brief.

Before Judges COBURN, AXELRAD and GILROY.

**Opinion**

PER CURIAM.

**\*1**   These three back-to-back appeals, which we now consolidate, relate to the 2004 relocation of the State's NorthSTAR medevac helicopter operation from University Hospital in Newark to Somerset Airport ("Somerset Airport" or "the Airport") in the Township of Bedminster ("Township" or "Bedminster"). Somerset Airport is a private airport, owned and operated by Somerset Air Service, Inc. ("SAS"). NorthSTAR is a state-operated emergency medical service helicopter unit that services the northern half of the State of New Jersey. It was established pursuant to the New Jersey Emergency Medical Service Helicopter Response Program, *N.J.S.A.* 26:2K-35 to-38.

The appeals challenge a Law Division order dated April 18, 2006, which enjoined defendants from interfering with NorthSTAR's medevac operation at the Airport pending a final decision in the matter; declared that a medevac helicopter operation was a permitted aeronautical activity at the Airport, and that office facilities for the medevac operation were permitted as accessory uses to the permitted Airport use; declared void, and of no force and effect, the action of the Bedminster Township Zoning Officer and Bedminster Township Engineer, who concluded that a medevac helicopter operation's presence at the Airport required variance approval from the Township of Bedminster Zoning Board of Adjustment ("Board of Adjustment"); declared that jurisdiction for SAS's application for conditional use and site plan approval, in order to renovate an existing hangar to create office space that will accommodate NorthSTAR, was vested in the Township of Bedminster Planning Board ("Planning Board"), as opposed to the Board of Adjustment, and therefore remanded the case to the Planning Board; and joined the Planning Board and Board of Adjustment as indispensable parties.

Defendants, Board of Adjustment and the Planning Board (collectively referred to as "the Boards"), and defendants-intervenors Township of Bridgewater ("Bridgewater"), Phoebe Weseley ("Weseley"), and the Bedminster, Branchburg, Bridgewater Concerned Citizens Coalition ("Citizens Coalition") filed separate appeals, raising the following procedural and substantive issues: whether the Law Division Judge erred (1) by granting injunctive and declaratory relief, considering SAS failed to exhaust its administrative remedies before the Board of Adjustment; (2)

BER-C-000117-26   05/07/2026 6:56:16 PM   Pg 15 of 22   Trans ID: CHC2026148395
Case 2:26-cv-05788   Document 1-3   Filed 05/20/26   Page 197 of 236 PageID: 298
Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

by not adding indispensable parties until the litigation had been decided; (3) by granting declaratory and injunctive relief to SAS; (4) by declaring that a medevac helicopter operation was a permitted aeronautical activity at Somerset Airport, and that all ancillary and support facilities were permitted accessory uses; (5) by declaring that the Planning Board was the proper venue to consider SAS's application for conditional use and site plan approval.

I

Somerset Airport was established in 1946 in the Township of Bedminster. It is privately owned and operated by SAS and has served as a base for numerous helicopter operations, including, for example, a corporate helicopter owned by the Puralator Corporation, an air charter service, a helicopter school, and State Police helicopters. SAS provides office and hangar space, as well as restroom facilities, to support flight operations at the airport. In the past, it also provided a restaurant/snack bar in the Airport's administration building.

**\*2** The Airport is located in Bedminster's R-10 (rural residential) zone, where it is a permitted conditional use. Bedminster's 2003 Master Plan contains these remarks about the Airport:

A conditional use in this district is an airport existing at the time of adoption of the 1946 Zoning Ordinance. The George Walker Field (formerly Somerset Airport) has operated as a permitted use since 1946 with conditions related to tenure, tract delineation, and runway length.

During the Planning Board's development of the master plan during the early 1990's, numerous public comments at a series of public information meetings addressed the issues of aircraft noise and potential environmental hazards associated with airport operations.

The Planning Board recognizes the right of the airport to continue operations, and such rights would exist even for a nonconforming use. The role of the airport as a recreational and education facility has a long history in Bedminster Township. However, the potential for expanded functions (increased business travel, reliever status, and introduction of jet aircraft) has previously prompted concerns over airport plans for runway length expansion and other development proposals.

Conditional use treatment of the airport provides a level of assurance that the conditions that have previously defined this permitted use will be enforceable under the Zoning Ordinance. Failure to adhere to these conditions will require that the expansion plans become the subject of review by the Zoning Board of Adjustment under *N.J.S.A. 40:55D-70*(d). The proofs required to secure such relief will help to assure that no substantial detriment to the public good will result.

In 1986, the Legislature created the New Jersey Emergency Medical Service Helicopter Response Program ("the Program"). *N.J.S.A. 26:2K-35* to-38. The Program was established in the Division of Local and Community Health Services of the Department of Health. *N.J.S.A. 26:2K-36*(a). But the helicopters used in the Program are maintained and piloted by the State Police. *N.J.S.A. 26:2K-35*(d); *N.J.S.A. 26:2K-37*.

The Legislature mandated the creation of at least two hospital-based emergency medical service helicopter units. *N.J.S.A. 26:2K-36*(a). NorthSTAR services the northern portion of the State, in coordination with the University of Medicine and Dentistry of New Jersey ("UMDNJ"). SouthSTAR services the southern portion of the State. *N.J.S.A. 26:2K-35*(g). Combined, NorthSTAR and SouthSTAR fly approximately 1500 medevacs per year, with SouthSTAR flying about 100 more than NorthSTAR. About seventy-five percent of the calls are for trauma scene transports, the other twenty-five percent are inter-hospital transports.

The staff of NorthSTAR and SouthSTAR are responsible for "render[ing] life support services to an accident or trauma victim, as necessary, in the course of providing emergency medical transportation." *N.J.S.A. 26:2K-36*(b). Critically ill and injured patients, including but not limited to victims of motor vehicle accidents, burns, and explosions, have the best chance for survival if transported within sixty minutes of their injury to one of the trauma centers in the State, where they can receive the specialized care and services that their injuries require. Air medical transport by helicopter is the quickest, and therefore the most effective, means of critical patient transport. By contrast, ground transport is significantly slower and more dangerous, thereby lessening the patients' likelihood of survival.

**\*3** Medevac helicopter operations are commonly located at airports and "nearly half of the registered air medical rotor wing programs are based at airports." In New Jersey,

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

BER-C-000117-26    05/07/2026 6:56:16 PM    Pg 16 of 22    Trans ID: CHC2026148395
Case 2:26-cv-05788    Document 1-3    Filed 05/20/26    Page 198 of 236 PageID: 299
Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

for example, at the outset of the Program, NorthSTAR and SouthSTAR, then collectively referred to as JEMSTAR, operated out of Mercer County Airport, in West Trenton. Subsequently, NorthSTAR moved to Morristown Municipal Airport, in Morristown, and SouthSTAR moved to Southern Jersey Regional Airport, near Voorhees. There are four additional air medical transport programs based at New Jersey airports, including: Atlantic Health Air-One, based at Morristown Municipal Airport; MONOC Medevac, based at Mercer County Airport, West Trenton; University Medevac Atlantic CARE, based at Hammonton Airport; and Air Ambulance Express, based at Mercer County Airport, West Trenton.

Airports provide "on site fuel availability, advanced weather technology, maintenance support, and aviation facilities that support navigational needs of the medevac pilots." In addition, airports typically provide both hangar space for the helicopters, and office space for the medevac staff, which generally includes such things as couches and microwave ovens. Indeed, some office space is seemingly required for medevac helicopter operations, since federal law imposes flight time restrictions upon medevac flight crews and mandates that the crews have "[a]n adequate place of rest ." 14 *C.F.R.* § 135.271(f); *United States v. Rocky Mountain Helicopters, Inc.,* 704 *F.Supp.* 1046, 1049-50 (D.Utah 1989). At their base airports, NorthSTAR and SouthSTAR have been provided with both hangar space and office space to house flight operations centers.

Elizabeth McKenzie, a licensed professional planner retained by SAS, submitted a certification in which she opined that medevac support facilities were permitted at Somerset Airport. Based upon her study and analysis, including review of the governing municipal land use regulations and visits to similar airports in Alexandria Township and Montgomery Township, New Jersey, she concluded

> that it is customary and even necessary to permit office and support space to be created in hangars occupied by various entities, including private pilots, helicopter flight schools, helicopter rental and charter businesses, aerial photographers and numerous other entities typically occupying hangar space at an airport. Not all of these can

nor should they be accommodated in a single central airport office.

In February 2005, in response to a number of concerns, including increased calls for service to the central and western portions of the State, and delayed response times to those areas from its then-current location at University Hospital in Newark, NorthSTAR moved its operations to Somerset Airport. The move significantly improved response times, particularly to the western portion of the State, and also eliminated the need to fly to Newark Liberty International Airport for fuel.

**\*4** NorthSTAR's presence at the Airport has upset some people in the area. Indeed, SAS's applications for various permits and approvals from Bedminster's local officials and governmental bodies, in order to accommodate NorthSTAR's operations, have been challenged at virtually every step of the process, and have spawned a multiplicity of litigations that were consolidated below for the purposes of case management.

On November 16, 2005, SAS applied to the Planning Board for conditional use approval and related site plan approval to permit interior renovations of an existing hangar building in order to accommodate NorthSTAR's operations. Alternatively, SAS sought conditional use approval and a related amendment to the previously approved site plan for the Airport property to permit the renovations. The proposed renovations of the hangar building would create an entry vestibule and closet, two restrooms, a kitchenette, and four offices.

The relevant Township ordinances provide, in pertinent part, as follows:

> Before a construction permit or certificate of occupancy shall be issued for any conditional use as permitted by this chapter, application shall be made to the Planning Board. The review by the Planning Board of a conditional use shall include any required site plan review pursuant to this chapter.... Site plan review of a modification to a previously approved conditional use shall not be required

BER-C-000117-26   05/07/2026 6:56:16 PM   Pg 17 of 22   Trans ID: CHC2026148395
Case 2:26-cv-05788   Document 1-3   Filed 05/20/26   Page 199 of 236 PageID: 300
Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

where the renovations or alterations to the interior or exterior of the building or structure do not involve any enlargement of the building or major structural change as determined by the Construction Code Official. (Ord. # 95-20, § 1)

In connection with SAS's site plan application, the Township's professional planner, Frank Banisch, prepared a review letter dated January 5, 2006. Banisch questioned whether an office for the medevac helicopter operation was a permitted use of the Airport property, and he concluded that SAS's proposed renovations would require a floor area ratio variance from the Board of Adjustment.

Thereafter, by letter dated February 28, 2006, Bedminster Township's Engineer and Zoning Officer advised SAS that two issues needed to be addressed before NorthSTAR could move from its temporary trailers into the Airport's administration building, a move necessitated by the February 28, 2006, expiration of the Special Use Permit: (1) SAS would either have to substantiate the sufficiency of the existing septic system or implement the new septic system, as approved by the Board of Health; and (2) although the Board of Adjustment had determined that the use and basing of helicopters was permitted at the Airport, "the medevac function is not a permitted principal use nor is it a use that is customarily incidental, or accessory, to the airport use," and therefore "the medevac use is not permitted at the airport absent an approval by the appropriate agency or board of the Township." Accordingly:

The establishment of the medevac use at the site on a permanent basis without the approval of the Board of Adjustment will be a violation of the Township Land Management Ordinance and may result in an unauthorized expansion of use of the existing on site subsurface sewage disposal system. If the medevac offices are retained on the site after the expiration of the special use permit, it will be necessary to issue notices of

violations/summonses for the reasons listed above.

 **\*5** Approximately one week later, by letter dated March 6, 2006, Bedminster's zoning officer advised SAS that within fifteen days of receipt of the letter, NorthSTAR's "medevac office must be removed from the airport unless the necessary approvals have been obtained. If the use is retained after this time without approval, a summons will be issued."

In March 2006, SAS filed a verified complaint in lieu of prerogative writs against the Township of Bedminster and Bedminster's zoning officer and engineer. Submitted with the complaint were certifications in support of an order to show cause why the defendants should not be restrained from interfering with or proceeding against NorthSTAR's medevac operations at the Airport. SAS also sought a declaratory judgment from the court indicating that: a medevac operation is a permitted primary use at the Airport; a medevac office facility is a permitted accessory use at the Airport; and jurisdiction over SAS's application for conditional use and site plan approval rests with the Planning Board.

On March 20, 2006, Judge Reed entered the requested order to show cause with temporary restraints, and issued a one-paragraph written opinion in support of his decision. Pending further order, Judge Reed enjoined defendants "from interfering with the NorthSTAR medevac operation at Somerset Airport," and stayed "[a]ll proceedings against Somerset Air Service, Somerset Airport, and NorthSTAR medevac in any way related to medevac operations or services at Somerset Airport."

Opposition was filed by defendants and the Citizens Coalition, which sought intervenor status. A hearing was held on March 31, 2006.

The judge ruled in favor of SAS and decided to continue the temporary restraints on any interference with the operations of NorthSTAR medevac at Somerset Airport, finding that NorthSTAR performed a public service and irreparable harm would occur if it could not continue its operations pending final resolution of the case.

The judge rejected the argument that SAS was required to exhaust its administrative remedies by filing an appeal with the Board of Adjustment, holding that, as a matter of state aviation law, helicopters were a permitted aeronautical

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

activity at the Airport, and medevac helicopters were merely a type of helicopter. Therefore, the judge ruled that medevac helicopters were a permitted aeronautical activity at the Airport, and the Zoning Officer and Township Engineer's declarations to the contrary were void. The judge also declared that the office space proposed to accommodate NorthSTAR's operations was a permitted accessory use to the permitted airport use. Accordingly, the judge vacated the action of the Bedminster Township Zoning Officer and remanded the case to the Planning Board to proceed with a review of SAS's application for conditional use and site plan approval. Finally, the court left it for the Planning Board to decide whether it had jurisdiction over the proposed floor area ratio, or whether SAS was required to seek a variance from the Board of Adjustment under *N.J.S.A.* 40:55D-70(d)(4).[2]

[2] SAS represents in its brief that: "On May 4, 2006, the Planning Board conducted a hearing and determined that the SAS application would not increase the floor area, and therefore no floor area ratio variance was required." The Citizens Coalition has appealed that ruling.

 **\*6** Thereafter, by order dated April 18, 2006, the judge permitted Malcolm S. Forbes, Jr. ("Forbes"), the Township of Bridgewater, Weseley, and the Citizens Coalition to intervene.[3] The judge further ordered, in pertinent part, as follows:

[3] In their briefs, the parties reference Sabina Forbes as a recognized intervenor. However, the record does not contain an order to that effect.

2. That, pending a final decision in this matter, the Defendants are enjoined from interfering with the NorthSTAR medevac operation at Somerset Airport and all municipal enforcement proceedings against Somerset Air Service, Somerset Airport, and NorthSTAR medevac in any way related to medical evacuation (medevac) operations/ services at Somerset Airport are stayed; and

3. That the medevac helicopter operation is a permitted use at Somerset Airport; and the contemplated 24 hr/365 day operation, and support facilities to accommodate such operation (sleeping, eating, hygiene) are accessory uses to the permitted use; and

4. That the action of the Bedminster Township Zoning Officer and Bedminster Township Engineer in their letter

of February 28, 2006 is vacated and is considered void, and of no force or effect; and

5. That jurisdiction for Somerset Air Service's site plan application is vested with the Bedminster Township Planning Board; and in the event it determines that a floor area ratio variance is required, the Twp. Bd. of Adjustment shall review same for the limited purpose of hearing said variance application; and

6. This Court shall retain jurisdiction over this matter, and directs that the Bedminster Twp. Planning Bd. and Bd. of Adjustment shall be joined herein as indispensable parties w/in 20 days hereof.

Thereafter, by order dated May 8, 2006, the judge certified paragraphs two, three, four, five, and six of the April 18, 2006, order as final pursuant to *R.* 4:42-2.[4] By separate order dated May 8, 2006, the judge denied a stay of the April 18, 2006, order, pending appeal.

[4] Because we doubt the propriety of the Final Order Certification, we grant leave to appeal nunc pro tunc in the interests of justice. *R.* 2:4-4(b)(2).

On June 20, 2006, the Planning Board and Board of Adjustment filed a notice of appeal from paragraphs three and five of the Law Division's April 18, 2006, order, and from the May 8, 2006, order that certified those paragraphs as a final judgment. That appeal was assigned docket number A-5311-05T2.

On June 21, 2006, Bridgewater filed a notice of appeal from paragraphs three, five, and six of the Law Division's April 18, 2006, order, and from the May 8, 2006, order that certified those paragraphs as a final judgment. That appeal was assigned docket number A-5341-05T2.

On June 22, 2006, Weseley and the Citizens Coalition filed a joint notice of appeal from paragraphs two, three, four, and five of the Law Division's April 18, 2006, order, and from the May 8, 2006, order that certified those paragraphs as a final judgment. That appeal was assigned docket number A-5353-05T2.

II

Weseley, the Citizens Coalition, and the Township of Bridgewater argue that the judgment of the Law Division should be reversed as procedurally improper because SAS

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

failed to exhaust its administrative remedies before the Board of Adjustment. They contend that, before proceeding to the Law Division to challenge the ruling of the Township Zoning Officer that a medevac helicopter operation was not a permitted use at the Airport, SAS was obligated to first file an appeal with the Board of Adjustment.

**\*7** The Township of Bridgewater, the Planning Board, and Board of Adjustment similarly argue that the Law Division erred by usurping the jurisdiction of the Board of Adjustment, and by issuing a conclusion on the question of permitted uses at the Airport without engaging in necessary fact-finding.

Trial courts have discretion to waive a party's obligation to exhaust administrative remedies in the interests of justice. As such, appellate courts will review any such decision for an abuse of discretion. *Durgin v. Brown,* 37 *N.J.* 189, 203 (1962).

The Municipal Land Use Law ("MLUL"), *N.J.S.A.* 40:55D-1 to-163, establishes administrative procedures for appealing decisions made by an administrative officer in enforcing a zoning ordinance, or for requesting an interpretation of a zoning ordinance. Under *N.J.S.A.* 40:55D-70(a) and (b):

> The board of adjustment shall have the power to:
>
> a. Hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative officer based on or made in the enforcement of the zoning ordinance;
>
> b. Hear and decide requests for interpretation of the zoning map or ordinance or for decisions upon other special questions upon which such board is authorized to pass by any zoning or official map ordinance, in accordance with this act;

See also *Nouhan v. Bd. of Adjustment of Clifton,* 392 *N.J.Super.* 283, 290-91 (App.Div.2007). In addition, *N.J.S.A.* 40:55D-72(a) provides that:

> Appeals to the board of adjustment may be taken by any interested party affected by any decision of an administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map. Such appeal shall be taken within 20 days by filing a

> notice of appeal with the officer from whom the appeal is taken specifying the grounds of such appeal. The officer from whom the appeal is taken shall immediately transmit to the board all the papers constituting the record upon which the action appealed from was taken.

Further, under the Court Rules, in general, a party must exhaust his or her administrative remedies before filing an action in lieu of prerogative writs. Specifically, *R.* 4:69-5 provides that: "Except where it is manifest that the interest of justice requires otherwise, actions under R. 4:69 shall not be maintainable as long as there is available a right of review before an administrative agency which has not been exhausted."

The exhaustion of remedies requirement set forth in *R.* 4:69-5 is "a rule of practice designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts." *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 588 (1975). However, "it is neither a jurisdictional nor an absolute requirement." *Ibid.* It will be waived as the interests of justice require, which

> **\*8** has been held to mean that exhaustion of remedies will not be required where administrative review will be futile, where there is a need for prompt decision in the public interest, where the issues do not involve administrative expertise or discretion and only a question of law is involved and where irreparable harm will otherwise result from denial of immediate judicial relief.
>
> [*Id.* at 589.]

Interpretation of a statute or municipal ordinance is primarily a judicial function, and the court may decide such issues of law without deference to any ruling by a lower court, administrative agency, or municipal body. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378 (1995).

Here, the exhaustion of administrative remedies was not required because the issue presented, whether a medevac helicopter operation is a permitted aeronautical activity at the Airport, is purely one of law, involving the interpretation of state and federal aviation law in conjunction with the local zoning ordinance. Also, the Board of Adjustment has already

BER-C-000117-26 05/07/2026 6:56:16 PM Pg 20 of 22 Trans ID: CHC2026148395
Case 2:26-cv-05788 Document 1-3 Filed 05/20/26 Page 202 of 236 PageID: 303

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

reviewed a substantially similar issue, whether the use and basing of helicopters was permitted at the Airport, and ruled in favor of SAS, and an appeal of that ruling was pending in the Law Division at the time the present litigation was filed. Judge Reed decided that case in favor of SAS on March 31, 2006. Therefore, the purpose of the exhaustion of remedies doctrine had been served, and it would result in unnecessary delay to remand the matter to the Board of Adjustment. Finally, given the nature of NorthSTAR's services and the public policy evident in the Legislature's establishment of the Emergency Medical Service Helicopter Response Program, the public interest is best served by prompt resolution of this dispute.

### III

The Planning Board, Board of Adjustment, Weseley, and the Citizens Coalition argue that the judgment of the Law Division should be reversed because the Planning Board and Board of Adjustment were not joined as indispensable parties until final judgment had been entered.

The applicable Court Rule is *R.* 4:28-1(a), which addresses the joinder of "[p]ersons [n]eeded for [j]ust [a]djudication." It states, in pertinent part:

A person who is subject to service of process shall be joined as a party to the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest in the subject of the action and is so situated that the disposition of the action in the person's absence may either (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

[*R.* 4:28-1(a).]

A person's indispensability is established "if the omitted person 'has an interest inevitably involved in the subject matter before the court and a judgment cannot justly be made between the litigants without either adjudging or necessarily affecting the absentee's interest.' " *Fox v. Twp. of W. Milford,* 357 *N.J.Super.* 123, 130 (App.Div.) (quoting *Jennings v. M & M Transp. Co.,* 104 *N.J.Super.* 265, 272 (Ch. Div.1969)), *certif. denied,* 176 *N.J.* 279 (2003).

**\*9** "The party-joinder rule is concerned with the completeness, soundness, and finality of the ultimate determination of a legal controversy." *Cogdell v. Hosp. Ctr. at Orange,* 116 *N.J.* 7, 18 (1989). Its purposes are to protect an absent person from an adjudication of his or her interests, and to promote judicial efficiency and economy by ensuring that any judgment entered is complete and binding upon all those with an interest in the subject matter of the case. *Id.* at 17-19.

Here, the question of whether the Planning Board and Board of Adjustment are indispensable parties is not before the court, since that aspect of the Law Division's judgment was not appealed. *Seacoast Builders Corp. v. Jackson Twp. Bd. of Educ.,* 363 *N.J.Super.* 373, 381-82 (App.Div.2003). Certainly, however, the Boards should have been joined as parties based upon *N.J.S.A.* 2A:16-56, which says this: "When declaratory relief is sought, all persons having or claiming any interest which would be affected by the declaration shall be made parties to the proceeding." The Boards could be considered "persons" having an interest in the outcome of this litigation. *See N.J.S.A.* 2A:16-50 (defining "person" as including "any person, partnership, joint stock company, unincorporated association or society, and municipal or other corporation of any character"). Although the Boards have no personal stake in whether NorthSTAR's medevac operations are permitted at the Airport, they have an interest in preserving their respective powers under the MLUL. *N.J.S.A.* 40:55D-20.

While it might have been a better practice for the judge to have joined the Boards as parties and considered any arguments they might have made before entering final judgment, the question presented in this case is purely one of law, and the Boards have addressed the issue here. Our review of the judge's rulings on issues of law is de novo. Thus, the Planning Board and Board of Adjustment are not harmed by making their arguments for the first time in the Appellate Division.

### IV

Weseley and the Citizens Coalition seek reversal of the grants of declaratory judgment and injunctive relief. They argue that the appropriate procedures were not followed in granting declaratory judgment, and that the applicable legal standards were not met for the grant of temporary injunctive relief.

According to Weseley and the Citizens Coalition, the declaratory judgment could not be entered without the benefit of discovery and a plenary hearing because the question

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

of whether a medevac helicopter operation is a permitted primary or accessory use at the Airport raises questions of fact.

Under the Uniform Declaratory Judgments Act, *N.J.S.A.* 2A:16-50 to-62, SAS possessed the right to "have determined any question of construction or validity arising under" state aviation law and the Bedminster land use ordinance, "and obtain a declaration of rights, status or other legal relations thereunder." *N.J.S.A.* 2A:16-53. In turn, the court had both the power and the discretion to declare such rights. *N.J.S.A.* 2A:16-52; *N.J .S.A.* 2A:16-61; *R.* 4:42-3; *Bress v. L.F. Dommerich & Co.,* 94 *N.J.Super.* 282, 287 (App.Div.1967). A justifiable controversy was presented in this case, rendering declaratory judgment appropriate, because SAS had been threatened with the imposition of "notices of violations/ summonses" for permitting NorthSTAR to operate at the Airport without a variance. *Indep. Realty Co. v. Twp. of N. Bergen,* 376 *N.J.Super.* 295, 302-03 (App.Div.2005).

**\*10** The Uniform Declaratory Judgments Act is remedial in nature, and must be liberally construed and administered. *N.J.S.A.* 2A:16-51. Its purpose "is to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." *Ibid.*

Where no disputed issues of facts are presented, a trial is not necessary. *R.* 4:46-2(c); *Brill v. Guardian Life Ins. Co. of Am .,* 142 *N.J.* 520, 529-30 (1995). Since this case involves a question of law, there was no need for discovery or a plenary hearing.

In the first count of its verified complaint, SAS asked that defendants be "enjoin[ed] ... from interfering with the NorthSTAR medevac at Somerset Airport." Judge Reed agreed, reasoning as follows:

> The interim restraints contained herein are necessary to maintain the status quo, and permit this court to consider the matter on a preliminary basis. *R.* 4:52-1. *Thompson v. Patterson,* 9 *N.J. Eq.* 624 (E. & A. 1854). In this case, in which the criteria for such relief has been met, *Crowe v. DeGioia,* 90 *N.J.* 126 (1982), the relief herein *pro tem* is particularly appropriate considering the third and fourth *Crowe* criteria. In

addition, the public interest militates in favor of *ad interim* relief, including restraint of proceedings to interfere with or remove MEDEVAC operations at Somerset Airport pending the return date.

And at a later point Judge Reed added the following:

> In seeking Planning Board approval of its site plan, SAS is doing what it is required to do under the rules promulgated pursuant to the Aviation Act: namely seeking local approval of its alteration of the airport facility to improve support facilities for the medevac service. Parenthetically, that status gives SAS standing to bring this action. *Instead of determining whether SAS's plans to accommodate the State Police medevac operation are in conformance with existing zoning and land use ordinances, Bedminster has continued to focus on whether the use of helicopters at the airport is a permitted use.* As held by this court in its most recent decision, helicopters are a permitted use at the Airport and the Township of Bedminster is impotent to find that its zoning ordinance provides otherwise. *The delay in resolving this dispute is created by emphasis on the wrong issue, and has prejudiced SAS and NorthSTAR. To vacate the restraints and permit the Township of Bedminster to terminate local availability of this emergency medical service helicopter response unit, before a final resolution, would be inconsistent with the applicable law applied to the facts here, and would be a dereliction of this court's responsibility. Those restraints will therefore be continued.*

[ (emphasis added) (footnote omitted).]

Weseley and the Citizens Coalition seek reversal of the temporary restraints, arguing that the standard for injunctive relief was not met. We disagree and affirm substantially for the reasons expressed by Judge Reed.

V

**\*11** Defendants and intervenors appeal from the judgment of the Law Division that, as a matter of law, a medevac helicopter operation was a permitted aeronautical activity at the Airport, and any office facilities needed were a permitted accessory use. They argue that medevac helicopter operations are not

Somerset Air Service, Inc. v. Township of Bedminster, Not Reported in A.2d (2007)

2007 WL 1774058

permitted at the Airport, or, alternatively, that this issue should be decided in the first instance by the Board of Adjustment.

This is a legal issue that we are permitted to review de novo. *Manalapan Realty, supra,* 140 *N.J.* at 378. We affirm substantially for the reasons given by Judge Reed in his well-reasoned written opinion.

## VI

The Planning Board and Board of Adjustment, Weseley and the Citizens Coalition, and the Township of Bridgewater argue that Judge Reed erred by remanding this matter to the Planning Board. They claim that the appropriate venue for SAS's site plan application is the Board of Adjustment, because a use variance is needed for the medevac helicopter operation, under *N.J.S.A.* 40:55D-70(d)(1), or, alternatively, a conditional use variance may be needed under *N.J.S.A.* 40:55D-70(d)(3) if the Airport does not comply with the conditions imposed by Bedminster's land use ordinance.

Again, we affirm substantially for the reasons expressed by Judge Reed. In that regard, we note that Judge Reed emphasized the court's respect for the appropriate exercise of power by municipal authorities, stating:

> The action of the Bedminster Township Zoning Officer is vacated. Therefore, there is nothing to appeal to the Board of Adjustment and the matter will be remanded to the Planning Board to proceed with site plan review, as the appropriate administrative forum and remedy. This will permit the exercise of local power over the use of land for aeronautical purposes, in order to permit development of a local planning/zoning record, with recognition of the proviso that municipalities must not exercise their zoning authority so as to collide with expressed policy goals of the State legislation, *N.J.S.A.* 6:1-20, or the final decision of the Commissioner, *Garden State Farms, Inc. v. Mayor Bay II,* 77 *N.J.* 439, 454 (1978). Proceeding in such a manner will operate to satisfy SAS's complaint that it has never had the

opportunity to present its plans for review by the Township Planning Board. It will have that opportunity now.

The municipality, intervenors, and [the Citizens Coalition], subject to the discretion of the Planning Board, will have the forum to express their local concerns. That is the opportunity which they seek.

The court will then have the benefit of a record to review in the context of a prerogative writ action, if and when appropriate. Or, the parties may argue at that time that the Commissioner of Transportation has jurisdiction and any review can be conducted by him, if that is appropriate, instead.

Judge Reed ruled that medevac helicopter operations are a permitted aeronautical activity at the Airport, and that the office space needed for the operation is either part and parcel of the permitted primary airport use, or a permitted accessory use thereto. Therefore, a use variance is not needed under *N.J.S.A.* 40:55D-70(d)(1), and the Board of Adjustment does not need to address that issue.

 **\*12**  The Township's land use ordinance is fully consistent with the MLUL on this issue. The ordinance provides, in pertinent part, that "[b]efore a construction permit or certificate of occupancy shall be issued for any conditional use as permitted by this chapter, *application shall be made to the Planning Board,*" and the Planning Board will conduct any required site plan review. (emphasis added).

At argument we were advised that the Planning Board has completed the review directed by Judge Reed and has issued a final administrative decision, which has been appealed to the Law Division. Therefore, comment on that aspect of the case would be inappropriate.

Affirmed.

## All Citations

Not Reported in A.2d, 2007 WL 1774058

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., | SUPERIOR COURT OF NEW JERSEY |
| | CHANCERY DIVISION: BERGEN COUNTY |
| Plaintiff, | Docket No.  BER-C-000117-26 |
| v. | |
| | Civil Action |
| NS PHARMA, INC., and | |
| NIPPON SHINYAKU CO., LTD., | **NOTICE OF MOTION TO FILE** |
| | **DOCUMENTS UNDER SEAL** |
| Defendants. | |

TO:   NS PHARMA, INC.
　　　140 East Ridgewood Avenue, Suite 280S, Paramus, New Jersey 07652

　　　NIPPON SHINYAKU CO., LTD.
　　　140 East Ridgewood Avenue, Suite 280S, Paramus, New Jersey 07652

PLEASE TAKE NOTICE that on June 5, 2026, at 9:00 a.m. or as soon thereafter as counsel may be heard, Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Plaintiff Capricor Therapeutics, Inc. ("Plaintiff"), shall move before the Superior Court of New Jersey, Chancery Division, Bergen County, General Equity Part, at the Bergen County Justice Center, 10 Main Street, Hackensack, New Jersey 07601, for an Order pursuant to R. 1:38-11 sealing (i) limited portions of Capricor's Verified Complaint for Equitable Relief; (ii) portions of Capricor's supporting Brief, (iii) portions of supporting Certifications and exhibits thereto (the "Pleadings").

1

PLEASE TAKE FURTHER NOTICE The materials Capricor seeks to seal disclose Confidential Information protected by Section 13.3 of the parties' January 24, 2022 Commercialization and Distribution Agreement (the "Distribution Agreement") or by the parties' Mutual Nondisclosure Agreement (incorporated as Exhibit E thereto), namely: (a) the pricing terms and economic mechanics of the Distribution Agreement; (b) the Distribution Agreement's term and other commercially sensitive contractual terms; (c) NS Pharma's December 2021 capability presentation and the financial projections and capability claims contained therein; (d) materials presented at, transcripts of, and minutes recorded for the parties' joint committee meetings; (e) non-public commercial, regulatory, and pre-launch-readiness information exchanged between the parties pursuant to the Distribution Agreement; (f) non-public correspondence between the parties' senior executives and general counsel concerning performance and the parties' negotiations surrounding the Distribution Agreement; and (g) Defendants' April 10, 2026 draft proposed amendment to the Distribution Agreement. The materials Capricor seeks to seal additionally include confidential business information of Capricor or that the Defendants assert is confidential business information.

PLEASE TAKE FURTHER NOTICE that in support of this motion, Plaintiff will rely on the Certification of Anthony Bergmann dated May 6, 2026 and the accompanying Brief in Support of Plaintiff's Motion to Seal. A proposed form of Order is submitted herewith.

PLEASE TAKE FURTHER NOTICE that pursuant to R. 1:6-2(d), Plaintiff requests oral argument in the event timely opposition is filed.

2

Dated: May 8, 2026

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By:   */s/ Andrew Muscato*
      Andrew Muscato
      **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
      One Manhattan West
      New York, New York 10001
      Telephone: (212) 735-3000
      Facsimile: (212) 735-2000

      Quyen Ta *
      Emily Haffner*
      525 University Avenue
      Palo Alto, California 94301
      Telephone: (650) 470-4500
      quyen.ta@skadden.com /
      emily.haffner@skadden.com

      William K. Wray, Jr.*
      500 Boylston Street
      Boston, Massachusetts 02116
      Telephone: (617) 573-4800
      william.wray@skadden.com

      *Attorneys for Plaintiff Capricor Therapeutics, Inc.*

      *Pro hac vice motion to be submitted

3

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION: BERGEN COUNTY <br> Docket No. BER-C-000117-26 <br><br><br> Civil Action <br><br> **[PROPOSED] ORDER GRANTING** <br> **PLAINTIFF'S MOTION TO SEAL** |

THIS MATTER having come before the Court on the motion of Plaintiff Capricor Therapeutics, Inc. ("Capricor"), by its counsel Skadden, Arps, Slate, Meagher & Flom LLP, for an Order sealing certain documents pursuant to Rule 1:38-11; and the Court having considered the papers submitted in support of the motion, and for good cause shown;

IT IS on this _____ day of May 2026,

ORDERED that Plaintiff's Motion to Seal is hereby GRANTED; and it is further

ORDERED that the following materials shall be filed and maintained under seal:

1. The portions of Capricor's Verified Complaint dated May 7, 2026, the portions of Capricor's Brief in Support of the Preliminary Injunction dated May 7, 2026, the portions of the Certification of Dr. Linda Marbán dated May 7, 2026, and the portions of the Certification of Richard Rieger dated May 7, 2026, in each case as identified

1

by redaction in the public versions filed contemporaneously herewith (the "Pleadings"), that disclose Confidential Information protected by Section 13.3 of the parties' January 24, 2022 Commercialization and Distribution Agreement (and the parties' Mutual Nondisclosure Agreement, incorporated as Exhibit E thereto), namely: (a) the pricing terms and economic mechanics of the Distribution Agreement (including the Transfer Price, Supply Price, and the parties' Net Sales share); (b) the Distribution Agreement's term and other commercially sensitive contractual terms; (c) NS Pharma's December 2021 capability presentation and the financial projections and capability claims contained therein; (d) materials presented at, transcripts of, and minutes recorded for the parties' joint committee meetings; (e) non-public commercial, regulatory, and pre-launch-readiness information exchanged between the parties pursuant to the Distribution Agreement; (f) non-public correspondence related to the Distribution Agreement; and (g) Defendants' April 10, 2026 draft proposed amendment to the Distribution Agreement.

2. The portions of Capricor's Pleadings that include confidential business information of Capricor or that the Defendants assert is confidential business information.

and it is further

ORDERED that any party or member of the public may move to unseal any materials filed under this Order pursuant to R, 1:38-11(c).

_____
Honorable Nicholas Ostuni, J.S.C.

Opposed ____

Unopposed ____

2

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NS PHARMA, INC., and<br>NIPPON SHINYAKU CO., LTD.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: BERGEN COUNTY<br>Docket No.  BER-C-000117-26<br><br><br>Civil Action<br><br>**CERTIFICATION OF<br>ANTHONY BERGMANN IN SUPPORT<br>OF MOTION TO SEAL**<br> |

Anthony Bergmann certifies as follows:

1.      I am the Chief Financial Officer of Plaintiff Capricor Therapeutics, Inc. ("Capricor"). I submit this Declaration in support of Capricor's Motion to Seal its Verified Complaint and supporting papers filed in this action (the "Pleadings"). The statements in this Certification are made of my own personal knowledge and on my review of the books and records of Capricor as kept in the ordinary course of business. If called as a witness, I could and would competently testify to the matters stated herein.

2.      Capricor is the developer and manufacturer of Deramiocel (also known as CAP-1002), an allogeneic cardiosphere-derived cell therapy for the treatment of Duchenne muscular dystrophy.

1

3.      On January 24, 2022, Capricor and Defendant Nippon Shinyaku Co., Ltd. ("Nippon Shinyaku") executed the Commercialization and Distribution Agreement (the "Agreement").

4.      The Agreement contains comprehensive confidentiality provisions. Section 13.3 of the Agreement requires each party to hold the other party's "Confidential Information" in strict confidence, to use such information solely for purposes of performance under the Agreement, and to restrict disclosure to persons bound by written confidentiality obligations or as compelled by applicable law. "Confidential Information" is defined in the Agreement to include, without limitation, the commercial, financial, technical, regulatory, clinical, and strategic information exchanged between the parties in connection with the commercialization and distribution of Deramiocel. Specifically, Section 13.3.1 defines "Confidential Information" in six subparts that, taken together, encompass each party's confidential and proprietary information disclosed under the Agreement—including, in subpart (a), each party's research and development activities, regulatory processes, sales and marketing plans, finances and business forecasts, customer lists, personnel information, and strategic plans; and, in subpart (d), any information whose nature or circumstances of disclosure permit a reasonable inference that the information is confidential or proprietary. Section 13.3.2 requires each party, during the term of the Agreement and for seven years after termination, to hold the Disclosing Party's Confidential Information in confidence, not to use it for its own account or for the account of any third party, and not to disclose it to any third party except as specifically permitted or required for performance under the Agreement.

2

5.     Section 13.3.3 of the Agreement further incorporates by reference the parties' Mutual Nondisclosure Agreement dated November 19, 2020, which is attached to the Agreement as Exhibit E. The Mutual Nondisclosure Agreement independently restricts disclosure of confidential information exchanged between the parties. Among other restrictions, MNDA Section 2.2 prohibits disclosure to any third party of (i) the fact that confidential information has been made available between the parties, (ii) that discussions or negotiations between the parties are taking place, or (iii) the status or content of any such discussions, without prior written consent.

6.     The Pleadings necessarily quote, summarize, or rely upon confidential business information of the parties that is also Agreement-protected information, including the following categories:

(a)     The pricing terms and economic mechanics of the Agreement as set forth in Exhibit A, and the Agreement's Term and other commercially sensitive contractual terms (including exclusivity, performance benchmarks, termination, and dispute-resolution provisions)—and the schedules and exhibits thereto. This category falls within Section 13.3.1(a) (covering, inter alia, "sales and marketing plans," "finances and business forecasts," and "strategic plans") and Section 13.3.1(d) (covering information whose nature or circumstances of disclosure permit a reasonable inference of confidentiality);

(b)     Non-public correspondence between the parties' senior executives and general counsel—including email and letter communications among Capricor's and the Distributor's personnel, and the in-person communications by NS Pharma's personnel on March 27, 2026—concerning Defendants' launch-readiness

3

performance, the parties' joint commercialization planning, the parties' disagreement over the Agreement's pricing structure, and Defendants' restructuring proposal. This category could fall within Section 13.3.1(d);

(c) Non-public commercial, regulatory, and pre-launch-readiness information exchanged between the parties pursuant to the Agreement—including materials presented at, transcripts of, and minutes recorded for the parties' joint committee meetings; draft Target Product Profiles and the parties' written feedback thereon; payor research, AMCP dossier, and provider billing-guide preparation; field sales force, medical affairs, and patient-services planning; the parties' distribution and supply-chain arrangements; and Defendants' personnel and budget plans for Deramiocel commercialization. This category falls within Section 13.3.1(a) (covering, inter alia, "sales and marketing plans," "regulatory processes," "strategic plans," "finances and business forecasts," and "personnel information");

(d) Non-public pricing methodology, demand forecasting, and government-price-reporting analysis derived from the Agreement's contractual pricing structure—including (i) Defendants' December 2021 presentation, and (ii) Capricor's and its expert's analysis of how the Transfer Price and Supply Price interact with Medicare Part B Average Sales Price (ASP), Medicaid Average Manufacturer Price (AMP), and best-price reporting requirements.

(e) Defendants' April 10, 2026 draft proposed amendment to the Agreement (the "Proposed Amendment").

4

7. The information described in paragraph 6 arguably constitutes "Confidential Information" within the meaning of Section 13.3.1 of the Agreement and may also be independently protected by the parties' Mutual Nondisclosure Agreement.

8. Capricor has a direct contractual obligation under Section 13.3.2 of the Agreement and the Mutual Nondisclosure Agreement to maintain the confidentiality of information covered by the Confidentiality clause and to take reasonable steps to prevent its unauthorized disclosure. Additionally, the Pleadings include references to Capricor's commercially-sensitive and confidential pricing information that is competitively sensitive and should not be publicly disclosed.

9. Capricor brings its Motion to Seal to discharge that obligation and to continue to safeguard information that the parties have treated as confidential for their own proprietary reasons. It is my understanding, based on the parties' course of dealing and on the Agreement's negotiated terms, that Defendants share Capricor's interest in maintaining the confidentiality of that information. Disclosure of the information described in paragraphs 6 and 8 would cause the following injuries:

(a) Breach by Capricor of its confidentiality obligations under Section 13.3 of the Agreement and under the Mutual Nondisclosure Agreement, obligations that both parties reasonably expected and relied upon when entering the Agreement;

(b) Public disclosure of information that the Defendants may view as commercially sensitive information;

(c) Prejudice to the parties' ability to negotiate in good faith concerning the subject matter of this action and

5

(d)     Prejudice to Capricor's ability to negotiate and contract with other parties

concerning the sale and distribution of Deramiocel.

10.     The sealing relief Capricor requests is narrowly tailored. Capricor seeks sealing only of references to information described in Paragraphs 6 and 8 above that are contained in: (i) the Verified Complaint; (ii) the brief, certifications and exhibits filed in support of the Order to Show Cause; and (iii) such further filings in this action as reference or attach Agreement-protected Confidential Information. Capricor has filed redacted public versions of the sealed materials subject to the Court's directions on this motion and will file unredacted documents as Confidential Documents, again subject to the Court's directions.

11.     I certify that the foregoing statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: _____, 2026

Anthony Bergmann.

7

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and <br> NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION: BERGEN COUNTY <br> Docket No.  BER-C-000117-26 <br><br><br><br> Civil Action |

---

**BRIEF IN SUPPORT OF THE MOTION OF PLAINTIFF CAPRICOR THERAPEUTICS, INC. TO FILE DOCUMENTS UNDER SEAL**

---

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
(A Delaware Limited Liability Partnership)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Quyen Ta*
Emily Haffner*
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500

William K. Wray, Jr.*
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

*Pro hac vice motion to be submitted

## TABLE OF CONTENTS

PRELIMINARY STATEMENT AND BACKGROUND..................................................................1

THE MOTION TO SEAL DOCUMENTS SHOULD BE GRANTED SINCE THE
  DOCUMENTS CONTAIN CONFIDENTIAL AND PROPRIETARY
  BUSINESS INFORMATION THAT THE COURTS PROTECT FROM PUBLIC
  DISCLOSURE.................................................................................................................3

    A.    Motion to Seal Standard..................................................................................3

    B.    Capricor Has a Legitimate Privacy Interest That Substantially Outweighs
          the Presumption of Public Access.................................................................3

    C.    The Documents that Capricor Seeks to Have Sealed.....................................6

CONCLUSION........................................................................................................................6

i

## TABLE OF AUTHORITIES

Page(s)

**CASES**

Commc'ns Workers of Am. v. Rousseau,
   417 N.J. Super. 341 (App. Div. 2010) ...................................................................3

Hammock by Hammock v. Hoffmann-La Roche, Inc.,
   142 N.J. 356 (1995) ..............................................................................................3

**RULES**

N.J. Ct. R. 1:2-1(c)..................................................................................................3

N.J. Ct. R. 1:38-11 ..................................................................................................1

N.J. Ct. R. 1:38-11(b)..............................................................................................3

ii

Plaintiff Capricor Therapeutics, Inc. ("Capricor" or "Plaintiff") hereby respectfully submits this Brief in support of its Motion to File Documents Under Seal pursuant to N.J. Ct. R. 1:38-11.  The documents or portions thereof that Capricor seeks leave to seal are collectively referred to as the "Sealed Materials".

## PRELIMINARY STATEMENT AND BACKGROUND

On May 7, 2026, Capricor commenced the present action by way of Order to Show Cause seeking rescission and injunctive relief concerning the Commercialization and Distribution Agreement dated January 24, 2022 ("Distribution Agreement") that it entered into with Defendant Nippon Shinyaku Co., Ltd. ("Nippon Shinyaku") with regard to the distribution and sale of a breakthrough treatment for Duchenne Muscular Dystrophy ("DMD") known as Deramiocel.

Capricor's Verified Complaint for Equitable Relief, supporting Brief and supporting Certification of Linda Marban and Richard Rieger contain Sealed Materials in the form of references to or exhibited documents that contain proprietary and confidential business information that Capricor is entitled to protect from public disclosures.  Moreover, portions of the Sealed Materials contain references to materials and documents belonging to Defendants that Capricor is obligated to safeguard under the terms of the Distribution Agreement.

By the present motion, Capricor seeks to have the Court seal the Sealed Materials because the disclosure of this information will cause it serious harm.  This includes, but is not limited to, causing Capricor to breach its contractual obligations to Nippon Shinyaku, and potentially revealing Capricor's internal processes, pricing models, and data concerning potential customers that will undermine the profitability of its business.

Moreover, Section 13.3 of the Distribution Agreement requires each party to hold the other party's "Confidential Information" in confidence, to use such information solely for purposes of performance under the agreement, and to restrict disclosure to persons bound by written confidentiality obligations or as compelled by applicable law. "Confidential Information" is defined to include, without limitation, the commercial, financial, technical, regulatory, clinical, and strategic information exchanged between the parties in connection with the commercialization and distribution of Deramiocel. Specifically, Section 13.3.1 defines "Confidential Information" in six subparts that encompass each party's confidential and proprietary information disclosed under the Distribution Agreement, including, in subpart (a), each party's research and development activities, regulatory processes, sales and marketing plans, finances and business forecasts, customer lists, personnel information, and strategic plans, and, in subpart (d), information whose nature or circumstances of disclosure permit a reasonable inference of confidentiality. Section 13.3.2 requires each party, during the term of the Agreement and for seven (7) years after termination, to hold the Disclosing Party's Confidential Information in confidence, not to use it for its own account or for any third party, and not to disclose it to any third party except as specifically permitted or required for performance under the Agreement.

Section 13.3.3 of the Distribution Agreement further attaches as Exhibit E and incorporates by reference the parties' Mutual Nondisclosure Agreement which further restricts disclosure of confidential information exchanged between the parties.

For these reasons, as further set below, the Court should grant the sealing of the Sealed Materials.

## ARGUMENT

### THE MOTION TO SEAL DOCUMENTS SHOULD BE GRANTED SINCE THE DOCUMENTS CONTAIN CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION THAT THE COURTS PROTECT FROM PUBLIC DISCLOSURE

**A.     Motion to Seal Standard**

N.J. Ct. R. 1:2-1(c) provides in relevant part:

> If a proceeding is required to be conducted in open court, no record of any portion thereof shall be sealed by order of the court except for good cause shown, as defined by R[ule] 1:38-11(b), which shall be set forth on the record.

N.J. Ct. R. 1:38-11(b) states that "[g]ood cause to seal a record" exists when:

1. Disclosure will likely cause a clearly defined and serious injury to any person or entity; and

2. The person's or entity's interest in privacy substantially outweighs the presumption that all court and administrative records are open for public inspection to R[ule] 1:38.

Questions concerning the sealing of documents "are addressed to the trial court's discretion." Hammock by Hammock v. Hoffmann-La Roche, Inc., 142 N.J. 356, 380. (1995).  In determining whether to seal a document, the court conducts a "flexible balancing process . . . to determine whether the need for secrecy substantially outweighs the presumption of access."  Id. at 381.  "Documents containing trade secrets, confidential business information and privileged information may be protected from disclosure."  Id. at 376; Commc'ns Workers of Am. v. Rousseau, 417 N.J. Super. 341, 354-358 (App. Div. 2010).

**B.     Capricor Has a Legitimate Privacy Interest That Substantially Outweighs the Presumption of Public Access**

The Sealed Materials satisfy both prongs of N.J. Ct. R. 1:38-11(b).

Capricor's Verified Complaint for Equitable Relief and the documents submitted in support of the Order to Show Cause for a Preliminary Injunction necessarily quote, summarize,

3

contain or rely upon information that the Distribution Agreement describes as protected proprietary and confidential business information falling within the following categories:

a. The pricing terms and economic mechanics of the Distribution Agreement set forth in Exhibit A, and the Distribution Agreement's and other commercially sensitive contractual terms (including exclusivity, performance benchmarks, termination, and dispute-resolution provisions)—and the schedules and exhibits thereto. This category falls within Section 13.3.1(a) (covering, inter alia, "sales and marketing plans," "finances and business forecasts," and "strategic plans") and Section 13.3.1(d) (covering information whose nature or circumstances of disclosure permit a reasonable inference of confidentiality);

b. Non-public correspondence between the parties' senior executives and general counsel—including email and letter communications among the parties' personnel concerning Defendants' launch-readiness performance, the parties' joint commercialization planning, the parties' disagreements over the Distribution Agreement's pricing structure. This category falls within Section 13.3.1(d) and is also subject to MNDA Section 2.2, which prohibits disclosure of the existence, status, or content of the parties' discussions and negotiations;

c. Non-public commercial, regulatory, and pre-launch-readiness information exchanged between the parties pursuant to the Distribution Agreement—including materials presented at, transcripts of, and minutes recorded for the parties' joint committee meetings; draft Target Product Profiles and the parties' written feedback thereon; payor research, AMCP dossier, and provider billing-guide preparation; field sales force, medical affairs, and patient-services planning; the

4

parties' distribution and supply-chain arrangements; and Defendants' personnel and budget plans for Deramiocel commercialization. This category falls within Section 13.3.1(a) (covering, inter alia, "sales and marketing plans," "regulatory processes," "strategic plans," "finances and business forecasts," and "personnel information");

d.  Non-public pricing methodology, demand forecasting, and government-price-reporting analysis derived from the Distribution Agreement's contractual pricing structure—including (i) Defendants' December 2021 presentation and (ii) Capricor's and its expert's analysis of how the Agreement's pricing structure interacts with Medicare Part B Average Sales Price (ASP), Medicaid Average Manufacturer Price (AMP), and best-price reporting requirements. This category falls within Section 13.3.1(a) and Section 13.3.1(d); and

e.  Defendants' April 10, 2026 draft proposed amendment to the Distribution Agreement (the "Proposed Amendment"), which the Distributor identified as Confidential Information of Defendants.

Disclosure of the information contained in the Sealed Materials would cause Capricor serious injury. Its exposure, among other things, could cause Capricor to breach its contractual agreements with the Distributor. Moreover, Capricor will face reputational damage that deters prospective new partners from dealing with it if it fails to protect materials it has agreed should be afforded confidentiality.

Thus, sealing is required to prevent the following harm:

a)  Public disclosure of commercially sensitive information—including pricing methodology, launch-readiness benchmarks, and internal commercial planning—that

5

neither Capricor nor Defendants have disclosed to competitors, payors, the investing public, or third parties, and that could be used to the competitive disadvantage of either party; and

b) Breach by Capricor of its confidentiality obligations under Section 13.3 of the Distribution Agreement and under the Mutual Nondisclosure Agreement, obligations that both parties reasonably expected and relied upon when entering the Agreement.

## C.      The Documents that Capricor Seeks to Have Sealed

Capricor requests that the Court's order seal the following documents and materials: (i) the portions of Capricor's Verified Complaint dated May 7, 2026; (ii) the portions of Capricor's Brief in Support of the Order to Show Cause dated May 7, 2026; (iii) the portions of the Certification of Dr. Linda Marbán dated May 7, 2026; and (iv) the portions of the Certification of Richard Rieger dated May 7, 2026, in each case as identified by redaction in the public versions filed contemporaneously herewith, that disclose Confidential Information protected by Section 13.3 of the Distribution Agreement, the parties' Mutual Nondisclosure Agreement (incorporated as Exhibit E to the Distribution Agreement), and other confidential business information of Capricor or that the Defendants in the categories described above.

## <u>CONCLUSION</u>

For the foregoing reasons, Capricor respectfully requests that the Court grant Plaintiff's Motion to File Documents Under Seal.

6

Dated: May 8, 2026

Respectfully submitted,

**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**

By:    */s/ Andrew Muscato*
       Andrew Muscato

       *Attorneys for Plaintiff*
       *Capricor Therapeutics, Inc.*

7

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

**FILED**

**MAY 1 2 2026**

**NICHOLAS OSTUNI, J.S.C.**

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NS PHARMA, INC., and<br>NIPPON SHINYAKU CO., LTD.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: BERGEN COUNTY<br>Docket No. BER-C-000117-26<br><br>Civil Action<br><br>**ORDER TO SHOW CAUSE FOR<br>PRELIMINARY INJUNCTION PURSUANT<br>TO RULE 4:52** |

This matter being brought before the Court by Andrew Muscato of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Plaintiff Capricor Therapeutics, Inc. ("Plaintiff" or "Capricor"), seeking relief by way of a preliminary injunction at the return date set forth below pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint and accompanying Certifications and the supporting brief filed herewith, and for good cause shown;

It is on this _12TH_ day of May 2026,

**ORDERED** that Defendants NS Pharma, Inc. and Nippon Shinyaku Co., Ltd. (collectively, "Defendants"), appear and show cause before the Honorable _Nicholas Ostuni_ Superior Court of New Jersey, Chancery Division, General Equity Part, Bergen County, at the Bergen County Justice Center, 10 Main Street, Hackensack, New Jersey 07601, at _2 pm_, or as soon thereafter as counsel can be heard, on the _3rd_ day of _June_, 2026 _via Zoom_ why an Order should not be issued preliminarily enjoining and restraining Defendants from:

A. Holding themselves out as the exclusive distributor of Deramiocel (CAP-1002) in the United States;

B. Taking any action, directly or indirectly, to interfere with Plaintiff's efforts to commercialize and distribute Deramiocel in the United States, either directly or through one or more third parties;

C. Enforcing, attempting or purporting to enforce any exclusivity provision of the Commercialization and Distribution Agreement dated January 24, 2022 (the "Agreement") against Plaintiff or against any third party with which Plaintiff seeks to partner for the commercialization or distribution of Deramiocel; and

D. Granting such other relief as the Court deems equitable and just; and it is

**FURTHER ORDERED** that:

1. A copy of this Order to Show Cause, the Verified Complaint, supporting Certifications, the brief, and any other papers submitted in support of this Order to Show Cause shall be served upon Defendants personally, ~~or by such other means as the Court may direct~~, within ___7___ days of the date hereof, in accordance with Rules 4:4-3 and 4:4-4, this being original process.

2. Plaintiff shall file with the Court its proof of service of the pleadings on Defendants no later than three (3) days before the return date.

3. Defendants shall file and serve a written response to this Order to Show Cause and the request for entry of injunctive relief, together with proof of service, by __5|26|26__. The original documents must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, and a courtesy copy of the opposition papers must be delivered directly to the chambers of Judge __Nicholas Ostuni__, whose address is: Bergen County

2

Justice Center, Room 420, 10 Main Street, Hackensack, New Jersey 07601. You must also send a copy of your opposition papers to Plaintiff's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary if you want the Court to hear your opposition to the injunctive relief Plaintiff is seeking.

4.      Plaintiff must file and serve any written reply in further support of the Order to Show Cause by ___6/2/26___. The reply papers must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, and a courtesy copy of the reply papers must be delivered directly to the chambers of Judge _Nicholas Osturc_.

5.      If Defendants do not file and serve an opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Plaintiff files proof of service and a proposed form of order at least three (3) days prior to the return date.

6.      If Plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date must be submitted to the Court no later than three (3) days before the return date.

7.      Defendants take notice that Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written answer to the Complaint and proof of service within thirty-five (35) days from the date of service of this Order to Show Cause, not counting the day you received it. These documents must be filed with the Clerk of the Superior Court in Bergen County through eCourts Civil, along with a filing fee payable to "Treasurer, State of New Jersey." You must also send a copy of your

3

Answer to Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: opposition to this Order to Show Cause is not an Answer, and you must file both. If you do not file and serve an Answer within thirty-five (35) days of this Order, the Court may enter a default against you for the relief Plaintiff demands.

8.    If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in Bergen County and online at njcourts.gov/sites/default/files/forms/10153_deptyclerklawref.pdf.

9.    The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than

_____ days before the return date.

*Nicholas Ostuni*

_____

Honorable

**NICHOLAS OSTUNI, JSC**

4

Andrew Muscato (NJ Atty ID 018661978)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**FILED**

MAY 12 2026

NICHOLAS OSTUNI, J.S.C.

*Attorneys for Plaintiff Capricor Therapeutics, Inc.*

| | |
|---|---|
| CAPRICOR THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NS PHARMA, INC., and <br> NIPPON SHINYAKU CO., LTD., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION: BERGEN COUNTY <br> Docket No. BER-C-000117-26 <br><br><br> Civil Action <br><br> **[PROPOSED] ORDER GRANTING <br> PLAINTIFF'S MOTION TO SEAL** |

THIS MATTER having come before the Court on the motion of Plaintiff Capricor Therapeutics, Inc. ("Capricor"), by its counsel Skadden, Arps, Slate, Meagher & Flom LLP, for an Order sealing certain documents pursuant to Rule 1:38-11; and the Court having considered the papers submitted in support of the motion, and for good cause shown;

IT IS on this 12TH day of May 2026,

ORDERED that Plaintiff's Motion to Seal is hereby GRANTED; and it is further

ORDERED that the following materials shall be filed and maintained under seal:

1. The portions of Capricor's Verified Complaint dated May 7, 2026, the portions of Capricor's Brief in Support of the Preliminary Injunction dated May 7, 2026, the portions of the Certification of Dr. Linda Marbán dated May 7, 2026, and the portions of the Certification of Richard Rieger dated May 7, 2026, in each case as identified

1

by redaction in the public versions filed contemporaneously herewith (the "Pleadings"), that disclose Confidential Information protected by Section 13.3 of the parties' January 24, 2022 Commercialization and Distribution Agreement (and the parties' Mutual Nondisclosure Agreement, incorporated as Exhibit E thereto), namely: (a) the pricing terms and economic mechanics of the Distribution Agreement (including the Transfer Price, Supply Price, and the parties' Net Sales share); (b) the Distribution Agreement's term and other commercially sensitive contractual terms; (c) NS Pharma's December 2021 capability presentation and the financial projections and capability claims contained therein; (d) materials presented at, transcripts of, and minutes recorded for the parties' joint committee meetings; (e) non-public commercial, regulatory, and pre-launch-readiness information exchanged between the parties pursuant to the Distribution Agreement; (f) non-public correspondence related to the Distribution Agreement; and (g) Defendants' April 10, 2026 draft proposed amendment to the Distribution Agreement.

2. The portions of Capricor's Pleadings that include confidential business information of Capricor or that the Defendants assert is confidential business information.

and it is further

ORDERED that any party or member of the public may move to unseal any materials filed under this Order pursuant to R, 1:38-11(c).

_Nicholas Ostuni_

_____

Honorable Nicholas Ostuni, J.S.C.

Opposed _____

Unopposed _✗_

2

BERGEN GENERAL EQUITY
BERGEN COUNTY JUSTICE CENTER
HACKENSACK, NJ 07601-7680



# SUPERIOR COURT OF NEW JERSEY
# BERGEN COUNTY
Telephone: (201) 221-0700

## PROCEEDING DATE SCHEDULED

05/12/2026

CASE CAPTION: CAPRICOR THERAPEUTIC VS NS PHARMA, INC.

CASE NUMBER: BER-C-000117-26

A Show Cause Hearing is scheduled for this case on 06/03/2026 at 02:00 PM. Before Judge NICHOLAS OSTUNI

Please report to: Court Room REMOT.

Contact the court for details on whether the proceeding will be held by video, phone, or paper.





05/12/2026





# ELIGIBLE PARTIES AND/OR ATTORNEYS

ANDREW MUSCATO                          Plaintiff Attorney

NS PHARMA, INC.                         Defendant

NIPPON SHINYAKU CO., LTD.               Defendant





05/12/2026





**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

**CAPRICOR THERAPEUTICS, INC**                                    DOCKET NO.: BER-C-000117-26

                                                                         *Plaintiff*

                            **vs**

**NS PHARMA, INC. and NIPPON SHINYAKU CO., LTD.**

                                                                         *Defendants*

# AFFIDAVIT OF SERVICE

State of New York }
County of New York }  ss.

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in Woodside, New York

That on **5/13/2026** at **12:54 PM** at **140 East Ridgewood Avenue, Suite 280S, Paramus, NJ 07652**

deponent served a(n) **Signed Order to Show Cause for Preliminary Injunction Pursuant to Rule 4:52 with Verified Complaint for Equitable Relief, Brief on Behalf of Plaintiff Capricor Therapeutics in Support of Its Application for a Preliminary Injunction, Certification of Dr. Linda Marban with Exhibits 1-14, Certification of Jonathan Soslow, M.D., M.S.C.I., Certification of Heather Hay, Certification of Elijah J. Stacy, Certification of Aidan Leffler, Certification of Aravindhan Veerapandiyan, M.D., Certification of Richard Rieger, Appendix of Unpublished Cases Cited in Plaintiff Capricor Therapeutics Brief in Support of its Application for a Preliminary Injunction, Notice of Motion to File Documents under Seal, [Proposed] Order Granting Plaintiff's Motion to Seal, Certification of Anthony Bergmann in Support of Motion to Seal, Brief in Support of the Motion of Plaintiff Capricor Therapeutics, Inc. to File Documents under Seal, Signed Order Granting Plaintiff's Motion to Seal, Unredacted - Confidential Documents: Signed Order Granting Plaintiff's Motion to Seal; Signed Order to Show Cause for Preliminary Injunction Pursuant to Rule 4:52; Verified Complaint for Equitable Relief; Certification of Richard Rieger; Brief on Behalf of Plaintiff Capricor Therapeutics in Support of its Application for a Preliminary Injunction; Certification of Dr. Linda Marban with Exhibits 1-14**

on **NS Pharma, Inc.**,

by delivering thereat a true copy of each to **Yuki Kawabata, Manager** personally, who stated that he/she is **authorized to accept service** thereof

Gender: Male
Race: Asian
Hair: Black
Age: 36 - 50 Yrs.
Height: 5' 9" - 6' 0"
Weight: 161 – 200 Lbs.
Other:
Sworn to before me this
15th day of

                                                                 Nicholai Aaron Granados
                                                                 License No.2114994-DCA

NOTARY PUBLIC
YONG SHI LIANG
NOTARY PUBLIC STATE OF NEW YORK
KINGS COUNTY
LIC. # 01LI0007685
COMM EXP. 05/16/2027

Serving By I        Inc. | 18 East 41st Street, Suite 1600 | New York, NY 10017
        New         City Dept. of Consumer Affairs License No. 0761160

**SUPERIOR COURT OF NEW JERSEY**
**CHANCERY DIVISION: BERGEN COUNTY**

**CAPRICOR THERAPEUTICS, INC.**                                    DOCKET NO.: BER-C-000117-26

                                                          *Plaintiff*

                              **vs**

**NS PHARMA, INC. and NIPPON SHINYAKU CO., LTD**

                                                          *Defendants*

# AFFIDAVIT OF SERVICE

State of New York }
County of New York }  ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in Woodside, New York

That on **5/13/2026** at **12:54 PM** at **140 East Ridgewood Avenue, Suite 280S, Paramus, NJ 07652**

deponent served a(n) **Signed Order to Show Cause for Preliminary Injunction Pursuant to Rule 4:52 withVerified Complaint for Equitable Relief, Brief on Behalf of Plaintiff Capricor Therapeutics in Support of Its Application for a Preliminary Injunction, Certification of Dr. Linda Marban with Exhibits 1-14, Certification of Jonathan Soslow, M.D., M.S.C.I., Certification of Heather Hay, Certification of Elijah J. Stacy, Certification of Aidan Leffler, Certification of Aravindhan Veerapandiyan, M.D., Certification of Richard Rieger, Appendix of Unpublished Cases Cited in Plaintiff Capricor Therapeutics Brief in Support of its Application for a Preliminary Injunction, Notice of Motion to File Documents under Seal, [Proposed] Order Granting Plaintiff's Motion to Seal, Certification of Anthony Bergmann in Support of Motion to Seal, Brief in Support of the Motion of Plaintiff Capricor Therapeutics, Inc. to File Documents under Seal, Signed Order Granting Plaintiff's Motion to Seal, Unredacted - Confidential Documents: Signed Order Granting Plaintiff's Motion to Seal; Signed Order to Show Cause for Preliminary Injunction Pursuant to Rule 4:52; Verified Complaint for Equitable Relief; Certification of Richard Rieger; Brief on Behalf of Plaintiff Capricor Therapeutics in Support of its Application for a Preliminary Injunction; Certification of Dr. Linda Marban with Exhibits 1-14**

on **Nippon Shinyaku Co., Ltd.**,

by delivering thereat a true copy of each to **Yuki Kawabata, Manager** personally, who stated that he/she is **authorized to accept service** thereof.

Gender: Male
Race: Asian
Hair: Black
Age: 36 - 50 Yrs.
Height: 5' 9" - 6' 0"
Weight: 161 – 200 Lbs.
Others:
Sworn to before me this
15th day of

                                                          Nicholai Aaron Granados
                                                          License No.2114994-DCA

NOTARY PUBLIC
YONG SHI LIANG
NOTARY PUBLIC STATE OF NEW YORK
KINGS COUNTY
LIC. # 01LI0007685
COMM EXP. 05/16/2027

Serving By Irving, Inc. | 18 East 41st Stree      ite 1600 | New York, NY 10017
New York City Dept. of Consumer      rs License No. 0761160